1   BRIAN J. STRETCH (CABN 163973)
    Acting United States Attorney
2
    DAVID R. CALLAWAY (CABN 121782)
3   Chief, Criminal Division

4   JOSEPH M. ALIOTO JR. (CABN 215544)
    Assistant United States Attorneys
5
        1301 Clay Street, Suite 340S
6       Oakland, California 94612
        Telephone: (510) 637-3680
7       Fax: (510) 637-3724
        Joseph.Alioto@usdoj.gov
8
    Attorneys for United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                         OAKLAND DIVISION
12

13  UNITED STATES OF AMERICA,          )  Case No. CR 12-00792 YGR
                                        )
14         Plaintiff,                   )  COMPENDIUM OF AUTHORITIES
                                        )
15      v.                              )  RE: UNITED STATES' OPPOSITION TO
                                        )  DEFENDANT'S MOTIONS TO LIMIT OR
16  HENRY CERVANTES, et al.,            )  EXCLUDE GANG EXPERT EVIDENCE
                                        )
17         Defendants.                  )
                                        )
18  _____    )

19      The United States respectfully submits this Compendium of Authorities cited in Government's

20  Consolidated Opposition to Defendant Henry Cervantes and Alberto Larez's Motions to Limit or

21  Exclude Gang Expert Evidence (doc. 785).

22  Dated: November 17, 2015                    Respectfully submitted,

23                                              BRIAN J. STRETCH
                                                Acting United States Attorney
24

25                                               /s/ Joseph M. Alioto Jr.
                                                _____
26                                              Joseph M. Alioto, Jr.
                                                Assistant United States Attorney
27

TABLE OF CONTENTS

Ex. A   *United States v. Vasquez*, 03-CR-851-ADS (E.D.N.Y. May 20, 2009) (agent was qualified as gang expert based on "information obtained at conferences, surveil[l]ance, MS-13 literature, interviews with gang members and victims," and agent's conclusions were "product of a 19-year career in law enforcement, not a particular set of documents that can be easily produced").

Ex. B   *United States v. Cyrus*, 05-CR-0324-MMC (N.D. Cal. Mar. 25-26, 2009) (gang expert testimony included opinions that certain criminal acts – including "shoot[ing] someone who was a known, cooperating federal witness," or "shooting somebody who was messing around with another gang member's girlfriend" – would enhance a gang member's reputation and standing within the gang).

Ex. C   *United States v. Slocum*, 02-CR-938-DOC (C.D.Cal. Feb. 6, 2007) (denying *Daubert* hearing and permitting gang expert testimony on history, structure, rules, and other enterprise evidence of organization).

Ex. D   *United States v. McIntosh*, 02-CR-938-VAP (C.D. Cal. Nov. 27, 2007) (gang expert testimony on origins, purpose, structure, symbols, and membership did not violate Rule 403).

Ex. E   *United States v. Cerna*, 08-CR-730-WHA (N.D. Cal Apr. 6, 2011 Rptr. Tr.) (Transcript of trial testimony of Mario Molina testifying about gang's history, territory, symbols, tattoos, graffiti and code words).

Ex. F   *United States v. Uvino*, 07-CR-725-JBW (E.D.N.Y. Dec. 3, 2008) (trial testimony demonstrating that post-*Mejia*, Second Circuit district courts continue to permit broad gang expert testimony on origins, existence, history, structure, rules, rituals, operations, and activities of racketeering enterprise).

Ex. G   *United States v. Prisco*, 08-CR-885-NRB (S.D.N.Y. Apr. 14, 2009) (same)

Ex. H   *United States v. Rubi-Gonzales*, 03-CR-851-ADS (E.D.N.Y. July 16, 2009) (after reversal in *Mejia*, the district court, over defendants' objections, permitted expert testimony on history,

1    structure, symbols, rules, practices, tattoos, etc. in retrial of *Mejia* defendants).

2    Ex. I    *United States v. Castro*, 03-CR-851-ADS (E.D.N.Y. Sept. 29, 2009) (same).

3    Ex. J    *United States v. Castro*, 03-CR-851-ADS (E.D.N.Y. Sept. 15, 2009) (in bench ruling, Judge

4    Splatt recognized *Mejia* and concluded that the broad ranging gang expert testimony of Agent

5    Tariche still admissible).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

UNITED STATES OF AMERICA,

-against-

DAVID VASQUEZ and LEDWIN CASTRO,

Defendants.

-------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
03-CR-851 (ADS)

**APPEARANCES:**

**BENTON J. CAMPBELL, UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK**
610 Federal Plaza
Central Islip, New York 11722
    By: Richard Donohue, Assistant United States Attorney
       John Durham, Assistant United States Attorney

**LORNA GOODMAN, NASSAU COUNTY ATTORNEY**
One West St
Mineola, N.Y. 11501
    By: Tatum J. Fox, Deputy County Attorney

**ROBERT LARUSSO, ESQ.**
Attorney for Defendant David Vasquez
300 Old Country Rd., Suite 341
Mineola, N.Y., 11501

**LAW OFFICE OF PETER J. TOMAO**
Attorney for Defendant Ledwin Castro
226 Seventh Street, Suite 302
Garden City, NY 11530
    By: Peter J. Tomao, Esq., Of Counsel

**SPATT, District Judge.**

Defendant Ledwin Castro ("Castro") has moved for an order directing the Government to provide: (1) the bases for FBI Special Agent Reynaldo Tariche's anticipated expert testimony; (2) the identities of individuals related to three homicides allegedly committed pursuant to the charged racketeering enterprise; and (3) any additional documents that the Government intends to use in its case-in-chief at least 30 days prior to trial. Also pending before the Court are motions by the Government and Nassau County, a non-party in this action, to quash a subpoena seeking the production of documents pertaining to the above-mentioned homicides.

## I. BACKGROUND

Castro and his co-Defendant David Vasquez ("Vasquez") (collectively "the Defendants") are charged with conspiracy to commit assault with a dangerous weapon in aid of racketeering activity, 18 U.S.C. § 1959(a)(6), assault with a dangerous weapon in aid of racketeering activity, 18 U.S.C. § 1959(a)(3), and the discharge of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1). These charges stem from the Defendants' alleged participation in two drive-by shootings in Nassau County on June 18, 2003.

### A. The Drive-By Shootings

The Defendants are both admitted members of MS-13, a nationwide criminal gang organized into local subunits referred to as "cliques." Vasquez was a member of a Long Island clique headed by Castro known as the Freeport Locos Salvatruchas.

2

The evidence at the first trial showed that, on the night of the shootings, the

Defendants and two other MS-13 gang members, Ralph Admettre and Nieves

Argueta, drove to a laundromat in Hempstead to search for members of SWP, a rival

gang.  From a van parked in a gas station parking lot across the street, Vasquez

opened fire on a crowd outside the laundromat, wounding Ricardo Ramirez and

Douglas Sorto.

Less than an hour later, the Defendants, Admettre and Nieves traveled to a

delicatessen in Freeport where they encountered a group of young black men that they

believed to be members of the Bloods, another rival gang.  At Vasquez's urging,

Nieves shot Carlton Alexander seven times in the back.  Despite being struck by

multiple gunshots, Alexander survived.  The Defendants, Admettre and Nieves were

arrested by the Nassau County Police Department approximately one month after the

shootings.

## B.  The Indictment and Trial

On June 23, 2005, a federal grand jury returned a superseding indictment

against six MS-13 members including, among others, the Defendants, Admettre and

Nieves.  Prior to trial, United States District Judge Leonard Wexler severed the

charges against Castro and Vasquez from the charges against several of their co-

Defendants.  The Defendants' remaining co-defendants pleaded guilty to assault and

3

Admettre pleaded to the conspiracy charge and to using a firearm during a crime of

violence.  However, Castro and Vasquez proceeded to trial on July 19, 2005.

At the trial, the Government called Hector Alicea, an officer with the New

York State Police, to provide expert testimony with regard to MS-13.  In particular,

Alicea testified to MS-13's history, structure, and modes of communication.  The

Government also called the three shooting victims, Admettre, and another co-

defendant to testify against the Defendants.  In addition, the Government offered into

evidence telephone records, the gun used in the shootings, ballistics reports, and the

Defendants' post-arrest confessions.  On July 26, 2005, a jury found both of the

Defendants guilty on all counts.

**C.  The Decision of the Second Circuit**

On October 6, 2008, the Second Circuit vacated the Defendants' convictions

and remanded the case to the District Court finding that Alicea's testimony violated

the Confrontation Clause of the Sixth Amendment and Fed. R. Evid. 703 because

Alicea had taken out of court statements obtained from MS-13 members during

custodial interrogations and conveyed the substance of those statements to the jury.

United States v. Mejia, 545 F.3d 179, 199 (2d Cir. 2008).  The Court concluded that,

under the circumstances, Alicea was "simply summarizing an investigation by others

that [was] not part of the record and presenting it in the guise of an expert opinion."

Id. (internal quotation marks and citations omitted).  The Court found that admitting

4

Alicea's testimony was not harmless error because his testimony beared heavily on the material issues of whether MS-13 was an enterprise and whether the gang had engaged in acts and threats of murder. Id. at 200.

**D.  The Re-Trial of the Defendants**

At the re-trial, the Government will be required to prove, among other things, that MS-13 was a racketeering enterprise within the meaning of 18 U.S.C. § 1959(b)(1) and 18 U.S.C. § 1961(1).  In particular, the Government will have to show that MS-13 was involved in acts and threats of murder.  To that end, the Government intends to prove that MS-13 members planned and carried out the homicides of Damian Corrente, Jaime Figueroa, and Dagoberto Ramos, prior to committing the assaults charged in this case.  In order to establish that MS-13 is a racketeering enterprise, the Government will also rely, at least in part, on the expert testimony of FBI Special Agent Reynaldo Tariche.

## II.  DISCUSSION

**A.  The Motions to Quash**

Fed. R. Crim. P. 17(c)(1) provides, in pertinent part, that a "subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates."  Under Rule 17(c)(2), courts enjoy the discretion to quash or modify a subpoena where "compliance would be unreasonable or oppressive."

Case 2:03-cr-00851-ADS    Document 391-2    Filed 05/07/2010    Page 6 of 20

On April 3, 2009, counsel for Castro served a subpoena on the Nassau County Police Department, seeking any and all records, including witness statements, that pertained to the homicides of Damian Corrente and Jaime Figueroa. At oral argument on these motions, counsel for Castro expanded his request to include any and all records pertaining to the homicide of Dagoberto Ramos. Nassau County has moved to quash that portion of the subpoena which seeks witness statements on the ground that such a request is prohibited by Rule 17(h). Nassau County has also sought to quash that portion of the subpoena which requests documents related to the Corrente homicide on the ground that these materials are protected by the law enforcement privilege.

The Government has moved to quash the subpoena in its entirety. In particular, the Government contends that the subpoena requests privileged information and, in any event, fails to meet the requirements of Rule 17. With respect to the Government's motion, Castro contends, as a preliminary matter, that the Government lacks standing to quash a subpoena served on a third-party.

### 1. Whether the Government Has Standing

The Court must determine, as a threshold matter, whether the Government has standing to challenge Castro's subpoena. Generally, "a party whose legitimate interests are affected by a subpoena may move to quash that subpoena." United States v. Nektalov, 2004 WL 1574721, at *1 (S.D.N.Y. 2004) (collecting cases). One

6

important question that Courts have considered in deciding the issue of standing is "whether the subpoenaed party joins in the Government's motion to quash." Id. (collecting cases).

Here, the Court finds that the Government has standing to challenge the subpoena because, at least in part, Nassau has joined in their application and the Government has a legitimate interest in preventing Castro from using a subpoena to obtain discovery materials that would otherwise be protected from disclosure. See United States v. Louis, 2005 WL 180885, at *5 (S.D.N.Y. Jan. 27, 2005) (finding that the Government had standing to quash a subpoena served on the Port Authority where, among other things, the federal prosecution arose out of a Port Authority investigation and the Port Authority joined the Government in seeking to quash the subpoena).

The Court also notes that, regardless of the parties' standing, the Court has an independent duty to review the propriety of the subpoena - a duty in this case that requires the Court to consider whether the documents sought are privileged and whether the subpoena itself comports with the requirements of Rule 17. See United States v. Khan, 2009 WL 152582, at *6 (E.D.N.Y. Jan. 20, 2009) (citing United States v. Weissman, 2002 WL 31875410, at *1 n. 1 (S.D.N.Y. Dec. 26, 2002)) (noting that "[r]egardless of the government's standing, the court has a duty to ensure that subpoenas are issued only for proper purposes and that they are in compliance with Rule 17.").

7

### 2. Whether the Subpoena Comports with the Requirements of Rule 17

Both the Government and Nassau County challenge whether Castro's subpoena comports with the requirements of Rule 17. In order to address this issue, a brief review of the interplay between Rules 16 and 17 of the Federal Rules of Criminal Procedure is necessary.

Pre-trial discovery in criminal cases is largely governed by Rule 16. Louis, 2005 WL 180885, at *2. Courts have been careful to point out that Rule 17(c), by contrast, should not be construed as a broad discovery device. See United States v. Cherry, 876 F. Supp. 547, 552 (S.D.N.Y. 1995) (citing United States v. Marchisio, 344 F.2d 653, 669 (2d Cir. 1965)). However, Rule 17(c) does permit a defendant to obtain *evidentiary* material prior to trial. See United States v. RW Professional Leasing Services Corp., 228 F.R.D. 158, 161 (E.D.N.Y. 2005) (citing United States v. Nixon, 418 U.S. 683, 698-99, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974)) (observing that "[t]he purpose of rule 17(c) is not to facilitate discovery, but to enable a party to obtain and inspect evidentiary material prior to trial."). The Court "assesses and controls the extent to which [Rule 17] is used in a good-faith effort to obtain evidence 'by its power to rule on motions to quash and modify.'" Louis, 2005 WL 180885, at *3 (quoting Bowman Dairy Co v. United States, 341 U.S. 214, 219, 71 S. Ct. 675, 95 L. Ed. 879 (1951)).

8

In deciding whether to quash or modify a subpoena, courts are guided by the factors set forth in United States v. Nixon. 418 U.S. 683, 94 S. Ct. 3090; 41 L. Ed. 2d 1039 (1974).  Under the Nixon factors, a party seeking the production of the documents must demonstrate that the materials are: (1) relevant; (2) admissible; (3) specifically identified; and (4) not otherwise procurable.  Id. at 699-670.  "In order to meet its burden, the proponent has to show that the documents sought are both relevant and admissible at the time of the attempted procurement."  RW Professional Leasing Services Corp., 228 F.R.D. at 162 (citing United States v. Marchisio, 344 F.2d 653, 669 (2d Cir. 1965), and United States v. Jenkins, 2003 WL 1461477, at *4 (S.D.N.Y. Mar. 21, 2003)).

First, the documents sought here by Castro are relevant. The Government has acknowledged that in order to show that MS-13 is a racketeering enterprise, it intends to prove that its members carried out the Corrente, Figueroa, and Ramos homicides. The subpoena seeks information about these homicides that would shed light on the dispositive issue of whether MS-13 had any role in these crimes.  Second, the Court is satisfied that some of the documents requested—police reports, reports of scientific evaluations, criminal records, and case worksheets—may be admissible at trial. However, Castro has failed to carry his burden to show that the requested witness statements would be admissible at trial.  See Cherry, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) (citing Marchisio, 344 F.2d at 669) ("In this respect, Rule 17(c) can be

contrasted with the civil rules which permit the issuance of subpoenas to seek

production of documents or other materials which, although not themselves

admissible, could lead to admissible evidence."). Moreover, if the statements sought

were made by individuals the Government intends to call as witnesses at the trial, then

even if they were admissible Castro would still not be entitled to them now because

Rule 17(h) expressly precludes a party from subpoenaing a witness statement.

Accordingly, the motions to quash Castro's request for witness statements are granted.


With respect to the third Nixon factor, the Court finds that Castro's subpoena

identifies the documents sought with sufficient particularity. See RW Professional

Leasing Services Corp., 228 F.R.D. at 162 ("When determining whether a request for

documents is specifically identified, the proponent must show that the subpoena is

being used to obtain relevant evidence and not merely as a 'fishing expedition' to

expand discovery."). Here, Castro has confined his request to documents pertaining

only to the three homicides that are central to the Government's case. See id. (citing

In re Grand Jury Subpeona, 1992 WL 142014, at *7 (E.D.N.Y. 1992)) (observing that

a "request is generally sufficiently specific where it limits documents to a reasonable

period of time and states with reasonable particularity the subjects to which the

documents relate."). Finally, these documents are not otherwise procurable without a

subpoena because they are in the sole possession of the Nassau County Police

Department.

Although Castro has satisfied the <u>Nixon</u> factors and therefore shown that his

subpoena comports, at least in part, with the requirements of Rule 17, the Court must

still determine whether the documents sought are nevertheless subject to the law

enforcement privilege.

### 3. Whether the Law Enforcement Privilege Applies

The purpose of the law enforcement privilege is "to prevent disclosure of law

enforcement techniques and procedures, to preserve the confidentiality of sources, to

protect witness and law enforcement personnel, to safeguard the privacy of individuals

involved in an investigation, and otherwise to prevent interference with an

investigation." <u>In re Dep't of Investigation of City of New York</u>, 856 F.2d 481, 484

(2d Cir. 1988). It is settled law that in asserting the law enforcement privilege, a party

carries the burden to set forth "those facts that are the essential elements of the

privileged relationship." <u>In re Grand Jury Subpoena Dated Jan. 4, 1984</u>, 750 F.2d

223, 224-25 (2d Cir. 1984).

Here, Nassau County claims that the documents sought in connection with the

Corrente homicide are subject to the law enforcement privilege because, among other

reasons, this case is still the subject of an open investigation. In particular, Nassau

County contends that producing these documents would expose law enforcement

11

techniques used in the investigation, deter witnesses from cooperating, and expose
confidential sources. Nassau County also notes that Castro's request is particularly
inappropriate because he has already received, among other materials, autopsy reports,
ballistics reports, and post-arrest statements relating to the Corrente homicide through
Rule 16 discovery. Although Nassau County has indicated its willingness to produce
documents related to the Figueroa and Ramos homicides, the Government appears to
contend that the law enforcement privilege also applies to these materials.

The Court declines to adopt a per se rule that a subpoena may not issue for
documents contained in the files of an ongoing police investigation. However, Nassau
County has offered several compelling reasons why certain documents in the Corrente
homicide file are subject to the law enforcement privilege. Although Nassau County
appears not to be concerned that producing the Figueroa and Ramos documents carries
the same risks, the Government argues—and the Court recognizes—that the privilege
may apply to these documents as well. However, given that these documents could
play an important role in Castro's defense, the Court finds it appropriate to conduct an
in camera review to determine which of these documents, if any, are privileged.
Accordingly, Nassau County is directed to provide the Court with any documents in
the Corrente, Figueroa, and Ramos homicide files that are responsive to Castro's
subpoena. The motions to quash are held in abeyance until the Court has had an
opportunity to conduct an in camera review.

12

**B. Castro's Discovery Motion**

Castro has moved for an order directing the Government to provide: (1) the bases for FBI Special Agent Reynaldo Tariche's anticipated expert testimony; (2) the identities of witnesses related to the Corrente, Figueroa, and Ramos homicides; and (3) any additional documents that the Government intends to use in its case-in-chief at least 30 days prior to trial.   The Court will address each of these requests in turn.

**1. Expert Disclosures**

Rule 16(a)(1)(G) requires the Government to produce a written summary of expert testimony that it intends to offer during its case-in-chief.  In particular, the Rule provides that this summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  The Second Circuit has explained that expert disclosure "is intended to minimize [the] surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  United States v. Cruz, 363 F.3d 187, 196 n.1 (2d Cir. 2004) (quoting United States v. Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997)).

13

Here, the Government indicates that Special Agent Tariche will testify that:
(1) MS-13 is a street gang that originated in Central America and later spread
throughout the United States with members largely of Central American descent; (2)
MS-13 is divided into subunits referred to as cliques and that members hold clique and
inter-clique meetings referred to as "universals"; (3) MS-13 members use certain
handsigns and wear blue and white to signify membership; (4) MS-13 members
communicate primarily in Spanish; (5) MS-13 has cliques on Long Island who have
violent rivalries with other Long Island gangs; and (6) within MS-13, the word
"chevala" is a derogatory term for a rival gang member. Castro is satisfied that the
Government has adequately set forth Tariche's qualifications and the substance of his
putative testimony. However, Castro contends that the Government has failed to
offer the bases and reasons for his conclusions. The Court disagrees.

In two letters, dated January 22, 2009 and April 1, 2009, the Government
explained that Tariche has analyzed and relied upon various sources during the course
of his career—information obtained at conferences, surveillance, MS-13 literature,
interviews with gang members and victims—in reaching the conclusions he will
present to the jury. Under the circumstances, this description of the bases for
Tariche's testimony is sufficient. The conclusions Tariche has drawn about MS-13
are the product of a 19-year career in law enforcement not a particular set of
documents that can be readily produced. The information the Government has

14

provided to Castro regarding the bases for Tariche's testimony is sufficient to give Castro a fair and adequate opportunity to challenge Tariche's expert testimony in a Daubert motion. 509 U.S. 579 (1993). Accordingly, Castro's motion for an order directing the Government to provide more details about the bases of Tariche's expert testimony is denied.

### 2. The Identities of Individuals Related to the Corrente, Figueroa and Ramos Homicides

Castro contends that the Government has failed to disclose the identities and whereabouts of witnesses related to the Corrente, Figueroa, and Ramos homicides. Castro seeks an order compelling the Government to provide unredacted copies of discovery materials already provided so that he can determine the identities of these witnesses. In particular, Castro requests that the Court order the Government to unredact: (1) the name of the individual who was driving Figueroa when he was shot; (2) the names of three MS-13 gang members who were arrested for possession of the Figueroa murder weapon; (3) the name and home address of the mother of Herbert Chacon, a member of MS-13; and (4) the home address of Chacon's co-defendant, Pedro Rosales.

The parties acknowledge that Rule 16 neither authorizes nor forbids the disclosure of witness identities. See United States v. Bejasa, 904 F.3d 137, 139 (2d Cir. 1990) (noting that Rule 16 does not require the Government to provides the names and addresses of its witnesses). However, Castro requests that the Court

15

exercise its discretion to compel such disclosure.  See United States v. Cannone, 528 F.2d 296 (2d Cir. 1975) (holding that the District Court has the discretion to compel the Government to disclose the identities of witnesses the Government intends to call at trial).  Castro contends that learning the identities and whereabouts of these individuals is essential to his trial preparation and will allow him to develop evidence relating to whether the homicides were part of the charged RICO enterprise.

It is not evident to the Court whether the Government even intends to call these individuals at the trial.  The Court notes that they were not called at the first trial.  Should they call these individuals as witnesses at the trial, the Government has assured both Castro and the Court that it will disclose their identities in advance of the trial.  However, even if the Court assumes that the Government will call each of these individuals as witnesses at the trial, Castro has still failed to convince the Court that disclosure of their identities is necessary at this stage.

In Roviaro v. United States, 353 U.S. 53, 60-61, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957), the Supreme Court held that "[w]here the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the [informant's] privilege must give way."  The Court elaborated that in weighing whether an informant's identity should be revealed in advance of trial, courts should "[balance] the public interest in protecting the flow of information against the individual's right to prepare his defense."  Id. at 62.  In

16

balancing these competing interests, courts may consider "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." United States v. Jackson, 345 F.3d 59, 70 (2d Cir. 2003) (quoting Roviaro, 353 U.S. at 62). Generally, a defendant is able to establish that disclosure is proper where the defendant shows that "'informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence.'" United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988) (quoting United States v. Russotti, 746 F.2d 945, 950 (2d Cir. 1984)).

As noted above, it is not clear to the Court that any of the individuals whose identities Castro seeks will be witnesses at the trial. Indeed, it is not even clear that all of these individuals may be properly characterized as informants. In any event, Castro has made an insufficient showing that they would be key witnesses or that their putative testimony would be significant in determining Castro's guilt. On the other hand, given the nature of the crimes charged and the fact that the Defendants are admitted members of a violent gang, the Court perceives a genuine risk in requiring the present disclosure of these individuals' identities and locations.

Under the circumstances of this case, the conclusory argument that Castro needs the identities of these individuals in order to prepare for trial is not sufficient. See United States v. Flaharty, 295 F.3d 182, 202 (2d Cir. 2002) (quoting United States v. Fields, 113 F.3d 313, 324 (2d Cir. 1997)) ("Speculation that disclosure of the

17

informant's identity will be of assistance is not sufficient to meet the defendant's burden."); Cannone, 528 F.2d 296 (2d Cir. 1975) (refusing to order the Government to disclose the identities of trial witnesses where the defendant offered only a conclusory claim that such disclosure was necessary for the defense's trial preparation). Accordingly, Castro's motion for an order directing the Government to presently disclose the identities and whereabouts of individuals related to the Corrente, Figueroa, or Ramos homicides is denied.

### 3. Discovery Deadline

Castro is already in possession of all Rule 16, Brady, Giglio, and Jencks Act, 18 U.S.C. § 3500, materials from the original trial. However, because the Government intends to offer new evidence related to the Corrente, Figueroa, and Ramos homicides, Castro moves for an order directing the Government to provide any additional documents that it intends to use in its case-in-chief or any documents material to the Defendants' trial preparation at least thirty days prior to the trial. Castro also appears to request the production of any new Brady material within the same timeframe.

"The overwhelming majority of district courts, in accord with Second Circuit authority, favor the view that 'it is within a district court's authority to direct the Government to identify [prior to trial] the documents it intends to rely on in its case in chief.'" United States v. Vilar, 530 F. Supp. 2d 616, 639 (S.D.N.Y. 2008) (quoting

18

United States v. Giffen, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004)).  Here, with four months until the scheduled trial date of September 14, 2009, the Government acknowledges that discovery is already largely complete with respect to any new materials pertaining to the Corrente, Figueroa, and Ramos homicides.  Under the circumstances, the Court sees no reason for the Government not to produce and identify all the documents it intends to use in its case-in-chief at least 30 days in advance of trial.

To the extent that the Government has already uncovered new Brady material, it should also be disclosed at least 30 days prior to the trial.  See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001) (holding that due process requires the Government to disclose Brady materials in time for its effective use at trial).  Of course, this order should not be understood to exclude the admission of any evidence that the Government obtains after the discovery deadline, provided the Government promptly discloses such evidence to the Defendants.

### III.  CONCLUSION

The motions by Nassau County and the Government to quash that portion of Castro's subpoena seeking statements by witnesses to the Corrente and Figueroa homicides are **GRANTED**.

Nassau County is directed to provide the Court with any and all documents in the Corrente, Figueroa, and Ramos homicide files that are

responsive to Castro's subpoena, within ten days of the date of this Order, so that

the Court may conduct an in camera review of those documents to determine

whether they are protected by the law enforcement privilege.

      Castro's motion for additional information pertaining to the bases for

Tariche's expert testimony is **DENIED**.

      Castro's request for an order compelling the Government to immediately

disclose the identities and whereabouts of individuals related to the Corrente,

Figueroa, and Ramos homicides is **DENIED**.

      The Government is directed to disclose any Brady material and all

documents it intends to use in its case-in-chief at least 30 days prior to the trial.

**SO ORDERED.**

Dated: Central Islip, New York
      May 20, 2009


                     *Arthur D. Spatt*
                     Arthur D. Spatt
            United States District Judge

Exhibit B

VOLUME 30

PAGES 6218 - 6421

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY

UNITED STATES OF AMERICA,  )
                            )
            PLAINTIFF,      )
                            )
     VS.                    )    NO. CR 05-0324 MMC
                            )
DENNIS CYRUS, JR.           )
                            )    SAN FRANCISCO, CALIFORNIA
            DEFENDANT.      )    WEDNESDAY, MARCH 25, 2009
_____)

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR THE GOVERNMENT:        JOSEPH P. RUSSONIELLO
                           UNITED STATES ATTORNEY
                           450 GOLDEN GATE AVENUE
                           SAN FRANCISCO, CALIFORNIA  94102
                   BY:  WILLIAM FRENTZEN, ESQUIRE
                        ROBERT DAVID REES, ESQUIRE


FOR THE DEFENDANT:         LAW OFFICES OF JAMES S. THOMSON
                           819 DELAWARE STREET
                           BERKELEY, CALIFORNIA  94710
                   BY:  JAMES S. THOMSON, ESQUIRE


                   LAW OFFICES OF JOHN T. PHILIPSBORN
                           507 POLK STREET, SUITE 350
                           SAN FRANCISCO, CALIFORNIA  94102
                   BY:  JOHN T. PHILIPSBORN, ESQUIRE


REPORTED BY:  JOAN MARIE COLUMBINI, CSR, RPR
              KATHERINE WYATT, CSR, RMR
              OFFICIAL REPORTER, U.S. DISTRICT COURT

PEAGLER - DIRECT/REES

1   A.   IN MY OPINION, IN MY EXPERIENCE THESE ARE THE ONLY

2   LOCATIONS, THE ECONOMICALLY-DEPRESSED POCKETS, OR PUBLIC

3   HOUSING AREAS OF SAN FRANCISCO ARE THE ONLY AREAS THAT I HAVE

4   OBSERVED BLACK STREET GANGS OPERATE, IF THAT'S YOUR QUESTION.

5   Q.   OKAY. AND JUST TO GET SOMETHING CLEAR, IS EVERYBODY WHO

6   LIVES IN ONE OF THESE LOW INCOME HOUSING PROJECTS PART OF A

7   GANG, STREET GANG THAT MIGHT BE ASSOCIATED WITH THAT HOUSING

8   COMPLEX?

9   A.   ABSOLUTELY NOT.  THE MAJORITY ARE NOT INVOLVED.

10   Q.   I GUESS WE'VE ALREADY ESTABLISHED THIS, BUT DO THE GANGS

11   THEMSELVES, THOUGH, TEND TO BE ASSOCIATED WITH A PARTICULAR

12   HOUSING AREA OR A LOW INCOME OR COOPERATIVE AREA?

13   A.   YES, THOSE AREAS IN MY EXPERIENCE ARE GANG TURF, WHAT YOU

14   WOULD CALL GANG TERRITORY, YES.

15   Q.   NOW, YOU JUST MENTIONED THE TERMS "TURF" AND "TERRITORY."

16   ARE STREET GANGS, IN YOUR OPINION, SUCH AS PAGE STREET GANG,

17   ARE TERRITORIAL?

18   A.   YES.  AND I'M RESTRICTED TO, I BELIEVE, SAN FRANCISCO. BUT

19   MY KNOWLEDGE GOES BEYOND SAN FRANCISCO. BUT IN SAN FRANCISCO

20   THEY ARE, AND OUTSIDE OF SAN FRANCISCO THEY ARE.

21   Q.   WELL, LET'S JUST STAY LIMITED TO STREET GANGS IN SAN

22   FRANCISCO. YOUR OPINION IS IS THAT THEY TEND TO BE TERRITORIAL;

23   IS THAT WHAT YOU'RE SAYING?

24   A.   YES.

25   Q.   OKAY. AND DO THEY REGARD THEIR TERRITORY AS A TURF, FOR

1    EXAMPLE?

2    A.    YES.

3    Q.    AND IS IT SOMETHING TO BE PROTECTED?

4    A.    YES.

5    Q.    LET'S MOVE ON TO, I GUESS, MAYBE GENERAL PRINCIPLES OF

6    THESE STREET GANGS, SUCH AS PAGE STREET GANG THAT YOU'RE

7    OFFERING OPINION ON.

8            IN YOUR OPINION, DO THESE TYPES OF STREET GANGS

9    OPERATE UNDER A KIND OF A COMMON SET OF PRINCIPLES OR A

10   PHILOSOPHY?

11   A.    YES.

12   Q.    WHAT WOULD BE THE MAIN TENETS OF SUCH A PHILOSOPHY, OR

13   OPERATING PHILOSOPHY PRINCIPLES?

14   A.    SOME OF THE MAIN TENETS WOULD BE THAT A MEMBER, A STREET

15   GANG MEMBER OR RELATED ASSOCIATE MUST BE RESPECTED, GUARD AND

16   CONTINUOUSLY MAINTAIN A RESPECT IN THE EYES OF -- PRETTY MUCH

17   IN THE EYES OF HIS PEERS AND OTHERS.

18           THERE'S A PHILOSOPHY OF YOU MUST MAINTAIN AND HAVE A

19   REPUTATION, A STREET REPUTATION. AND MOST OF THE TIME THAT

20   REPUTATION, IN MY OPINION, IS ENHANCED THROUGH VIOLENCE AND

21   THERE'S -- IF -- THE PHILOSOPHY IS REVENGE.

22           IF YOUR REPUTATION OR THAT REPUTATION OF THAT GANG

23   REPUTATION OR YOU'RE DISRESPECTED, REVENGE MUST BE EXACTED.

24   THAT'S A PHILOSOPHY OR A PRINCIPLE, IF YOU WILL.

25           IT WAS ALREADY MENTIONED EARLIER, THE CODE OF

1    SILENCE. BASICALLY, NEVER EVER COOPERATE WITH LAW ENFORCEMENT,

2    LAW ENFORCEMENT INVESTIGATIONS, WITH THE EXCEPTION OF, WHICH

3    WE'RE ALL AWARE, IS IF ALLEGATIONS OF MISCONDUCT BY LAW

4    ENFORCEMENT OFFICIALS OR CRIMINAL ACTS BY LAW ENFORCEMENT

5    OFFICIALS, THERE'S NO PROBLEM WITH BREAKING THAT CODE UNDER

6    THOSE SET OF CIRCUMSTANCES.

7    Q.    RESPECT, REPUTATION, REVENGE AND A CODE OF SILENCE.  IS

8    THAT YOUR TESTIMONY OF THE MAIN FOUR OPERATING PRINCIPLES OF

9    STREET GANGS, SUCH AS PAGE STREET GANG IN SAN FRANCISCO?

10   A.    THOSE WOULD BE FOUR, YES.

11   Q.    LET'S GET INTO SOME SPECIFICS ABOUT THESE PRINCIPLES AND

12   HOW THEY ACTUALLY TRANSLATE INTO SPECIFIC ACTION BY MEMBERS OF

13   STREET GANGS IN SAN FRANCISCO.

14         YOU FIRST MENTIONED RESPECT.  CAN YOU GIVE US SOME

15   INSIGHT INTO HOW AN EFFORT TO GAIN RESPECT OR AVOID DISRESPECT

16   ACTUALLY TRANSLATES INTO A GANG MEMBER'S ACTIONS ON THE STREET?

17         MR. PHILIPSBORN:  OBJECTION, YOUR HONOR.  I THINK THE

18   FOUNDATION WAS LAID SO AS TO COMPLY WITH COURT'S DIRECTIVE, BUT

19   NOW, I MEAN, THIS IS JUST SAYING IN GENERAL.

20         THE COURT:  WELL, LET ME TAKE A LOOK AT THE QUESTION.

21         MR. PHILIPSBORN:  OBJECTION, RELEVANCE AND 403.

22         THE COURT:  I THINK I HAVE TO ASK THE REPORTER.

23   THAT'S ONE OF THOSE QUESTIONS I CAN'T READ WITHOUT ASKING THE

24   REPORTER.

25         (THEREUPON, THE RECORD WAS READ BACK AS FOLLOWS:

1    A.   ABSOLUTELY, YES.

2    Q.   FOR EXAMPLE, CAN EXACTING REVENGE ENHANCE A REPUTATION?

3    A.   YES.

4    Q.   LET'S NOW MOVE ON TO THE LAST KIND OF GUIDING PRINCIPLE

5    YOU TALKED ABOUT, THIS CODE OF SILENCE.   HOW DOES THAT WORK IN

6    PRACTICE?

7    A.   WELL, THE CODE OF SILENCE, IT'S NOT A NEW PHENOMENON. YOU

8    JUST DO NOT COOPERATE WITH LAW ENFORCEMENT. IT COULD -- THE

9    EASY WAY TO DESCRIBE IT IS THERE'S A HIERARCHY ON THE STREETS

10   OR IN THE GANG LIFESTYLE.   THE TOP OF THAT HIERARCHY IS GOING

11   TO BE YOUR KILLER, YOUR COP KILLER.   AT THE BOTTOM OF THAT IS

12   GOING TO BE YOUR CRACK ADDICT AND YOUR SNITCH.

13           THAT'S NOT A PHRASE I NORMALLY USE.   IT'S A COMMONLY

14   UNDERSTOOD PHRASE.   BUT IT'S INFORMANTS, SOURCES.   SO THAT'S

15   PRETTY MUCH MY ANSWER.

16   Q.   AND JUST TO GIVE A LITTLE BIT MORE DETAIL, WHAT IS A

17   SNITCH?

18   A.   SNITCH IS AN INFORMANT, POLICE.   WHEN I FIRST CAME IN ONE

19   OF THE -- I ASKED A MENTOR OF MINE:

20           "HOW DO I BE A GOOD COP OR A GOOD CORRECTIONAL

21           OFFICER, A GOOD DEPUTY?"

22           AND THE ANSWER WAS:

23           "YOU MUST HAVE INFORMANTS."

24           TO UNDERSTAND, TO GET INFORMATION, TO INVESTIGATE

25   CASES YOU HAVE TO HAVE INFORMANTS.

VOLUME 31

PAGES 6422 - 6620

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY

UNITED STATES OF AMERICA,      )
                               )
          PLAINTIFF,           )
                               )
  VS.                          )   NO. CR 05-0324 MMC
                               )
DENNIS CYRUS, JR.              )
                               )   SAN FRANCISCO, CALIFORNIA
          DEFENDANT.           )   THURSDAY, MARCH 26, 2009
_____)


## TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

FOR THE GOVERNMENT:      JOSEPH P. RUSSONIELLO
                         UNITED STATES ATTORNEY
                         450 GOLDEN GATE AVENUE
                         SAN FRANCISCO, CALIFORNIA  94102
                BY:  WILLIAM FRENTZEN, ESQUIRE
                     ROBERT DAVID REES, ESQUIRE


FOR THE DEFENDANT:       LAW OFFICES OF JAMES S. THOMSON
                         819 DELAWARE STREET
                         BERKELEY, CALIFORNIA  94710
                BY:  JAMES S. THOMSON, ESQUIRE

                         LAW OFFICES OF JOHN T. PHILIPSBORN
                         507 POLK STREET, SUITE 350
                         SAN FRANCISCO, CALIFORNIA  94102
                BY:  JOHN T. PHILIPSBORN, ESQUIRE


(FURTHER APPEARANCE ON FOLLOWING PAGE)

REPORTED BY:   JOAN MARIE COLUMBINI, CSR, RPR
               KATHERINE WYATT, CSR, RMR
               OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

1          **BRIAN PEAGLER**

2    HAVING BEEN CALLED AS A WITNESS BY THE GOVERNMENT WAS

3    PREVIOUSLY DULY SWORN AND EXAMINED FURTHER AS FOLLOWS:

4          **MR. REES:**  THANK YOU, YOUR HONOR.

5          **DIRECT EXAMINATION BY MR. REES (RESUMED)**

6    **BY MR. REES**

7    **Q**   YESTERDAY, INSPECTOR PEAGLER, WE TALKED ABOUT RESPECT,

8    REPUTATION, REVENGE, AND THE CODE OF SILENCE, AND HOW THOSE

9    GENERAL PRINCIPLES AFFECT AND MOTIVATE STREET GANGS IN SAN

10   FRANCISCO SUCH AS THE ONE YOU'VE IDENTIFIED AS PAGE STREET GANG.

11   I'D LIKE NOW TO TURN TO SOME OF THE ACTUAL ACTIVITIES OF THE

12   GANG AS A GROUP.

13          WHAT, IF ANYTHING, DOES A PARTICULAR STREET GANG IN

14   SAN FRANCISCO DO AS A GROUP?

15   **A**   AS A GROUP STREET GANG, PRIMARILY, TRAFFICKING NARCOTICS IS,

16   IN MY EXPERIENCE, IS THE MAIN TASK OF BLACK STREET GANGS IN SAN

17   FRANCISCO.

18   **Q**   AND THE STREET GANGS THAT WE HAVE BEEN TALKING ABOUT, IS A

19   COMMON PURPOSE TO TRAFFIC IN NARCOTICS IN A PARTICULAR AREA?

20   **A**   YES.

21   **Q**   CAN YOU DESCRIBE THAT?

22   **A**   WELL, THE STREET GANGS -- EXCUSE ME, PARTICULARLY PAGE

23   STREET, THEY TRAFFIC THEIR NARCOTICS ON THEIR TURF.  IN MY

24   EXPERIENCE, NO ONE WHO IS -- IF YOU'RE NOT AFFILIATED OR RELATED

25   OR ASSOCIATED WITH THAT GROUP, YOU DO NOT TRAFFIC NARCOTICS IN

1    THAT AREA THAT WE DISCUSSED YESTERDAY.

2    Q    AND AS A GROUP, IF SOMEBODY DID ATTEMPT TO TAKE -- TO SELL

3    NARCOTICS IN THEIR TURF, WOULD MEMBERS OF A STREET GANG IN SAN

4    FRANCISCO TAKE SOME COORDINATED ACTION WITH RESPECT TO THAT?

5    A    YES.

6    Q    WHAT WOULD THAT BE?

7    A    WELL, I'VE ACTUALLY TESTED THAT MYSELF IN ACTUALITY, WAS

8    WORKING AS AN UNDERCOVER, AND COMING ON TURF AND STANDING THERE.

9    AND, ACTUALLY, WHAT HAPPENS IS YOU GET APPROACHED, THEY'LL ASK

10   YOU WHAT ARE YOU DOING HERE, AND ESSENTIALLY TELL YOU, GET OFF

11   THIS BLOCK.  AND, NORMALLY, IT WOULD BE MORE THAN ONE PERSON.

12   Q    WITH RESPECT TO NARCOTICS TRAFFICKING, IS THERE ANY SHARING

13   OF THE PROFITS GENERALLY WITH THE STREET GANGS THAT WE HAVE BEEN

14   DISCUSSING?

15   A    WELL, NOT IN AS WE WOULD SEE, WELL, WE'VE MADE THIS PROFIT

16   FROM THIS AMOUNT OF NARCOTICS, AND, HERE, LET'S EQUALLY SHARE

17   THIS MONEY.

18            THE MONEY IS SHARED IN VARIOUS WAYS.  IT CAN BE

19   SHARED BY -- IF AN INDIVIDUAL IS INCARCERATED, THEY COULD GET

20   TOGETHER BAIL MONEY FOR THAT INDIVIDUAL.  IF AN INDIVIDUAL IS

21   INCARCERATED, MONEY COULD BE PUT ON THAT INDIVIDUAL'S BOOKS.

22   THEY CAN GO BUY FOOD FOR EACH OTHER.

23            YOU KNOW, LIKE WE TALKED ABOUT WITH YOUR REPUTATION.

24   IF YOUR SHOES AREN'T RIGHT, THEY MIGHT GET TOGETHER, HERE'S SOME

25   MONEY FOR THOSE SHOES.  AS WE ALL KNOW, NIKES ARE VERY EXPENSIVE

1          WOULD IT HELP A GANG MEMBER'S REPUTATION, OR COULD BE

2     PERCEIVED TO HELP THEIR REPUTATION, IF THEY SHOT SOMEBODY WHO

3     REFUSED TO GIVE THEM ACCESS TO THEIR WEAPONS?

4     A.   YES. YES.

5     Q.   WOULD IT HELP A GANG MEMBER'S REPUTATION, OR COULD IT BE

6     PERCEIVED TO HELP A GANG MEMBER'S REPUTATION TO SHOOT SOMEBODY

7     WHO WAS MESSING AROUND WITH ANOTHER GANG MEMBER'S GIRLFRIEND?

8     A.   YES.

9     Q.   COULD IT HELP A GANG MEMBER'S REPUTATION, OR COULD IT BE

10    PERCEIVED TO HELP A GANG MEMBER'S REPUTATION, TO SHOOT A PERSON

11    WHO HAD ARGUED WITH THEM AND DISPUTED WITH THEM ABOUT WHAT THE

12    PROPER TURF THAT THEY COULD SELL DRUGS IN WAS?

13    A.   YES. NOW, AUDIENCE PLAYS A ROLE IN THAT PERCEPTION. IT WOULD

14    BE BENEFICIAL IF OTHERS WITNESSED IT.

15    Q.   IF OTHERS HAD SEEN THIS DISRESPECT?

16    A.   YES.

17    Q.   WOULD IT HELP A GANG MEMBER'S REPUTATION, OR WOULD IT BE

18    PERCEIVED TO HELP A GANG MEMBER'S REPUTATION, TO SHOOT SOMEONE

19    WHO WAS A KNOWN, COOPERATING FEDERAL WITNESS?

20    A.   YES.

21    Q.   EVEN IF ANY ONE OF THESE HYPOTHETICALS WASN'T NECESSARILY

22    OVERALL GOOD FOR THE GROUP, COULD IT NONETHELESS BE GOOD FOR THE

23    SHOOTER'S REPUTATION?

24    A.   ABSOLUTELY.

25    Q.   AND IF A PERSON DIDN'T HAVE ANY PARTICULAR REPUTATION, DO

Exhibit C

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,        )    CASE NO. CR 02-938 (E) DOC

12                Plaintiff(s),        )

13            v.                       )

14   6) RONALD BOYD SLOCUM;            )    O R D E R RE: DEFENDANT
     13) WAYNE BRIDGEWATER;            )    HOUSTON'S MOTION TO EXCLUDE
15   31) HENRY MICHAEL HOUSTON,        )    THE GOVERNMENT'S GANG EXPERT
                                       )    TESTIMONY AND FOR A PRETRIAL
16                Defendant(s).        )    DAUBERT HEARING AS TO THE
                                       )    ADMISSIBILITY OF SUCH
17                                     )    TESTIMONY
                                       )
18   _____  )
                                       )
19                                     )

20        This matter is before the Court on Defendant Houston's Motion to Exclude the

21   Government's Gang Expert Testimony and for a Pretrial Daubert Hearing as to the Admissibility

22   of Such Testimony.  On January 26, 2007, the government designated Danine Adams, an

23   employee of the Federal Bureau of Prisons, as an expert witness.  *See* Fed. R. Evid. 16(a)(1)(E).

24   The government also indicated that it may later designate additional expert witnesses.  Mr.

25   Houston challenges the proffered testimony of Ms. Adams and requests a pretrial hearing to

26   examine the proffered testimony and determine its relevance, reliability, and possible unfair

27   prejudice.  After considering all of the papers filed in support of and in opposition to the motion,

28   as well as the oral arguments of the parties, the Court DENIES the motion IN PART, GRANTS

1 | the motion IN PART, and RESERVES ruling IN PART until trial.

2 | **I.    Standard**

3 | Rule 702 of the Federal Rules of Evidence provides:

4 | If scientific, technical, or other specialized knowledge will assist the trier of fact to

5 | understand the evidence or to determine a fact in issue, a witness qualified as an

6 | expert by knowledge, skill, experience, training, or education, may testify thereto

7 | in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

8 | facts or data, (2) the testimony is the product of reliable principles and methods,

9 | and (3) the witness has applied the principles and methods reliably to the facts of

10 | the case.

11 | Rule 702 imposes a "gatekeeping" obligation on the courts to ensure that expert

12 | testimony is relevant and reliable. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579,

13 | 589 (1993). This gatekeeping function applies to all types of expert testimony, not simply

14 | scientific expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999).

15 | The "admissibility of expert opinion testimony generally turns on the following preliminary

16 | question of law determinations by the trial judge under FRE 104(a).

17 | . Whether the opinion is based on scientific, technical, or other specialized knowledge;

18 | . Whether the expert's opinion would assist the trier of fact in understanding the

19 | evidence or determining a fact in issue;

20 | . Whether the expert has appropriate qualifications - i.e., some special

21 | knowledge, skill, experience, training or education on that subject matter.

22 | . Whether the methodology or technique the expert uses 'fits' the conclusions . . .

23 | . Whether its probative value is substantially outweighed by the risk of unfair

24 | prejudice, confusion of issues, or undue consumption of time."

25 | *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (internal citations omitted).

26 | **II.    Request for Pretrial Hearing**

27 | Mr. Houston requests that the Court conduct a pretrial hearing to examine the proffered

28 | expert testimony in detail and determine its admissibility. However, the Ninth Circuit has

1    expressly held that no such hearing is required. *See United States v. Alatorre*, 222 F.3d 1098,

2    1099 (9th Cir. 2000). In *Alatorre*, the Ninth Circuit upheld the trial court's decision not to hold

3    a pretrial hearing to determine the admissibility of expert testimony. There, the court noted that

4    the trial court had allowed the defense counsel "to question the government's proffered expert at

5    trial, in the presence of the jury, via voir dire." *Id.* Comparing the voir dire conducted during

6    trial with voir dire conducted at a pretrial hearing, the court stated "in terms of the trial court's

7    'gatekeeping' responsibility as to admissibility of this type of experiential expert testimony, we

8    see no significant difference . . . ." *Id.* at 1104.

9        Likewise, this Court believes that a pretrial hearing is unnecessary in this case. Counsel

10   for Defendants will be permitted to question the Government's expert witnesses during trial

11   regarding their qualifications and whether their proffered testimony is relevant, reliable, and

12   based on an accepted methodology. Moreover, as Ms. Adams already testified in the trial of Mr.

13   Houston's co-defendants Barry Mills and Tyler Bingham, the parties and the Court have the

14   benefit of knowing much of what Ms. Adams intends to testify to in this trial. As indicated

15   below, the Court has used Ms. Adams prior testimony to define generally what testimony will

16   and will not be admissible in this trial. Therefore, the Court DENIES Mr. Houston's request for

17   a pretrial hearing and RESERVES ruling on the qualifications, relevance, and reliability of the

18   expert witnesses until trial as well as the related issue of prejudice under Federal Rule of

19   Evidence 403.[1]

20   _____

21       [1]At trial, the Court will address Mr. Houston's argument that Ms. Adams does not

22   qualify as an expert since, as he alleges, "[m]ost of her knowledge has come from her
     own criminal investigation or administrative investigation in this case and not on any

23   particular expertise on the subject," Motion at 7, and because "Adams' methods lack any
     of the traditional expert techniques in forming or testing hypotheses." Reply at 2.

24   "Under Rule 702, the proffered expert must establish that reliable principles and methods

25   underlie the particular conclusions offered . . . ." *United States v. Hermanek*, 289 F.3d
     1076 (9th Cir. 2002). However, it is worth noting now that, to the extent Mr. Houston's

26   challenges are to gang or criminal enterprise expert testimony in general, the Ninth

27   Circuit has upheld the use of such testimony. *See United States v. Valencia-Amezcua*,
     278 F.3d 901, 908 (9th Cir. 2002) ("[I]t is commonplace that expert testimony regarding

28   the structure of criminal enterprises is admissible to help the jury assess a defendant's

3

1    **III.    Allowable Testimony**

2              Though the Court reserves ruling on the exact scope of allowable testimony until defense

3    counsel has questioned the expert witness at trial, some of Mr. Houston's additional arguments

4    can be discussed now.

5              Mr. Houston objects that Ms. Adams will testify as both a fact witness and an expert

6    witness, so that her testimony may introduce hearsay into the fact witness testimony.  Mr.

7    Houston makes the related argument that Ms. Adams is likely to stray from the scope of her

8    expertise and testify to her own opinion about lay matters.[2]  To the extent Mr. Houston may be

9    arguing that a witness may never testify both as a fact witness and as an expert witness, the

10   Court notes that the Ninth Circuit has already upheld the use of such testimony.  *See United*

11   *States v. Alonso*, 48 F.3d 1536, 1540-42 (9th Cir. 1995) (holding that the trial court did not abuse

12   its discretion in allowing law enforcement officers to testify as experts to the significance of

13   activities that they personally observed the defendant engage in).

14             Expert witnesses are allowed to rely on certain types of hearsay in forming their opinions.

15   *See* Fed. R. Evid. 703 ("If [the facts or data underlying the expert opinion are] of a type

16   reasonably relied upon by experts in the particular field in forming opinions or inferences upon

17   the subject, the facts or data need not be admissible in evidence in order for the opinion or

18   inference to be admitted.").  However, a witness that testifies both as a fact witness and as an

19   expert witness may rely on hearsay only for the expert witness portion of his or her testimony.

20   *See United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2001) ("the government has cited no

21   case and we have found none, in which a court has permitted a witness to rely on hearsay for

22   non-expert testimony simply because that witness was also qualified to rely on hearsay for other,

23   _____

24   involvement in that enterprise."); *Hankey*, 203 F.3d 1160 (upholding the admission of
     gang expert testimony).

25

26             [2] In particular, Mr. Houston objects to any testimony by Ms. Adams regarding the
     interpretation of the August 28, 1997 phone call between Defendant Slocum and Al

27   Benton which Mr. Houston contends consists only of "plain language that [is] not code or
     slang" that is "merely susceptible of different interpretations by lay people . . . ." Motion

28   at 9.

4

1    expert testimony."); Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness'

2    testimony in the form of opinions or inferences is limited to those opinions or inferences which

3    are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding

4    of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific,

5    technical, or other specialized knowledge . . . ."). The Court will closely monitor the testimony

6    of Ms. Adams, if it is admitted, to ensure that her fact testimony is not based on inadmissible

7    evidence and to limit her expert testimony to truly expert matters. Ms. Adams, and any other

8    expert witness, shall not testify to the interpretation of evidence that simply involves plain

9    language or is otherwise not properly the subject of expert testimony. For example, Ms. Adams,

10   and other expert witness, shall not testify as to the interpretation of the August 28, 1997 phone

11   call from Defendant Slocum to Al Benton. As to this portion of the proffered testimony, Mr.

12   Houston's motion is GRANTED.

13        Mr. Houston also argues that the dual nature of Ms. Adams' testimony may cause her fact

14   witness testimony to be viewed with the cachet of an expert. If the distinction between fact and

15   expert testimony becomes blurred at any point during the testimony, the Court may instruct the

16   jury regarding the differences between fact and expert testimony and may limit the witness'

17   testimony to avoid confusion.

18   \ \ \

19   \ \ \

20   \ \ \

21   \ \ \

22   \ \ \

23   \ \ \

24   \ \ \

25   \ \ \

26   \ \ \

27   \ \ \

28   \ \ \

**IV.   Conclusion**

For the foregoing reasons, Mr. Houston's request for a pretrial hearing is DENIED, his motion is RESERVED until trial to the extent it seeks to exclude the testimony of expert witnesses, and his motion is GRANTED to the extent it seeks to limit expert testimony on lay matters.

IT IS SO ORDERED.

DATED: February 6, 2007

_David O. Carter_

DAVID O. CARTER
United States District Judge

# Exhibit D

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

| Case No. | CR 02-938 (A) VAP | Date | November 27, 2007 |
|---|---|---|---|

Present: The Honorable    Virginia A. Phillips, United States District Judge

Interpreter

| Marva Dillard | Phyllis Preston | Stephen Wolfe |
|---|---|---|
| Deputy Clerk | Court Reporter/Recorder, Tape No. | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| David Michael Sahakian Richard Scott McIntosh Carl Edgar Knorr, Jr. | NO | X | | Burton H. Shostak, Joseph L. Green, Charles M. Rogers, Richard G. Novak, Dariel R. Schattnik, Richard H. Sindel | NO | X | |

Proceedings:    Minute Order Granting in Part and Denying in Part Motion to Exclude Expert Witness Designation

## I.    Introduction

On September 30, 2007 Defendant Richard Scott McIntosh filed a "Motion to: (1) Compel Expert Discovery; (2) For Evidentiary Hearing Re: Admissibility of Expert Opinion Evidence" ("McIntosh Mot."). Defendant Carl Edgar Knorr, Jr. joined the McIntosh Motion on October 17, 2007. Defendant McIntosh filed his Reply ("McIntosh Reply") on October 29, 2007.

On October 1, 2007 Defendant David Michael Sahakian filed a "Motion to Exclude the Government's Designation of Danine Adams and Shelby Montgomery as Expert Witnesses Concerning the Subject Matter Detailed in Their Resumes Provided to the Defense on September 4, 2007 and for a Pretrial Daubert Hearing as to the Admissibility of Such Testimony" ("Sahakian Mot."). Defendants Richard Scott McIntosh and Carl Edgar Knorr Jr. joined the Sahakian Motion on October 8, 2007 and October 17, 2007, respectively.

On October 1, 2007 Defendant Carl Edgar Knorr, Jr. filed a "Motion of Carl E. Knorr, Jr. To Exclude the Government's Gang Expert Testimony and for a Pretrial Daubert Hearing as to the Admissibility of Such Testimony" ("Knorr Mot."). Defendant Richard Scott McIntosh joined the Motion on October 8, 2007. Defendant Knorr filed his Reply ("Knorr Reply") on October 29, 2007. Defendant Sahakian joined in the Knorr Reply on October 30, 2007.

The Government filed its consolidated Opposition ("Opp'n") on October 22, 2007 with respect to all three Motions ("Motions"). Defendants Sahakian, McIntosh and Knorr's ("Defendants'") Motions came before this Court for hearing on November 15, 2007. After reviewing and considering all papers filed in support of, and in opposition to, the Motions, as well as the arguments advanced by counsel at the hearing, the Court **GRANTS in PART and DENIES in PART** Defendants' Motions.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

## II.    Discussion

On September 4, 2007, the Government designated Danine Adams and Shelby Montgomery, both employees of the Federal Bureau of Prisons, as expert witnesses pursuant to Fed. R. Evid. 16(a)(1)(E). Defendants challenge the proffered testimony of Adams and Montgomery and request a pretrial hearing to examine the proffered testimony and determine its relevance, reliability, and possible unfair prejudice.

## A.    Legal Standard for Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Fed. R. Evid. 702 ("Rule 702"), which states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 589 (1993), provided further guidance, holding that Rule 702 imposes a "gatekeeping" obligation on the courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." The Supreme Court in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-149 (1999) expanded the gatekeeping obligation of the courts, holding that it is not limited to scientific expert testimony, but applies to all expert testimony. Further, the Supreme Court held, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. at 152.

The Ninth Circuit in United States v. Hankey, 203 F.3d 1160 (9th Cir. 2000), set forth the following "preliminary questions" under Fed. R. Evid. 104(a) to analyze the admissibility of expert opinion testimony pursuant to the principles set forth in Daubert and Kumho Tire:

- Whether the opinion is based on scientific, technical, or other specialized knowledge;
- Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;
- Whether the expert has appropriate qualifications - i.e., some special knowledge, skill, experience, training or education on that subject matter[;]
- Whether the testimony is relevant and reliable[;]
- Whether the methodology or technique the expert uses 'fits' the conclusions . . .[;]
- Whether its probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

Id. at 1168 (internal citations omitted).

## B.    Defendants' Request for a Pretrial Hearing

Defendants request that the Court conduct a pretrial hearing to examine the proffered expert testimony in detail and determine its admissibility under the rules discussed above. [Sahakian Mot. at 23-24; McIntosh Mot. at 10; Knorr Mot. at 13.] The Ninth Circuit has expressly held that a pretrial hearing is not required for a

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

trial court properly to discharge its gatekeeping function under Daubert. See United States v. Alatorre, 222 F.3d 1098, 1099 (9th Cir. 2000). In Alatorre, the Ninth Circuit upheld the trial court's decision not to hold a pretrial hearing to determine the admissibility of expert testimony. Id. at 1105. The Alatorre court held that the trial court, by permitting defendant "to conduct a lengthy voir dire" during trial and ruling "on the relevance and reliability of [the expert's] testimony. . . fulfilled its duty to make a determination as to the reliability of the expert's testimony." Id.

Nevertheless, a pretrial hearing would be helpful in determining the expertise of these witnesses, at least with respect to Adams, who is expected to testify extensively for the Government; Montgomery's testimony is expected to be quite limited. Counsel for Defendants will have the opportunity during a pretrial hearing to explore the qualifications, relevance, reliability, and any undue prejudice resulting from the proffered testimony of Adams. Moreover, Counsel for Defendants will have the opportunity to question Adams on her specific methodology used in forming their expert opinions. After such pretrial hearing, the Court will rule on the qualifications, relevance, and reliability of Adams as well as the related issue of prejudice under Fed. R. Evid. 403. Counsel for Defendants shall have the opportunity to similarly question Montgomery at the time of trial, outside the presence of the jury. The Court will rule on Montgomery's qualifications, relevance, and reliability as well as the related issue of prejudice under Fed. R. Evid. 403 at that time.

**C.     Defendants' Arguments Regarding Allowable Testimony.**

Although the Court reserves its ruling on the precise scope of allowable expert testimony until the time of the pretrial hearing, some of Defendants' arguments regarding the admissibility of the proffered testimony can be addressed here.

**1.     Can the Government's Expert Witnesses Testify Both as Fact and Expert Witnesses?**

Defendants contend that "[t]he fact that Adams and Montgomery and the other witnesses will be testifying both as lay and expert witnesses causes great concern regarding the scope of admissible testimony permitted under the Rules of Evidence." [Sahakian Mot. at 5.] Further, Defendants argue that "[i]f the opinions are largely based on the witnesses's investigation of this case then it should not be permitted under the guise of 'expert' testimony as fact witnesses generally are not permitted to give opinion testimony or base their testimony on hearsay or other inadmissible evidence." [Id.]

Defendants contend the testimony of Danine Adams in the earlier trials of co-defendants Barry Mills and Tyler Bingham illustrate the prejudice that can result from this type of testimony. [Sahakian Mot. at 13.] In that case, Adams was permitted to testify about Aryan Brotherhood ("AB") activities; in particular, she testified regarding communications sent from Tyler Bingham to Al Benton through Ronald Slocum which allegedly resulted in the murders at Lewisburg. [Sahakian Mot. at 13-19.] Adams was allowed to testify as to her interpretations of the communications, i.e., that the murders at Lewisburg were committed in furtherance of the AB enterprise. [Id.] Upon questioning by the court, she testified that she based her opinion on her interview of Kevin Roach, an inmate informant. [Id.]

Defendants assert that the communication in question was in "plain language that was not code or slang" but "merely susceptible of different interpretations by lay people." Therefore, Defendants contend, Adams's interpretation of the communications was a lay opinion "based on her snitch interviews," not expert opinion. [Id.]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

The Government responds that "while it is true that the proposed experts will provide both factual and expert testimony, this does not negate their ability to testify as an expert witness." [Opp'n at 12.] Moreover, the Government asserts "Ms. Adams and Ms. Montgomery are allowed to rely on evidence which would otherwise be inadmissible in rendering [their] opinions, specifically hearsay obtained from interviews of cooperating witnesses." [Opp'n at 15 (citing Hankey, 203 F.3d at 1169 (an expert may base an opinion on inadmissible evidence, including hearsay, as long as it is the kind that is reasonably relied upon in that expert's field))].

Precedent in the Ninth Circuit clearly establishes that a witness may testify both as a fact witness and as an expert witness. See United States v. Alonso, 48 F.3d 1536, 1540-42 (9th Cir. 1995) (holding that the trial court did not abuse its discretion in allowing law enforcement officers to testify as experts to the significance of activities that they personally observed the defendant engage in). Moreover, expert witnesses are allowed to rely on certain types of hearsay in forming their opinions. See Fed. R. Evid. 703 ("If [the facts or data underlying the expert opinion are] of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").

In contrast, a witness who testifies both as a percipient and an expert witness may only rely on hearsay for the expert witness portion of his or her testimony. See United States v. Dukagjini, 326 F.3d 45, 58 (2d Cir. 2001) ("the government has cited no case and we have found none, in which a court has permitted a witness to rely on hearsay for non-expert testimony simply because that witness was also qualified to rely on hearsay for other, expert testimony."); Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge. . .").

At trial, the Government's expert witnesses will not be allowed to testify on factual matters based on inadmissible evidence. The Government is cautioned that any overlap of fact testimony and expert testimony based on inadmissible evidence offered by the Government's expert witnesses will result in the exclusion of both the fact and expert testimony. Furthermore, the Court will instruct the jury at the time the witness testifies regarding the distinction between opinion testimony from a witness qualified to give expert testimony, and testimony based on a witness's observations. Defense counsel is invited to prepare a special instruction for the Court's consideration.

## 2.    Is the Proposed Expert Testimony Impermissibly Prejudicial to Defendants?

Defendants argue that a jury "attaches a heightened credibility to the testimony of a qualified expert which risks bolstering the fact-based testimony of the same witness." [Sahakian Mot. at 21; Knorr Mot. at 8-9.] Defendants further argue that such confusion by the jury could lead to inmate informants being "vouched" for by the expert testimony. [Sahakian Mot. at 22; Knorr Mot. at 13.] Defendants contend this is precisely what happened in the trial of co-defendants Mills and Bingham where Adams, through her stature as an expert, "was allowed to perform the ultimate courtroom alchemy — turning raw snitch sewage into prosecution gold." [Sahakian Mot. at 22.]

Defendants' arguments, while colorful, are unpersuasive. Fed. R. Evid. 403 provides:

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES - GENERAL

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If the Court finds that the probative value of the Government's expert witness testimony outweighs the danger of unfair prejudice, such testimony will be excluded. If the Court finds that the jury is possibly being misled or confused by the expert witness testimony, the Court may instruct the jury regarding the differences between fact and expert testimony or some other limiting instructions to cure the prejudice. See Hankey, 203 F.3d 1160, 1173; United States v. Tsinnijinnie, 91 F.3d 1285, 1289 (9th Cir.1996); United States v. Rubio-Villareal, 927 F.2d 1495, 1503 (9th Cir.1991).

**D.     Defendants' Arguments Regarding "Validation."**

Defendants contend that the Government's designated expert witnesses may testify that Defendants are "validated member[s]" of the Aryan Brotherhood ("AB"). [McIntosh Mot. at 3; Knorr Mot. at 10.] The phrase "validated member" is "a term of art employed by the Federal Bureau of Prisons ("BOP") to refer to an inmate who the BOP has determined, through its own internal protocols, is a member of a prison gang or other 'disruptive group.'" [Id. at 7; Id. at 11.]

Defendants contend "[t]he government has failed, to date, to provide [Defendants] with discovery related to the BOP's 'validation' of his membership in the AB "required under Rule 16 of the Federal Rules of Criminal Procedure as well as Rules 702 and 703 of the Federal Rules of Evidence. [Id. at 4; Id. at 10.] Defendants assert any testimony that Defendants are "validated member[s]" of the AB should be precluded or, in the alternative, should be the subject of an evidentiary hearing. [Id; Id.]

Defendants contend that the issue of "validation" is of "critical significance" to Count Eight, the murder of Terry Walker, alleged against them in the First Superceding Indictment. [McIntosh Mot. at 9.] Count Eight charges Defendants with committing a violent crime in aid of racketeering ("VICAR") in violation of 18 U.S.C. § 1959(a)(1). Defendants argue that, in order to obtain a conviction under a VICAR count, "the government must prove, in addition to other elements, that Mr. McIntosh killed Mr. Walker for the purpose of promoting his position within the Aryan Brotherhood." [Id. (citing United States v. Vasquez-Velasco, 15 F.3d 833, 842, (9th Cir. 1994); United States v. Bracy, 67 F.3d 1421, 1429 (9th Cir. 1995))].

Finally, Defendants argue that whether or not the Government is ultimately able to produce BOP documents which conclude that Defendants are validated members of the AB, any expert opinion must first be tested against the factors set out in Hankey. [Id. at 10.]

The Government concedes that it has not produced the "validation" discovery for Defendants and asserts that it will produce the "validation" discovery as soon as it is able. [Opp'n at 17-18.] It contends that the "validation" discovery was first requested from the BOP on September 4, 2007 and several subsequent requests have been made since that date. [Id. at 21-22.] As to Defendants McIntosh and Knorr, the Government is ordered to turn over the "validation packet" no later than November 30, 2007. In the event the documents consisting of the "validation packet" are not disclosed to the defense by that date, the Government may not use them in its prosecution of this case.

Although the Government argues that an evidentiary hearing is unnecessary as it does not dispute that if

# Exhibit E

VOLUME 7

PAGES 1604 - 1820

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM ALSUP

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>PLAINTIFF, )<br>)<br> VS. )<br>)<br>MARVIN CARCAMO, )<br>ANGEL NOEL GUEVARA, MORIS )<br>FLORES, GUILLERMO HERRERA, )<br>JONATHAN CRUZ-RAMIREZ, )<br>WALTER CRUZ-ZAVALA, )<br>ERICK LOPEZ, )<br>)<br>DEFENDANTS. )<br>)<br>_____ ) | <br><br><br><br><br><br><br><br><br><br> NO. CR 08-0730 WHA<br><br> SAN FRANCISCO, CALIFORNIA<br> WEDNESDAY, APRIL 6, 2011 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:            MELINDA L. HAAG
                         UNITED STATES ATTORNEY
                         450 GOLDEN GATE AVENUE, BOX 36055
                         SAN FRANCISCO, CALIFORNIA  94102
                    BY:  **WAI WILSON LEUNG, AUSA**
                         **WILLIAM FRENTZEN, AUSA**

FOR PLAINTIFF:            DEPARTMENT OF JUSTICE
                         CRIMINAL, GANG UNIT
                         950 PENNSYLVANIA AVE., N.W., ROOM 6646
                         WASHINGTON, DC 20005
                    BY:  **THERYN GALE GIBBONS**, **TRIAL ATTORNEY**

(APPEARANCES CONTINUED ON NEXT PAGE)

**REPORTED BY: JOAN MARIE COLUMBINI, RPR, CSR #5435**
          **KATHERINE POWELL SULLIVAN, RPR, CRR, CSR #5812**

**APPEARANCES (CONTINUED):**


FOR DEFENDANT            **KOUROSH KEN BEHZADI, ESQUIRE**
MARVIN CARCAMO:          2467 VIA DE LOS MILAGROS
                         PLEASANTON, CALIFORNIA  94566


FOR DEFENDANT            **LUPE MARTINEZ, ESQUIRE**
ANGEL NOEL GUEVARA:      1010 WEST TAYLOR STREET
                         SAN JOSE, CALIFORNIA  95126


                         **JENNIFER LYNN NAEGELE, ESQUIRE**
                         P.O. BOX 12375
                         SAN FRANCISCO, CALIFORNIA  94112


FOR DEFENDANT            **MARK ROSENBUSH, ESQUIRE**
MORIS FLORES:            214 DUBOCE AVENUE
                         SAN FRANCISCO, CALIFORNIA  94103


FOR DEFENDANT            LAW OFFICES OF MARTIN SABELLI
GUILLERMO HERRERA:       149 NATOMA STREET, 3RD FLOOR
                         SAN FRANCISCO, CALIFORNIA  94105
                    BY:  **MARTIN ANTONIO SABELLI, ESQUIRE**


FOR DEFENDANT            **JOHN TIMOTHY PHILIPSBORN, ESQUIRE**
JONATHAN CRUZ-RAMIREZ:   507 POLK STREET, SUITE 350
                         SAN FRANCISCO, CALIFORNIA 94102


                         LAW OFFICE OF SUSAN RAFFANTI
                         483 NINTH STREET, SUITE 200
                         OAKLAND, CALIFORNIA  94607
                    BY:  **SUSAN MARIE RAFFANTI, ESQUIRE**


FOR DEFENDANT            **RANDY SUE POLLOCK, ESQUIRE**
WALTER CRUZ-ZAVALA:      2831 TELEGRAPH AVENUE
                         OAKLAND, CALIFORNIA 94609


FOR DEFENDANT            LAW OFFICE OF PETER GOODMAN
ERICK LOPEZ:             400 MONTGOMERY STREET, 2ND FLOOR
                         SAN FRANCISCO, CALIFORNIA 94104
                    BY:  **PETER GOODMAN, ESQUIRE**


ALSO PRESENT:            SPANISH LANGUAGE INTERPRETERS

PROCEEDINGS

```
 1           MR. GOODMAN:  MR. PHILIPSBORN.

 2           THE COURT:  WAIT, WAIT.  HE WASN'T HERE?

 3           MS. GIBBONS:  YOUR HONOR, SO AS NOT TO ANNOY THE

 4    COURT, WOULD IT --

 5           THE COURT:  WAIT.  WE HAVE TO WAIT FOR

 6    MR. PHILIPSBORN.

 7              (MR. PHILIPSBORN ENTERED THE COURTROOM.)

 8           MR. PHILIPSBORN:  MY APOLOGIES, YOUR HONOR.

 9           THE COURT:  IT'S OKAY, BUT I NEED TO ASK ALL THE

10    LAWYERS TO TRY HARDER TO BE BACK ON TIME.  THE JURY IS READY TO

11    GO.  BRING IN THE JURY.

12              (THE JURY ENTERED THE COURTROOM.)

13           THE COURT:  PLEASE BE SEATED.  WELCOME BACK.

14           GOVERNMENT MAY CALL ITS NEXT WITNESS.

15           MS. GIBBONS:  THE UNITED STATES CALLS SERGEANT MARIO

16    MOLINA.

17           THE COURT:  SERGEANT MOLINA, WELCOME.

18           THE WITNESS:  THANK YOU, YOUR HONOR.

19           THE COURT:  PLEASE STAND OVER THERE AND RAISE YOUR

20    RIGHT HAND.  SWEAR HIM IN.

21                      MARIO MOLINA,

22    CALLED AS A WITNESS FOR THE PLAINTIFF HEREIN, HAVING BEEN FIRST

23    DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

24           THE WITNESS:  I DO.

25           THE COURT:  HAVE A SEAT.  WE NEED TO TAKE YOUR
```

1  PICTURE FOR THE CLOSING ARGUMENTS.

2          (A PHOTOGRAPH WAS TAKEN OF THE WITNESS.)

3          **THE CLERK:**  GREAT.

4          **THE COURT:**  ALL RIGHT.  IF YOU WOULDN'T MIND AFTER

5  YOU GET YOUR GLASS OF WATER, PLEASE ADJUST THE MICROPHONE SO IT

6  CATCHES YOUR VOICE.  PULL THE MIC CLOSER TO YOU.  VERY GOOD.

7          GO AHEAD, COUNSEL.

8                    **DIRECT EXAMINATION**

9  **BY MS. GIBBONS:**

10 **Q**    SIR, COULD YOU PLEASE STATE AND SPELL YOUR NAME FOR THE

11 RECORD?

12 **A**    MY NAME IS MARIO MOLINA, M-A-R-I-O M-O-L-I-N-A.

13 **Q**    HOW ARE YOU CURRENTLY EMPLOYED?

14 **A**    I'M A POLICE OFFICER FOR THE CITY AND COUNTY OF SAN

15 FRANCISCO, CURRENTLY HOLDING THE RANK OF SERGEANT.

16 **Q**    HOW LONG HAVE YOU BEEN A SWORN POLICE OFFICER?

17 **A**    SINCE 1994.

18 **Q**    PRIOR TO YOUR WORK AS A POLICE OFFICER, COULD YOU DESCRIBE

19 YOUR EDUCATION?

20 **A**    SURE.  I HAVE AN AA DEGREE IN CRIMINOLOGY FROM THE SAN

21 FRANCISCO CITY COLLEGE.  I ALSO HAVE A BA ON CHILD

22 DEVELOPMENTAL PSYCHOLOGY FROM SAN FRANCISCO STATE.  I ALSO HAVE

23 A MASTER'S DEGREE IN MARRIAGE, FAMILY AND CHILDREN'S COUNSELING

24 FROM SAN FRANCISCO STATE.

25 **Q**    PRIOR TO YOUR WORK AS A SAN FRANCISCO POLICE OFFICER --

1          **MS. GIBBONS:**  YOUR HONOR, MAY I HAVE ANOTHER COUGH

2    DROP?  I'M SORRY.

3    **BY MS. GIBBONS:**

4    **Q**    PRIOR TO YOUR WORK AS A SAN FRANCISCO POLICE OFFICER, DID

5    YOU HOLD ANY OTHER JOBS?

6    **A**    I DID.  IN 1987 I WAS A COUNSELOR AT THE YOUTH GUIDANCE

7    CENTER AT 375 WOODSIDE HERE IN SAN FRANCISCO.  I WORKED THERE

8    FOR ABOUT FIVE YEARS.  THE FIRST THREE YEARS I WAS AN ASSISTANT

9    COUNSELOR, WORKING THE MIDNIGHT SHIFT.  IN 1992 I BEGAN WORKING

10   ON THE DAYTIME, SO FROM '92 TO '94 -- I'M SORRY -- 1990 TO '92

11   I WORKED THE DAY SHIFT AS A COUNSELOR.  AND THAT'S IN THE

12   HOUSING UNIT WHERE JUVENILES ARE HELD IN CUSTODY AWAITING

13   TRIALS, COURT HEARINGS.

14          IN '92 I BECAME A PROBATION OFFICER FOR THE CITY AND

15   COUNTY OF SAN FRANCISCO.  I WORKED OUT OF 850 BRYANT, THE HALL

16   OF JUSTICE HERE IN SAN FRANCISCO, AND WAS ASSIGNED TO A

17   SPANISH-SPEAKING CASELOAD, MOSTLY TO LATINO CLIENTS.

18   **Q**    THANK YOU.  COULD WE JUST GO BACK A LITTLE BIT?

19          THE YOUTH GUIDANCE CENTER, CAN YOU DESCRIBE WHAT YOU

20   DID THERE?

21   **A**    YES.  AS I SAID BEFORE, I WAS A COUNSELOR.  WE CALL THEM

22   COUNSELORS.  IT'S A PEACE OFFICER POSITION.  YOU ARE ACTUALLY A

23   PEACE OFFICER.

24          BASICALLY, WHAT I DID ON A DAILY BASIS, WHEN I WAS

25   WORKING MIDNIGHTS I WAS WORKING INTAKE.  I WAS IN THE RECEIVING

 1  UNIT.  WE WOULD GO AHEAD AND RECEIVE THE YOUTH THAT WERE IN

 2  CUSTODY FROM THE POLICE.  MAKE SURE THEY SHOWER, THEY GOT CLEAN

 3  CLOTHES, THEY ATE IF THEY WERE HUNGRY, AFFORDING PHONE CALLS TO

 4  CALL THEIR PARENTS, THEIR LAWYERS, THEIR LAWYERS, GIVE THEM

 5  ROOMS, ASSIGN THEM TO A SPECIFIC HOUSING UNIT DEPENDING ON WHAT

 6  THE CUSTODY ISSUES WERE.

 7          AND IN 1990 I WAS WORKING IN A DAYTIME POSITION.  I

 8  WORKED IN THE SOPHISTICATED YOUTH HOUSING UNIT, WHICH WAS B4

 9  AND THEN B5 FOR SOPHISTICATED CRIMINALS.  THAT'S WHAT THEY CALL

10  IT.

11          SO MY JOB THERE ENTAILED COMING IN AT 6:00 O'CLOCK IN

12  THE MORNING.  I WOULD GET THEM UP, GET THEM OUT OF THEIR ROOM,

13  MAKE SURE THEY SHOWER, THEY ATE BREAKFAST, GET THEM READY FOR

14  SCHOOL, TAKE THEM TO SCHOOL WITHIN THE HOUSING UNIT, MAKE SURE

15  THEY WROTE THEIR LETTERS, THEY CALLED THEIR LAWYERS, OFFER THEM

16  ACTIVITIES, RECREATIONAL ACTIVITIES.  AND ON WEEKENDS I WILL DO

17  MOVIES, VISITING, HELPING TO WRITE LETTERS, AND SO FORTH.

18  **Q**    THANK YOU.

19          AS A PROBATION OFFICER, COULD YOU DESCRIBE A LITTLE

20  BIT ABOUT WHAT YOU DID?

21  **A**    SURE.  I STARTED IN THE PROBATION DEPARTMENT IN 1992.  I

22  WAS ASSIGNED TO A SPANISH SPEAKING CASELOAD.  BASICALLY WORKED

23  MISDEMEANOR CASELOAD.  IT WAS MISDEMEANOR CASELOAD.  AT THE

24  BEGINNING I WAS ASSIGNED TO PEOPLE WHO WERE IN PROBATION FOR

25  DOMESTIC VIOLENCE, PETTY THEFT AND OTHER MISDEMEANOR CASES.

1 SOME OF THEM WERE GANG MEMBERS THAT I HAD DEALT WITH AS A

2 JUVENILE.  SO I GOT TO SEE THEM AGAIN, NOW IN A DIFFERENT

3 PERSPECTIVE AS AN ADULT.

4         THEN I WAS MOVED ON TO A NARCOTICS CASELOAD, MAINLY

5 FELONY SUPERVISION.  I WAS ASSIGNED TO ABOUT 250 CLIENTS THAT I

6 SUPERVISE BY MAIL, SOME BY PHONE.  AND THE MORE, WHAT WE CALL,

7 HIGH RISK, THEY WOULD COME IN AND SEE ME ONCE A MONTH.

8 **Q**   SO, AT THE YOUTH GUIDANCE CENTER, THEN AT THE PROBATION

9 WHEN YOU WERE A PROBATION OFFICER, DID YOU HAVE A CHANCE TO

10 INTERACT WITH GANG MEMBERS?

11 **A**   I DID.  IN THE YOUTH GUIDANCE CENTER I DID.  I WAS WORKING

12 IN WHAT IS CALLED B5, WHICH IS THE MAXIMUM SECURITY UNIT.  I

13 DEALT WITH THE YOUTH THAT WERE AWAITING COMMITTAL PROCEEDINGS,

14 AND SOME OF THEM WERE GANG MEMBERS FROM THE MISSION DISTRICT.

15 SO I DEALT WITH THEM AT THAT LEVEL.

16 **Q**   WHAT TYPES OF GANG MEMBERS WERE THEY?

17 **A**   I'M SORRY?

18 **Q**   WHAT TYPES OF GANG MEMBERS WERE THEY?

19 **A**   MAINLY AT THAT TIME WAS IN THE 80'S NORTEÑOS AND SOREÑOS.

20 **Q**   WE'LL GET INTO THAT IN A MINUTE, I GUESS.

21         LET'S GO BACK TO YOUR WORK AS A POLICE OFFICER.  WHEN

22 DID YOU -- I PRESUME YOU WENT TO THE ACADEMY?

23 **A**   I DID.  I ENTERED THE POLICE ACADEMY IN 1994, AND I WAS

24 THERE FOR ABOUT FIVE MONTHS.  BACK THEN IT WAS ABOUT A

25 FIVE-MONTH ACADEMY.

1        I GRADUATED IN '95, THE BEGINNING OF '95, AND I WAS

2   ASSIGNED TO CHINATOWN AREA FOR TRAINING, WHICH CONSISTED OF

3   THREE MONTHS TRAINING.  THAT'S THE TIME THAT YOU ARE PAIRED UP

4   WITH SOMEBODY WHO IS AN FTO, A FIELD TRAINING OFFICER.  AND YOU

5   WORK DIFFERENT HOURS.  LIKE YOU WORK MIDNIGHTS, YOU WORK SWING

6   WATCH, AND THEN DAY WATCH AS A PATROL OFFICER.  SO, MAINLY, I

7   WAS IN UNIFORM DRIVING A BLACK AND WHITE VEHICLE FOR THE SAN

8   FRANCISCO POLICE DEPARTMENT.

9        I DID THAT THROUGH, I THINK IT WAS, MAY '95, AND THEN

10  I PASSED MY PROGRAM, SO I GOT TO STAY THERE FOR A LITTLE BIT.

11  AND THEN I WAS TRANSFERRED TO MISSION STATION, IN THE MISSION

12  DISTRICT, I WOULD SAY THE LATTER PART OF THE SUMMER, AND I

13  STARTED WORKING AS A PATROL OFFICER IN THE MISSION DISTRICT.

14       ONCE AGAIN, I WAS DOING THE SAME DUTIES.  DRIVING A

15  BLACK AND WHITE VEHICLE, RESPONDING TO 911 CALLS, RESPONDING TO

16  CRIMES IN PROGRESS, DEALING WITH CRIME SCENES, TALKING TO

17  WITNESSES, VICTIMS OF CRIMES AND SO FORTH.

18  **Q**    WHERE IS MISSION STATION LOCATED?

19  **A**    MISSION STATION CURRENTLY IS AT 630 VALENCIA STREET, WHICH

20  IS THE CORNER OF VALENCIA AND 17TH STREET.

21  **Q**    YOU WORKED AT MISSION STATION FOR HOW LONG?  I'M NOT SURE

22  IF I CAUGHT THAT.

23  **A**    I WAS THERE FROM '95 TO 2003.

24  **Q**    AND DID YOU HAVE ANY ASSIGNMENTS, PARTICULAR ASSIGNMENTS

25  WHILE YOU WERE THERE OTHER THAN PATROL?

1  A    YES, I DID.  THE LATTER PART OF '95 WE WERE EXPERIENCING A

2  LOT OF GANG CRIMES IN THE MISSION DISTRICT, AND WE HAD A UNIT

3  THAT WAS ASSIGNED TO INVESTIGATE GANG-RELATED CRIMES.

4         SO AS A PART OF THE ASSIGNMENT I WAS ASKED TO BE IN

5  PLAIN CLOTHES.  SO I PARTNERED UP WITH -- MY FIRST PARTNER WAS

6  OFFICER CASTRO, AND I WORKED PLAINCLOTHES.  SO MY ASSIGNMENT

7  CHANGED A LITTLE BIT.  I WAS WORKING THE SWING WATCH STARTING

8  AT 4:00 O'CLOCK.  I WORK FROM 4:00 P.M. TO 2:00 A.M. IN PLAIN

9  CLOTHES, AND MY MAIN DUTIES WAS TO GET TO KNOW GANG MEMBERS.

10 Q    WHEN YOU SAY "PLAIN CLOTHES," FOR THOSE OF US WHO DON'T

11 KNOW WHAT YOU'RE TALKING ABOUT --

12 A    I'M SORRY, CIVILIAN CLOTHES.  SO I WILL WEAR LIKE YOU GUYS

13 ARE WEARING, PLAIN CLOTHES.  I WILL HAVE MY RADIO, MY DUTY

14 WEAPON, MY BULLETS, MY VEST.  IF I'M NOT DOING NARCOTICS

15 INVESTIGATION, I WILL HAVE MY VEST.  BUT IF I WAS DOING

16 NARCOTICS, I WAS ON THE STREET LOOKING TO BE A DRUG ADDICT,

17 BUYING DRUGS, I WOULD TAKE THAT OFF.  BUT MAINLY WAS JUST

18 UNDERCOVER INVESTIGATIONS.

19 Q    AND DID YOU WORK IN GANG AREAS AT THIS POINT?

20 A    I DID.  MY MAIN -- MY MAIN JOB WAS TO GET TO KNOW GANG

21 MEMBERS, GET TO KNOW WHO THEY WERE, WHAT GANG THEY BELONGED TO,

22 WHAT COLORS THEY WERE WEARING, WHETHER THEY WERE IN PROBATION

23 OR ON PAROLE, NICKNAMES, WHO WAS COMMITTING CRIMES.

24         I ALSO -- AT THE BEGINNING I WAS ABLE TO BUY

25 NARCOTICS FROM THEM BECAUSE THEY DIDN'T KNOW ME.  SO I WAS ABLE

Case 3:12-cr-00792-XR Document 579-6 Filed 03/17/15 Page 158 of 179

1  TO INFILTRATE THE NEIGHBORHOODS WHERE THEY HANG OUT AND BUY

2  NARCOTICS IN AN UNDERCOVER CAPACITY.  SO I WAS DOING THAT FOR A

3  WHILE UNTIL EVERYBODY KNEW WHO I WAS, SO I WASN'T ABLE TO BUY

4  ANYMORE.

5       BUT I CONTINUED TO DO -- ENGAGE ON A DAILY BASIS WITH

6  GANG MEMBERS.

7  Q    DURING YOUR WORK IN THE MISSION DISTRICT, WERE YOU AWARE

8  OF ANY PARTICULAR GANGS IN THAT AREA AT THAT TIME?

9  A    YES.

10 Q    WHAT ARE THOSE GANGS?

11 A    AT THAT TIME IN '95, I WOULD SAY MID '90'S, THERE WERE

12 THREE GANGS AT THE TIME.  AT THAT SPECIFIC TIME IT WAS

13 NORTEÑOS, SOREÑOS AND AN INDEPENDENT GANG THAT WENT BY THE NAME

14 OF 11TH STREET.  AND THEY WERE NOT AFFILIATED WITH THE SOREÑOS,

15 NOR WERE THEY AFFILIATED WITH THE NORTEÑOS; THEY JUST STOOD ON

16 THEIR OWN.

17 Q    DID YOU -- DID THERE COME A POINT WHERE YOU LEARNED ABOUT

18 A GANG CALLED MS-13?

19 A    YES.

20 Q    WHEN WAS THAT?

21 A    IN '95 WHEN I WAS ASSIGNED TO THE MISSION DISTRICT, I

22 BEGAN SEEING GRAFFITI, I BEGAN TALKING, ARRESTING MEMBERS OF

23 MS-13, MARA SALVATRUCHA.

24 Q    DID YOU SPEAK TO PEOPLE IN THE COMMUNITY ABOUT MS-13?

25 A    DO I TALK TO PEOPLE IN THE COMMUNITY ABOUT MS-13 AT THE

1    PRESENT OR AT THAT TIME?

2    **Q**    AT THAT TIME.

3    **A**    AT THAT TIME, YES.  WE HAD COMMUNITY MEETINGS.  THERE WAS

4    A LOT OF CONCERN AT THAT TIME ABOUT THE VIOLENCE THAT WAS GOING

5    ON IN THE MISSION DISTRICT, SO I ATTENDED COMMUNITY MEETINGS.

6        I ATTENDED -- WE HAD DIFFERENT PROGRAMS IN THE

7    MISSION DISTRICT.  WE HAD THE BOYS AND GIRLS CLUB.  WE HAD

8    HORIZONS UNLIMITED.  WE HAVE ANOTHER CENTER CALLED PRECITA

9    CENTER WHICH IS NOT IN THE MISSION, PER SE, GEOGRAPHICALLY.

10   IT'S JUST ONE BLOCK OFF OF CESAR CHAVEZ.

11       I ATTENDED MEETINGS WITH THE YOUTH THERE.  I ATTENDED

12   SCHOOL MEETINGS WHERE THERE WAS CONCERNS ABOUT GANG VIOLENCE OR

13   GANG PROBLEMS IN THE SCHOOLS AND SO FORTH.

14       **MR. PHILIPSBORN:**  OBJECTION, YOUR HONOR, IN THE SENSE

15   THAT I DON'T THINK WE'VE EXPLAINED -- OR THE COURT HAS YET

16   EXPLAINED THE BASIS ON WHICH AN EXPERT WITNESS CAN RELY ON

17   INFORMATION THAT'S RECEIVED FROM VARIOUS SOURCES TO FORM

18   OPINIONS.  I MEAN, SPECIFICALLY, WHAT WE'RE DOING IS BEGINNING

19   TO GET HEARSAY THAT'S FORMING, I'M ASSUMING, THE BASIS OF

20   OPINIONS, FOR EXAMPLE, CONCERNS ABOUT VIOLENCE.

21       I WONDER IF THE COURT MIGHT BE WILLING TO INSTRUCT

22   THE JURY ABOUT THE FUNCTION OF AN EXPERT AND THE FACT THAT THE

23   LAW PERMITS AN EXPERT TO RELY ON HEARSAY TO FORM OPINIONS, BUT

24   THAT THE WITNESS IS HERE TO EXPRESS OPINIONS AND THAT THE BASIS

25   FOR HIS OPINIONS WILL NEED TO BE ESTABLISHED THROUGH OTHER

 1  EVIDENCE?

 2        **MS. GIBBONS:**  IF I MAY ADDRESS THAT?  I THINK I'M

 3  LAYING THE FOUNDATION HERE TO QUALIFY HIM AS AN EXPERT BY GOING

 4  THROUGH WHAT HE'S DONE.

 5        **THE COURT:**  WELL, I WANT TO SAY SOMETHING.  HE'S HERE

 6  IN HIS EXPERT ROLE; IS THAT CORRECT?

 7        **MS. GIBBONS:**  THAT'S CORRECT, YOUR HONOR.

 8        **THE COURT:**  AND YOU KNOW THAT I HAVE -- WE'VE HAD

 9  SOME MOTION PRACTICE ON THIS, AND THERE IS AN ORDER ON POINT?

10        **MS. GIBBONS:**  YES, SIR, YOUR HONOR.

11        **THE COURT:**  ALL RIGHT.  I WILL SAY SOMETHING TO THE

12  JURY.

13        SERGEANT MOLINA HAS BEEN HERE BEFORE IN PRETRIAL

14  PROCEEDINGS, BECAUSE ONE HAT THAT HE WEARS IN THIS CASE IS TO

15  GIVE CERTAIN OPINIONS, UNLIKE OTHER WITNESSES WHO COME IN AND

16  SAY:  I SAW THE RED LIGHT, AND IT WAS RED, WITH MY OWN EYES.

17  THAT'S USUALLY THE WAY WE PROCEED IN CASES.  WHAT PEOPLE SAW

18  FIRSTHAND OR HEARD SOMEBODY SAY FIRSTHAND.

19        AND YOU'VE ALREADY PICKED UP ON THE FACT THAT HEARSAY

20  IS OFTEN NOT ADMISSIBLE BECAUSE THE PERSON SPEAKING OR THE

21  SOURCE IS THE -- IS NOT UNDER OATH, NOT SUBJECT TO

22  CROSS-EXAMINATION, COULD BE TOTALLY UNRELIABLE.

23        SO, SOMETIMES, THOUGH, WE ALLOW AN EXPERT TO COME IN

24  AND TESTIFY ABOUT CERTAIN THINGS.  I HAVE LIMITED THIS

25  WITNESS'S TESTIMONY, AND HE'S NOT SUPPOSED TO TALK ABOUT

1  VIOLENCE.  THAT WAS IN THE PRIOR ORDER.  THERE WERE THINGS LIKE

2  GANG COLORS, THINGS LIKE GRAFFITI, SO FORTH, BUT WE HAVE BEEN

3  THROUGH THIS.

4          SO, IF THE GOVERNMENT IS GOING TO PROVE VIOLENCE,

5  IT'S GOT TO DO IT THROUGH FIRSTHAND WITNESSES.

6          NOW, WE'VE ALREADY SEEN SOME FIRSTHAND WITNESSES COME

7  IN HERE, BUT WE'RE NOT GOING TO HAVE SOMEBODY COME IN AND GIVE

8  OPINIONS, MERE OPINIONS ABOUT THINGS -- CRIMES THAT HAVE BEEN

9  COMMITTED AND THE LIKE.  WE ARE GOING TO HAVE FIRSTHAND

10 TESTIMONY.

11         SO -- BUT I HAVE TOLD THE GOVERNMENT THEY CAN PRESENT

12 SERGEANT MOLINA TO GIVE CERTAIN OPINIONS THAT I THINK --

13 POSSIBLY IT'S UP TO YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO

14 IT -- THAT WOULD BE OF POSSIBLE USE TO YOU THAT GO TO OTHER

15 THINGS.  FOR EXAMPLE -- WELL, I WON'T START GIVING YOU THE

16 EXAMPLES.  WE'LL SEE WHERE THIS GOES.

17         BUT THIS IS NOT YOUR ORDINARY WITNESS.  HE IS HERE

18 TODAY IN HIS ROLE AS AN EXPERT WITH EXPERT OPINIONS AND NOT

19 HERE AS A WITNESS TO SAY, FOR EXAMPLE, WHAT COLOR THE LIGHT WAS

20 AT THE TIME OF THE INTERSECTION, OR TO GIVE FIRSTHAND

21 KNOWLEDGE.

22         I'M GOING TO CAUTION THE GOVERNMENT TO BE SURE YOU

23 STICK TO WHAT THE RULINGS WERE THAT WE MADE ON SERGEANT MOLINA

24 AS TO WHAT KINDS OF OPINIONS HE CAN OFFER AND WHAT KINDS OF

25 OPINIONS HE CAN'T.

1    I WANT TO SAY TO SERGEANT MOLINA, YOU ARE NOT

2  SUPPOSED TO BE GETTING INTO VIOLENCE.  THE GOVERNMENT CAN TRY

3  TO PROVE UP VIOLENCE THROUGH OTHER WITNESSES WHO CAN SAY IT

4  FIRSTHAND.

5    THERE WERE CERTAIN THINGS I SAID THAT MIGHT BE OF USE

6  TO THE JURY WITHIN THE SCOPE OF YOUR EXPERTISE, AND YOU ARE

7  CERTAINLY FREE TO GO INTO THAT, AND I EXPECT THE GOVERNMENT

8  KNOWS EXACTLY WHAT THOSE ARE.  I'M NOT ACCUSING MS. GIBBONS OF

9  DOING ANYTHING WRONG.  I DON'T THINK SHE'S DONE ANYTHING WRONG.

10  BUT I DID LAY DOWN SOME GUIDELINES EARLIER.  I WANT US TO STICK

11  TO THOSE GUIDELINES.

12    **MS. GIBBONS:**  YOUR HONOR, IF I COULD HAVE SOME

13  CLARIFICATION?  I HAVEN'T ASKED FOR ANY OPINIONS YET.

14    **THE COURT:**  HE STARTED TALKING ABOUT VIOLENCE.

15    **MS. GIBBONS:**  OKAY.

16    **THE COURT:**  THE PEOPLE AT THE SCHOOL, THEY WERE

17  CONCERNED ABOUT THE VIOLENCE AND ALL THAT.  SO THAT MAY ALL BE

18  TRUE, BUT IF THE IDEA IS TO LEAVE THE IMPRESSION THAT MS-13 IS

19  A VIOLENT GANG, YOU SHOULD BRING IN THE FIRSTHAND WITNESSES WHO

20  CAN PROVE THAT UP AND NOT TRY TO PROVE IT UP THROUGH OPINIONS.

21    **MS. GIBBONS:**  YES, SIR, YOUR HONOR.  ABSOLUTELY.

22    **MR. SABELLI:**  I'M SORRY.  BEFORE MS. GIBBONS GETS

23  ROLLING HERE -- I'M SORRY TO INTERRUPT.

24    FOR THE RECORD, I WANT TO BE CLEAR ON BEHALF OF

25  MR. HERRERA, I OBJECT TO THIS MAN BEING ADMITTED AS AN EXPERT

 1   BECAUSE OF THE UNRELIABILITY OF HIS SOURCES AND BASED ON THE

 2   CONFRONTATION CLAUSE.

 3        **THE COURT:**  THANK YOU FOR THAT OBJECTION.  THAT'S

 4   BEEN OVERRULED FOR REASONS PREVIOUSLY STATED.  MR. SABELLI,

 5   THANK YOU FOR MAKING YOUR POINT AGAIN.

 6        **MR. SABELLI:**  THANK YOU, YOUR HONOR.

 7        **THE COURT:**  YOU MAY CONTINUE.

 8   **BY MS. GIBBONS:**

 9   **Q**   I'M NOT SURE IF I ASKED YOU THIS, BUT DO YOU SPEAK

10   SPANISH?

11   **A**   I DO.  IT'S MY FIRST LANGUAGE.

12   **Q**   HAS THAT AIDED YOU IN YOUR INVESTIGATIONS AND YOUR WORK?

13   **A**   IT DOES, YES.

14   **Q**   AFTER YOUR MISSION ASSIGNMENT, WHAT WAS YOUR NEXT

15   ASSIGNMENT?

16   **A**   I WAS ASSIGNED TO THE SAN FRANCISCO POLICE DEPARTMENT GANG

17   TASK FORCE.

18   **Q**   AND HOW LONG DID YOU HOLD THAT ROLE?

19   **A**   I WAS THERE FOR FIVE YEARS.

20   **Q**   DID YOU HAVE ANY SPECIALTY IN THE GANG TASK FORCE?

21   **A**   YES.  I WAS ASSIGNED TO INVESTIGATE -- I WAS ASSIGNED TO

22   INVESTIGATE CRIME, CRIMES.

23   **Q**   AS FAR AS YOU KNOW, YOUR SPANISH SPEAKING ABILITIES, DID

24   YOU HAVE A ROLE WITH REGARD TO YOUR ABILITY TO SPEAK SPANISH?

25   **A**   YEAH, I WAS ASSIGNED TO THE LATINO SECTION OF THE GANG

```
 1   TASK FORCE.  I WORKED THERE FOR FIVE YEARS.  AND MOST OF THE

 2   CASES THAT WERE ASSIGNED TO ME WERE CASES THAT WERE GENERATED

 3   IN THE MISSION DISTRICT OR THE TENDERLOIN DISTRICT OR

 4   INGLESIDE, WHICH WE HAVE A LARGE POPULATION OF LATINOS IN SAN

 5   FRANCISCO.

 6   Q    HOW LONG DID YOU HOLD THIS ROLE AS A GANG TASK FORCE

 7   INVESTIGATOR?

 8   A    I DID THAT FOR FIVE YEARS.

 9   Q    SO THAT'S -- I'M SORRY.  WHEN DID YOU STOP, WHAT YEAR?

10   A    IN 2008.

11   Q    THEN WHAT DID YOU DO NEXT?

12   A    I WAS PROMOTED TO THE RANK OF SERGEANT, AND I WAS

13   TRANSFERRED TO PATROL AGAIN.  SO I WAS ASSIGNED TO THE

14   EXCELSIOR DISTRICT, WHICH IS OUT OF THE MISSION DISTRICT.  I

15   WAS ON PATROL FOR, I WOULD SAY, ABOUT A COUPLE OF MONTHS,

16   WORKING MIDNIGHTS.

17           THEN I WAS ASKED TO BE THE SUPERVISOR OF THE

18   PLAINCLOTHES UNIT THERE, WHICH WOULD CONCENTRATE IN NARCOTICS

19   ENFORCEMENT, ROBBERY ABATEMENT DUTIES AND SO FORTH;

20   PLAINCLOTHES INVESTIGATION.

21   Q    IN THE COURSE OF YOUR WORK IN THE MISSION DISTRICT AND

22   THEN INGLESIDE, DID YOU HAVE THE OPPORTUNITY TO SPEAK WITH GANG

23   MEMBERS?

24   A    I DID.

25   Q    IS THAT A COMMON OCCURRENCE?
```

1  A    IT WAS -- WELL, THE INGLESIDE DISTRICT WAS A LITTLE BIT

2  DIFFERENT BECAUSE WE HAVE AFRICAN-AMERICAN GANGS AND LATINO

3  GANGS ALSO.  SO MY HORIZONS EXPANDED A LITTLE BIT MORE BECAUSE

4  I HAD TO DEAL WITH OTHER GANGS BESIDES LATIN GANGS.  SO, YES.

5  Q    AND DID YOU HAVE THE OCCASION TO SPEAK IN PARTICULAR WITH

6  MS-13 GANG MEMBERS?

7  A    IN THE INGLESIDE DISTRICT ONLY IF I CAME IN CONTACT WITH

8  THEM IN A TRAFFIC STOP AND SO FORTH.  BUT WE DON'T HAVE A

9  NEIGHBORHOOD OR AN AREA THAT MS-13 WILL CLAIM IN THE INGLESIDE

10  DISTRICT, NO.

11  Q    HOW ABOUT IN THE MISSION, WHEN YOU WERE WORKING IN THE

12  MISSION?

13  A    I WAS TRANSFERRED TO THE MISSION IN 2009, AND I HAD DEALT

14  WITH MS-13 GANG MEMBERS SINCE, SINCE THEN, YES.

15  Q    AND YOU'VE HAD THE OPPORTUNITY TO SPEAK WITH THEM?

16  A    I HAVE.

17  Q    AND IS THAT A COMMON OCCURRENCE?

18  A    IT WAS FOR AWHILE, BUT IT STOPPED.

19  Q    HOW WOULD YOU SPEAK WITH THEM, JUST WALK UP AND TALK TO

20  THEM?  HOW DID THAT GO?

21  A    AS A MATTER OF FACT, THE LAST TIME I TALKED TO MS-13, I

22  WAS BUYING NARCOTICS FROM THEM IN AN UNDERCOVER CAPACITY IN

23  DOLORES PARK.

24  Q    OKAY.  BUT AS FAR AS WHEN YOU WOULD SPEAK TO MS-13 MEMBERS

25  ON THE STREET, WAS IT VOLUNTARY?  DID IT SEEM --

1    A    ON THE STREETS?  THE MEMBERS THAT I CAN RECALL WAS JUST

2    TAKE ONS, WHAT WE CALL TAKE ONS, JUST APPROACH THEM AND

3    CONSENSUAL ENCOUNTER AND SO FORTH.

4    Q    CAN YOU EXPLAIN WHAT A CONSENSUAL ENCOUNTER IS?

5    A    A CONSENSUAL ENCOUNTER IS WHEN A POLICE OFFICER IS EITHER

6    IN A VEHICLE OR ON FOOT AND WILL APPROACH A PERSON AND TALK TO

7    THEM:  HI, HOW ARE YOU, WHAT ARE YOU DOING?

8         IN ORDER FOR POLICE OFFICERS TO STOP SOMEBODY'S

9    MOVEMENTS, WE HAVE TO HAVE PROBABLE CAUSE THAT THE PERSON IS

10   DOING SOMETHING OR IS ABOUT TO DO SOMETHING THAT MIGHT BE -- I

11   DON'T WANT TO SAY THE WORD "ILLEGAL," BUT IT MIGHT BE SOMETHING

12   IT'S NOT SUPPOSED TO BE DOING.

13        IN OTHER INSTANCES, CONSENSUAL ENCOUNTER IS WHEN

14   YOU'RE JUST COMING UP AND TALK TO SOMEBODY:  HI, HOW ARE YOU,

15   WHAT ARE YOU DOING IN THE PARK?  SOME PEOPLE GO, LIKE, YEAH,

16   RIGHT, AND WALK AWAY FROM YOU, AND THAT'S THAT BECAUSE YOU

17   DON'T HAVE ANY LEGAL BINDINGS TO STOP THEM, SO IT'S JUST AN

18   ENCOUNTER.

19   Q    SO DID YOU FIND THAT -- DID MS-13 MEMBERS TALK TO YOU

20   VOLUNTARILY, CONSENSUALLY?

21   A    YES.  SOMETIMES THEY WOULD.  SOMETIMES THEY WALK AWAY FROM

22   ME, SO...

23   Q    DO YOU HAVE ANY TRAINING IN GANG INVESTIGATIONS?

24   A    I DO.  I HAD GONE TO NUMEROUS CONFERENCES AND SEMINARS IN

25   THE LAST FEW YEARS.

1  **Q**    WOULD YOU PLEASE DESCRIBE THEM?

2  **A**    SURE.  THE MOST RECENT ONE I ATTENDED WAS IN SAN DIEGO,

3  CALIFORNIA AND THAT WAS LAST YEAR.  IT WAS PUT ON BY -- AN

4  ORGANIZATION I BELONG TO, INTERNATIONAL LATINO GANG

5  INVESTIGATORS ASSOCIATION.  THEY PUT ON A TRAINING ON LATIN

6  GANGS AND DRUG CARTELS FROM MEXICO.  SO I WAS ABLE TO ATTEND

7  THAT.  I WOULD SAY IT WAS AUGUST -- I'M NOT A HUNDRED PERCENT

8  SURE, BUT IT WAS AUGUST OF LAST YEAR.

9          PRIOR TO THAT I HAD ATTENDED ANOTHER CONFERENCE PUT

10  ON BY ILGI, INTERNATIONAL LATINO GANG INVESTIGATORS, AND IT WAS

11  DONE IN DENVER, COLORADO.  THE SAME THING.  THEY FOCUS ON LATIN

12  GANGS, TRANSNATIONAL GANGS, MOTORCYCLE GANGS AND SO FORTH.

13          PRIOR TO THAT, IN 2008 I WENT TO SAN ANTONIO, TEXAS,

14  ANOTHER NATIONAL CONFERENCE FOR INTERNATIONAL LATINO GANG

15  INVESTIGATORS.  AND, BASICALLY, THE SAME THING.  BASED ON

16  LATINO GANGS, MS-13, SOREÑOS FROM SOUTHERN CALIFORNIA, LOCAL

17  GANGS IN SAN ANTONIO, AFRICAN-AMERICAN GANGS.  WE TALKED A

18  LITTLE BIT ABOUT WHAT'S GOING ON THERE AND SO FORTH.

19          I ALSO HAD ATTENDED A CONFERENCE THAT WAS PUT ON BY

20  THE FBI IN DALLAS, TEXAS.  THAT WAS IN 2005.  THAT WAS MAINLY

21  ON MS-13.

22          ALSO, IN 2008, I ATTENDED A CONFERENCE PUT ON BY

23  HOMELAND SECURITY IN JACKSONVILLE, FLORIDA, AND THAT WAS BASED

24  ON MS-13, HOW THEY'RE SPREADING THROUGHOUT THE UNITED STATES,

25  THEIR TRENDS, HOW THE OTHER AGENCIES ARE DEALING WITH MS-13,

1  WHAT THEY'RE SEEING IN THEIR CITIES, CRIMES THAT THEY'RE

2  SEEING, AND SO FORTH.

3  **Q**    I'M SORRY TO INTERRUPT YOU.  HAVE YOU TAUGHT ANY TRAINING

4  ON LATINO GANGS?

5  **A**    I HAVE.  I WAS ASKED BY THE CALIFORNIA DEPARTMENT OF

6  JUSTICE TO BE INSTRUCTOR FOR A SET OF CONFERENCES THAT THEY PUT

7  ON IN 2007, I THINK IT WAS, IN NORTHERN CALIFORNIA.  THAT WAS

8  SPECIFIC ON MS-13, SO I GOT TO TALK -- MYSELF AND SERGEANT

9  MCDONALD, WHO WORKS IN THE GANG TASK FORCE, WE WERE ASKED TO

10  PUT ON A CLASS TO TEACH NORTHERN CALIFORNIA PEACE OFFICERS, AND

11  THAT INVOLVED HIGHWAY PATROL, LOCAL POLICE DEPARTMENTS,

12  DEPARTMENT OF CORRECTIONS AND SO FORTH, ABOUT MS-13 IN NORTHERN

13  CALIFORNIA.

14        SO I WAS AN INSTRUCTOR, AND WE DID -- WE DID A SET OF

15  TRAININGS -- I THINK IT WAS THE CITY OF REDDING, SAN JOSE,

16  SACRAMENTO.  SO IT'S ABOUT THREE OR FOUR CITIES THAT WE DID IN

17  A PERIOD OF ABOUT A MONTH AND A HALF.

18        I ALSO TEACH AT THE SAN FRANCISCO POLICE ACADEMY.

19  I'M AN INSTRUCTOR THERE.  I TEACH NEW POLICE OFFICERS COMING

20  INTO OUR DEPARTMENT ABOUT GANGS.  I TEACH INTRODUCTION TO

21  GANGS.  THAT'S IN GENERAL.  I TALK ABOUT ALL DIFFERENT TYPES OF

22  GANGS THAT WE HAVE IN SAN FRANCISCO.

23        THEN I ALSO TEACH THE LATINO SECTION OF THE GANG

24  CULTURE, AND THAT'S A BLOCK, TWO HOURS.  SO I TEACH ABOUT FOUR

25  HOURS.

1          I ALSO TEACH THE CADETS.  WE HAVE A PROGRAM FOR

2   EXPLORERS OR CADETS THAT COME INTO THE POLICE DEPARTMENT.  I

3   TEACH A CLASS ON LATINO GANGS.

4          I ALSO TEACH -- I TAUGHT 911 DISPATCHERS ABOUT THE

5   GANG CULTURE AND IMPORTANT THINGS THAT SHOULD BE ASKED WHEN YOU

6   ARE TALKING TO A VICTIM OR WITNESS OF A GANG CRIME.  I TALKED

7   ABOUT THE AREAS WHERE GANG MEMBERS WERE.  SO I TAUGHT THEM.

8          I ALSO HAD TAUGHT PROBATION OFFICERS ABOUT THE GANG

9   CULTURE, DIFFERENT GANGS THAT WE HAVE IN SAN FRANCISCO.  I HAD

10  ALSO TAUGHT MEMBERS OF OUR COMMUNITY PROGRAMS.  LIKE THE

11  SALVATION ARMY, THEY HAVE A PROGRAM CALLED "BACK ON TRACK,"

12  AND, MAINLY, THERE'S COUNSELORS THAT DEAL WITH PEOPLE THAT ARE

13  COMING BACK INTO OUR COMMUNITY AFTER BEING INCARCERATED, SOME

14  OF WHOM ARE GANG MEMBERS.  SO I TEACH THEM ABOUT GANG COLORS,

15  AREAS IN THE CITY OF SAN FRANCISCO THAT GANG MEMBERS

16  CONGREGATE, WHAT TO LOOK FOR, RECOGNIZING TATTOOS AND SO FORTH,

17  GRAFFITI, ALSO.  SO, YES, I DO A LOT OF TEACHING.

18  **Q**    THANK YOU.

19         HAVE YOU PREVIOUSLY BEEN QUALIFIED IN A COURT OF LAW

20  AS A GANG EXPERT?

21  **A**    YES, I HAVE.

22  **Q**    APPROXIMATELY HOW MANY TIMES?

23  **A**    I WOULD SAY OVER 30 TIMES OR SO.

24  **Q**    AND CAN YOU NAME SOME OF THE COURTS THAT YOU'VE BEEN

25  QUALIFIED AS A GANG EXPERT IN?

1  **A**    I HAVE BEEN QUALIFIED IN SUPERIOR COURT IN SAN FRANCISCO,

2  SAN MATEO COUNTY, MARIN COUNTY.

3  **Q**    AND SPECIFICALLY AS TO MS-13, HAVE YOU BEEN QUALIFIED AS A

4  GANG EXPERT?

5  **A**    YES, I HAVE.

6  **Q**    ABOUT HOW MANY TIMES?

7  **A**    I WOULD SAY OVER TEN TIMES.

8  **Q**    HAVE YOU TESTIFIED AS A GANG EXPERT -- OTHER THAN BEING

9  QUALIFIED, ABOUT HOW MANY TIMES HAVE YOU TESTIFIED AS A GANG

10  EXPERT?  DOES THAT MAKE SENSE?  NO.  I WAS WRONG.

11        HAVE YOU ALWAYS TESTIFIED FOR THE PROSECUTION AS A

12  GANG EXPERT?

13  **A**    THE MAJORITY, YES.  BUT I HAVE RECENTLY TESTIFIED FOR THE

14  DEFENSE WITHIN THE LAST MONTH AND A HALF.

15  **Q**    AND HAVE YOU EVER BEEN DENIED STATUS AS AN EXPERT BY ANY

16  COURT?

17  **A**    NO.

18        **MS. GIBBONS:**  YOUR HONOR, AT THIS TIME THE UNITED

19  STATES OFFERS SERGEANT MOLINA AS AN EXPERT IN MS-13 IN THE SAN

20  FRANCISCO BAY AREA.

21        **THE COURT:**  ALL RIGHT.  THE -- IT'S ALWAYS UP TO THE

22  JURY TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY TESTIMONY,

23  INCLUDING TESTIMONY ALLOWED AS OPINIONS.  SO, THIS WITNESS,

24  ENOUGH FOUNDATION HAS BEEN LAID TO ALLOW THE JURY TO HEAR THE

25  SUBJECT MATTERS THAT I SAID WERE ADMISSIBLE UNDER THE COURT'S

1  ORDER, PREVIOUS ORDER ON THIS.  THOSE WENT TO THINGS LIKE

2  TATTOOS, AND SIGNS, TERRITORIES, COLORS, AND THE LIKE, BUT

3  THERE WERE CERTAIN AREAS THAT WERE RULED OFF LIMITS, AND I

4  EXPECT COUNSEL AND THE WITNESS TO HONOR THE PREVIOUS

5  GUIDELINES.

6           SO THERE WE ARE.

7           **MR. PHILIPSBORN:**  YOUR HONOR, THE COURT, I BELIEVE,

8  PERMITTED THE DEFENSE SIMPLY TO SHORTHAND THE FACT THAT THERE

9  HAD BEEN OBJECTIONS PREVIOUSLY TENDERED, INCLUDING THOSE STATED

10 BY MR. SABELLI.  AND SINCE THIS IS THE FORMAL OFFERING OF

11 SERGEANT MOLINA AS AN EXPERT, I REITERATE THOSE OBJECTIONS,

12 WHICH I RECOGNIZE THE GOVERNMENT -- I'M SORRY -- WHICH I

13 RECOGNIZE THE COURT HAS ALREADY OVERRULED, BUT WE REITERATE

14 THEM.

15          **THE COURT:**  WELL, THE COURT OVERRULED POSITIONS OF

16 BOTH SIDES AND FOUND ITS OWN WAY ON THIS.  WHATEVER THOSE

17 OBJECTIONS WERE THAT WERE PREVIOUSLY MADE, WE HAD CONSIDERABLE

18 DISCUSSION ABOUT THIS, SO THOSE ARE -- THOSE ARE RESERVED FOR

19 THE RECORD.

20          **MR. PHILIPSBORN:**  THANK YOU, YOUR HONOR.

21          **THE COURT:**  AND TO THE EXTENT I OVERRULED THEM

22 BEFORE, THEY'RE OVERRULED AGAIN.  BUT THE GOVERNMENT MUST ALSO

23 KEEP IN MIND THE RESTRICTIONS THAT I PLACED ON THIS TESTIMONY,

24 THIS OPINION TESTIMONY.

25          **MS. GIBBONS:**  YES, SIR, YOUR HONOR.

```
 1              THE COURT:  ALL RIGHT.  GO AHEAD.

 2   BY MR. MARTINEZ:

 3   Q    SERGEANT MOLINA, DOES MS-13 GO BY ANOTHER NAME?

 4   A    YES.  MARA SALVATRUCHA.

 5   Q    AND DO YOU KNOW WHAT THAT MEANS IN ENGLISH?

 6   A    IN ENGLISH?  WELL, YES.  MARA MEANS GROUP.  MARA IS

 7   SALVADORIAN SLANG FOR GROUP.  SALVATRUCHA, YOU CAN BREAK IT UP

 8   INTO -- SALVATRUCHA IS USUALLY REFERRED TO A PERSON WHO IS FROM

 9   THE COUNTRY OF EL SALVADOR.  SALVA, S-A-L-V-A, MEANS SAVIOR,

10   AND TRUCHA IS IN REFERENCE TO A PERSON FROM EL SALVADOR.

11              IT'S A SLANG FOR SALVADORIAN NATIONAL THAT HAS COME

12   TO BE USED IN THE STREETS OF SAN SALVADOR, L.A. AREA, SAN

13   FRANCISCO.  TRUCHA ALSO MEANS TROUT IN SPANISH, WHICH IS A

14   FISH, BUT IN CONTEXT TO THE GANG IT'S A GROUP OF SALVADORIANS,

15   MARA SALVATRUCHA.

16   Q    WHERE WAS -- WHERE WAS MS-13 ESTABLISHED?

17   A    MS-13 WAS ORIGINATED IN THE MID '80'S IN THE AREA PICO

18   RIVERA IN THE CITY OF LOS ANGELES, SOUTHERN CALIFORNIA.

19   Q    DOES MS-13 HAVE CLIQUES?

20   A    THEY DO.

21   Q    AND IN PARTS OF CALIFORNIA?

22   A    YES, THROUGHOUT CALIFORNIA.  MAINLY, THEY'RE IN SOUTHERN

23   CALIFORNIA, THE L.A. AREA, BUT WE HAVE ONE HERE IN SAN

24   FRANCISCO.  WE HAVE ONE IN RICHMOND, CALIFORNIA.  AND THERE'S

25   OTHER CLIQUES THROUGHOUT NORTHERN CALIFORNIA.
```

1  Q    AND ELSEWHERE IN THE UNITED STATES?

2  A    NORTHERN CALIFORNIA.

3  Q    AND ELSEWHERE IN THE UNITED STATES?

4  A    I'M SORRY?

5  Q    ELSEWHERE IN THE UNITED STATES?

6  A    YES, MS-13 IS A TRANSNATIONAL GANG.  SO YOU FIND THEM OUT

7  OF THE UNITED STATES.  YOU FIND IT THROUGH LATIN AMERICA,

8  CANADA AND SO FORTH.

9  Q    ARE YOU FAMILIAR WITH THE TERMS SOREÑO OR NORTEÑO?

10  A    I'M FAMILIAR WITH BOTH, YES.

11  Q    CAN YOU PLEASE DESCRIBE WHAT A SOREÑO IS?

12  A    SOREÑO MEANS SOUTHERNER, AND IN SPANISH -- IT'S,

13  BASICALLY, A PERSON WHO HAS TIES OR IS AFFILIATED WITH THE

14  SOREÑO GANG OUT OF SOUTHERN CALIFORNIA.

15  Q    OKAY.  WHAT'S THE LITERAL TRANSLATION, DID YOU SAY THAT,

16  OF SOREÑO?

17  A    SOUTHERNER.

18  Q    DO YOU KNOW IF THEY CLAIM A CERTAIN COLOR?

19  A    I DO.  AND THEY CLAIM THE COLOR BLUE.

20  Q    HOW ABOUT NUMBER; DO THEY CLAIM A NUMBER?

21  A    THEY AFFILIATE WITH THE NUMBER 13, WHICH STANDS FOR THE

22  13TH LETTER OF THE ALPHABET, WHICH IS THE M.

23  Q    AND FOR NORTEÑOS, WHAT ARE NORTEÑOS?

24  A    NORTEÑO TRANSLATES TO NORTHERNER.  THEY'RE MAINLY IN

25  NORTHERN CALIFORNIA.

1  **Q**    DO THEY CLAIM A COLOR?

2  **A**    YES, THEY DO.  THEY CLAIM THE COLOR RED.

3  **Q**    WHAT'S THE RELATIONSHIP BETWEEN NORTEÑOS AND SOREÑOS IN

4  SAN FRANCISCO?

5  **A**    THEY'RE RIVALS.

6  **Q**    DOES MS-13 ALIGN ITSELF WITH EITHER SOREÑOS OR NORTEÑOS?

7  **A**    CAN YOU REPEAT THAT?

8  **Q**    DOES MS-13 ALIGN ITSELF WITH EITHER SOREÑOS OR NORTEÑOS?

9  **A**    MS-13 ALIGNS WITH SOREÑOS.

10 **Q**    ARE THERE ANY SLANG TERMS THAT ARE USED BY MS-13 TO

11 DESCRIBE NORTEÑOS OR RIVAL GANGS?

12 **A**    YES, THERE IS.  THEY USE THE TERM OF THE WORD CHAVALA,

13 C-H-A-V-A-L-A.

14 **Q**    WHAT DOES THAT WORD MEAN?

15 **A**    CHAVALA MEANS GIRL, OR LITTLE GIRL.

16 **Q**    THIS IS WHAT THEY REFER TO THEIR RIVALS AS?

17 **A**    TO THE RIVALS.

18        AND THEY ALSO USE THE WORD CHAPETES, C-H-A-P-E-T-E-S.

19 **Q**    WHAT DOES THAT MEAN?

20 **A**    CHAPETES MEANS CHAPS, ROSY CHEEKS.  THEY ALSO USE THE WORD

21 BUSTERS, B-U-S-T-E-R, IN REFERENCE TO NORTEÑOS.

22 **Q**    CHAPS, THE ROSY CHEEKS, WHAT DOES THAT MEAN?

23 **A**    WHAT I KNOW IS MAINLY REFERS TO AMERICAN BORN LATINO.

24 **Q**    ARE THERE ANY TERMS USED BY NORTEÑOS THAT ARE DEROGATORY

25 TO REFER TO MS-13 MEMBERS?

1   **A**   YES.  NORTEÑOS USE THE WORD SCRAP, SCRAPAS, S-C-R-A-P-A-S,

2   SCRAPAS.  AND THEY ALSO USE -- SPECIFICALLY TO MS-13, THEY USE

3   THE WORD CEROTE, QUOTE/UNQUOTE, WHICH IS SPELLED C-E-R-O-T-E,

4   WHICH TRANSLATED, QUOTE/UNQUOTE, MEANS PEACE OF SHIT.  IT'S A

5   COMMON SALVADORIAN TERM THAT SALVADORIANS USE ALMOST IN THEIR

6   DAILY TALKS, THE WORD "CEROTE."  SO IT'S TYPICAL TO A

7   SALVADORIAN NATIONAL, AND IT'S BEING USED BY NORTEÑOS IN

8   REFERENCE TO MS-13 GANG MEMBERS.

9   **Q**   OTHER THAN COLORS, ARE THERE ANY TYPES OF CLOTHING THAT

10  SOREÑOS COMMONLY WEAR?

11  **A**   YES, THEY LIKE TO WEAR THE DODGERS, L.A. DODGERS GEAR;

12  HATS, JACKETS, JERSEYS, SOCKS, WHATEVER THAT IS BLUE AND WHITE

13  AND REPRESENTS SOUTHERN CALIFORNIA.

14         THEY ALSO WEAR THE FOOTBALL TEAM, RAIDERS, GEAR.

15  RAIDERS, AT ONE POINT THEY RELOCATED FROM OAKLAND TO SOUTHERN

16  CALIFORNIA, SO THEY BECAME PART OF THAT CULTURE OVER THERE.  SO

17  SOREÑOS STARTED WEARING THE RAIDERS GEAR IN REFERENCE TO

18  SOUTHERN CALIFORNIA.  SOME OF THEM STILL WEAR RAIDERS GEAR HERE

19  AS OF RIGHT NOW.

20         THEY ALSO LIKE TO WEAR DALLAS COWBOYS GEAR BECAUSE,

21  ONCE AGAIN, IT'S BLUE AND WHITE, AND THEY WEAR THE JERSEYS,

22  THEIR HATS, SO FORTH.

23  **Q.**   AND, LIKEWISE, DID NORTEÑOS WEAR CERTAIN TYPES OF SPORTS

24  CLOTHES?

25  **A.**   YES.  NORTEÑOS WEAR THE SAN FRANCISCO 49ERS GEAR,

1  ESPECIALLY THE RED AND BLACK JACKETS AND HATS, THE JERSEYS, THE

2  T-SHIRTS.  AND THEY ALSO WEAR THE SAN FRANCISCO GIANTS BECAUSE

3  IT REPRESENTS NORTHERN CALIFORNIA.

4  **Q.**  BUT HAVE YOU SUREÑOS WEAR THESE NORTEÑO 49ERS SPORTING

5  CLOTHES BEFORE?

6  **A.**  I SEEN SUREÑOS WEARING SAN FRANCISCO GIANTS.  THIS ONE KID

7  WHO'S A BASEBALL FAN, SO HE WEARS THE SAN FRANCISCO GIANTS

8  CLOTHING.

9  **Q.**  SO, NOT ALL SUREÑOS AVOID WEARING THESE GIANTS CLOTHING?

10  **A.**  NO.  I SEEN AT LEAST ONE THAT LIKES TO WEAR THE GIANTS

11  CLOTHING.

12  **Q.**  ARE SUREÑOS AND NORTEÑOS -- WHERE IN SAN FRANCISCO ARE

13  SUREÑOS AND NORTEÑOS?

14  **A.**  MAINLY, THEY ARE IN THE MISSION DISTRICT.  THEY'RE --

15  NORTEÑOS, NORTHERNERS, THEY ARE IN THE SOUTH SIDE OF THE

16  DISTRICT.  THAT WOULD BE ON MISSION STREET, BETWEEN 22ND TO

17  CESAR CHAVEZ.  IN THE MISSION DISTRICT IF YOU GO NORTH TO

18  SOUTH, AND IF YOU GO WEST TO EAST, IT WILL BE FROM, I WOULD

19  SAY, GUERRERO TO POTRERO AVENUE, ALL THE WAY DOWN BY THE

20  HOSPITAL.

21        AND THEY GO LIKE IN L SHAPE BECAUSE IN THE LOWER 24TH

22  STREET THEY BRANCH A LITTLE BIT NORTH TOWARDS THE INTERSECTION

23  OF 21ST AND ALABAMA.  AND 22ND AND BRYANT.  ALL THOSE AREAS

24  RIGHT THERE.  THEY STILL CONSIDERED NORTEÑO TURF.

25        SUREÑOS IN SAN FRANCISCO IN THE MISSION DISTRICT --

1   I'M SORRY, NORTEÑOS ALSO HAVE A COUPLE OF BLOCKS ON THE NORTH

2   SIDE OF THE DISTRICT, WHICH IS NATOMA ALLEY, BETWEEN 14TH AND

3   15TH, AND WOODWARD ALLEY, BETWEEN 14 AND 15.

4           THAT'S A LITTLE ODD, BUT THEY JUST SPLIT UP A LITTLE

5   BIT AND THEY HAVE TWO BLOCKS THERE THAT THEY CLAIM.

6           SUREÑOS CLAIM THE NORTH SIDE OF THE DISTRICT.  IN THE

7   MISSION DISTRICT THEY CLAIM THE NORTH SIDE.  THEY CLAIM MISSION

8   STREET BETWEEN 21ST TO SOUTH, AND 16 TO THE NORTH.  AND THEY

9   ALSO CLAIM 16TH STREET, BETWEEN CHURCH STREET TO THE WEST AND

10  POTRERO AVENUE TO THE EAST.

11          THEY HAVE A FEW PARKS THEY CLAIM.  THEY CLAIM

12  FRANKLIN SQUARE PARK, WHICH IS LOCATED AT 17TH AND BRYANT.

13  THEY ALSO CLAIM DELORES PARK.  HISTORICALLY, THEY HAVE CLAIMED

14  DELORES PARK, WHICH IS LOCATED AT 18TH AND CHURCH, 18TH AND

15  DELORES.

16          THEY ALSO CLAIM THE MISSION PLAYGROUND, WHICH IS

17  LOCATED AT 850 VALENCIA, BETWEEN 19TH AND 20TH, ON THE WEST

18  SIDE OF THE STREET.

19          THEY CLAIM INTERSECTION OF 20TH AND MISSION FOR

20  MS-13.  SAN CARLOS AND 20TH, LEXINGTON AND 20TH, WHICH ARE TWO

21  LITTLE ALLEYS THAT GO NORTH AND SOUTH PARALLEL TO MISSION AND

22  VALENCIA.  THE AREA OF 19TH AND MISSION AND 16TH AND MISSION.

23          **MS. GIBBONS:**  THE COURT'S INDULGENCE.  I DIDN'T

24  REALIZE I COULD USE THE ELMO.

25          **THE COURT:**  WHAT ARE WE WAITING FOR?

1      **MS. GIBBONS:**  I'M GOING TO SHOW WHAT'S BEEN MARKED AS

2  THE GOVERNMENT'S EXHIBIT 1 FOR IDENTIFICATION.

3      **THE COURT:**  ALL RIGHT.  IS THIS JUST FOR THE COURT

4  AND COUNSEL AND THE WITNESS?

5      **MS. GIBBONS:**  YES, SIR.

6      **THE COURT:**  ALL RIGHT.  FINE.

7      **THE CLERK:**  SHOULD BE ON.

8      (DOCUMENT DISPLAYED TO COUNSEL AND THE WITNESS.)

9  **BY MS. GIBBONS:**

10 **Q.**   SGT. MOLINA, DO YOU RECOGNIZE WHAT'S BEEN MARKED AS

11 GOVERNMENT'S 1 FOR IDENTIFICATION?

12 **A.**   UHM, I RECOGNIZE THE MAP THAT I INITIAL, PUT MY STAR

13 NUMBER ON IT, YES, MISSION DISTRICT, YES.

14 **Q.**   IT'S A GOOGLE MAP?

15 **A.**   YES.

16 **Q.**   DID YOU MARK ON THIS TO DESCRIBE TERRITORY BEFORE YOU CAME

17 TO COURT?

18 **A.**   I DID.  I DID IN THE PAST.

19 **Q.**   AND SHOWING YOU PAGE 2 OF THE GOVERNMENT'S 1.  DO YOU

20 RECOGNIZE THIS?

21 **A.**   CAN YOU LOWER IT A LITTLE BIT.

22 **Q.**   LIKE THAT?

23 **A.**   YES.  THANK YOU.  YES, I DO.

24 **Q.**   HOW DO YOU RECOGNIZE IT?

25 **A.**   IT'S A GOOGLE MAP THAT I MARK IN THE PREVIOUS HEARING.

1    IT'S THE MISSION DISTRICT.

2         **MS. GIBBONS:**  YOUR HONOR, THE UNITED STATES REQUESTS

3    TO PUBLISH THIS AS A DEMONSTRATIVE TO THE JURY.

4         **THE COURT:**  ALL RIGHT.  THAT'S FINE.  YOU CAN -- ANY

5    OBJECTION?

6         **MR. PHILIPSBORN:**  NO, YOUR HONOR.  BUT I'M ASSUMING

7    THERE'S GOING TO BE A FOUNDATION FOR THE OPINION LAID.  I THINK

8    IT WAS AT A PREVIOUS HEARING, BUT RIGHT NOW ALL WE HAVE ARE

9    OPINIONS WITHOUT FOUNDATION.

10        **THE COURT:**  WELL, HE'S -- THAT'S FOR COUNSEL TO

11   DECIDE WHETHER TO BRING OUT OR NOT.  AND IF THE COUNSEL --

12   THAT'S A DIFFERENT QUESTION.  THAT'S YOUR ASSUMPTION.  BUT I'M

13   NOT REQUIRING THAT.

14        **MR. SABELLI:**  ALSO, YOUR HONOR, THERE APPEARS TO BE

15   SOME HANDWRITING ON THE BOTTOM THAT I THINK IS EXTRANEOUS.  I

16   DON'T THINK THAT NEEDS TO BE PUBLISHED TO THE JURY.

17        **THE COURT:**  I CAN'T SEE WHAT'S ON THE BOTTOM.  SHOW

18   ME THAT.  PUSH IT UP SO I CAN SEE.

19        WELL, NO, THAT'S -- THAT CAN STAY ON THERE.  THAT'S

20   NOT A PROBLEM.

21        OKAY.

22        **MR. GOODMAN:**  YOUR HONOR.

23        **THE COURT:**  YES.

24        **MR. GOODMAN:**  I HAVE ONE OTHER OBJECTION.  IT'S

25   UNCLEAR AS TO THE TIME THAT THESE PARTICULAR MARKINGS RELATE

1   TO.  DOES IT RELATE TO THE PRESENT OR DOES IT RELATE TO AT THE

2   TIME OF HIS --

3        **THE COURT:**  I'LL ASK COUNSEL.  THAT'S A GOOD

4   QUESTION.  AND, MS. GIBBONS, YOU CAN CLARIFY.

5        GO AHEAD.  FOR ILLUSTRATIVE PURPOSES, YOU CAN SHOW

6   THESE TO THE JURY.  WHICH ONE DO YOU WANT TO SHOW FIRST.

7        **MS. GIBBONS:**  WE'LL START WITH GOVERNMENT'S EXHIBIT

8   1, PAGE 1.

9        **THE COURT:**  WHAT DO YOU MEAN EXHIBIT 1?  IS THAT THE

10  EXHIBIT?

11       **MS. GIBBONS:**  I MARKED IT AS 1.

12       **THE COURT:**  IT SAYS SOMETHING DOWN AT THE BOTTOM,

13  LIKE "119."  I HATE TO BE -- GO DOWN TO THE BOTTOM AND SHOW ME

14  WHAT'S ON THAT TAG.

15       **MS. GIBBONS:**  THIS WAS ORIGINALLY MARKED AS 18.

16       **THE COURT:**  WHERE DID 18 COME FROM?

17       **MS. GIBBONS:**  WELL, IT'S ON THE BACK.  IT'S BEEN

18  REMARKED AS 1 FOR TRIAL.

19       **THE COURT:**  I SEE.  ALL RIGHT.  OKAY.  SO LET ME

20  EXPLAIN.  FOR PURPOSES OF THE TRIAL, IT'S NUMBER 1; IS THAT

21  RIGHT?

22       **MS. GIBBONS:**  YES, SIR.

23       **THE COURT:**  BUT IT'S NOT GOING TO GO INTO THE JURY

24  ROOM.  IT'S JUST FOR ILLUSTRATING HIS TESTIMONY.

25       **MS. GIBBONS:**  ABSOLUTELY.

1          **THE COURT:**  YOU ALL REMEMBER THAT OVER THERE.  YOU'RE

2   NOT GOING TO SEE THIS IN THE JURY ROOM, BUT YOU WILL SEE IT OUT

3   HERE.  AND THE ACTUAL EVIDENCE IS WHAT THE WITNESS SAYS.

4          AGAIN, I SAY TO YOU, THIS IS OPINION TESTIMONY AND IS

5   NOT FACT TESTIMONY.  IT'S OPINION TESTIMONY BASED ON THIS

6   WITNESS.  AND IT'S UP TO COUNSEL TO LAY THE FOUNDATION, IF SHE

7   WANTS, FOR WHAT -- WHAT HE BASES THESE OPINIONS ON.

8          AND WITH THAT, I'M GOING TO LET YOU CLARIFY WHAT THE

9   TIME PERIOD IS.

10          IT ALSO, I THINK, IS WORTH SAYING -- TELL ME IF THIS

11  IS RIGHT -- YOU MADE A POOR CHOICE OF HIGHLIGHTER BECAUSE THE

12  BACKGROUND COLORS ARE THE SAME COLOR AS THE HIGHLIGHTER.  I

13  DON'T KNOW WHY WE DID THAT.

14          THE ONLY WAY YOU CAN REALLY TELL WHAT'S BEEN

15  HIGHLIGHTED IS A LITTLE THICKER.  IS THAT RIGHT?

16          **THE WITNESS:**  YES.

17          **THE COURT:**  ALL RIGHT.  SO NEXT TIME WE WILL DO A

18  BETTER JOB ON PICKING A BETTER COLOR.  I WANT THAT TO BE

19  CLARIFIED.

20          NOW -- YES, MR. FRENTZEN.

21          **MR. FRENTZEN:**  YOUR HONOR, I'LL TAKE CREDIT.  I THINK

22  THAT WAS MY MESS-UP WHEN WE WERE DOING THE HEARING AND I DIDN'T

23  BRING ENOUGH DIFFERENT-COLORED MARKERS.  I'LL TAKE CREDIT FOR

24  THAT.

25          **THE COURT:**  WE'LL GIVE YOU THE CREDIT FOR THAT.

1          **MR. FRENTZEN:** THANK YOU.

2          **THE COURT:** SMART MOVE.

3          (LAUGHTER)

4          **THE COURT:** OKAY. LAY AT LEAST THE FOUNDATION FOR

5   THE TIME PERIOD. I THINK THAT'S A REASONABLE REQUEST BY

6   COUNSEL. GO AHEAD AND SHOW IT TO THE JURY, YES.

7          (DOCUMENT DISPLAYED.)

8   **BY MS. GIBBONS:**

9   **Q.** DURING THE TIME FRAME OF, I GUESS, 2000 TO 2008, DID

10  SUREÑOS CLAIM A CERTAIN TERRITORY IN THE MISSION?

11  **A.** YES.

12  **Q.** AND, LIKEWISE, DID NORTEÑOS CLAIM A TERRITORY IN THE

13  MISSION?

14  **A.** YES.

15  **Q.** WHAT ARE WE LOOKING AT HERE ON THIS MAP?

16  **A.** WE LOOKING AT THE MISSION DISTRICT, MAINLY THE NORTH SIDE

17  OF THE DISTRICT. YOU HAVE -- ACTUALLY, YOU LOOK THE ENTIRE

18  MISSION DISTRICT.

19          YOU ARE LOOKING AT 24TH STREET TO THE SOUTH. THAT

20  WOULD BE THE BOTTOM PART OF THE SCREEN. AND ALL THE WAY UP TO

21  14TH STREET, TO THE NORTH. AND THAT WOULD BE THE UPPER PART OF

22  THE SCREEN.

23  **Q.** AND DID YOU MAKE SOME MARKINGS ON THIS?

24  **A.** I DID. MY MARKINGS, LIKE YOUR HONOR STATED, ARE THE HEAVY

25  YELLOW, ON TOP OF THE YELLOW. SO IT LOOK LIKE LITTLE

 1  GREEN'ISH.  LITTLE THICKER, ALSO.

 2          AND I MARKED THE AREAS THAT I JUST PRIOR DESCRIBED A

 3  FEW MINUTES AGO, ABOUT SUREÑO TURF.

 4  **Q.**   THE SIGNIFICANCE OF YOUR MARKINGS IS SUREÑO TURF?

 5  **A.**   YES.  IN THE MIDDLE OF THE SCREEN RIGHT NOW --

 6  **Q.**   OKAY.

 7  **A.**   -- WHERE THE LETTER "A" IS PLACED, YOU CAN SEE SOME HEAVY

 8  MARKINGS, THICKER MARKINGS, ON THAT.

 9  **Q.**   AND NOW TURNING THE PAGE, CAN YOU SEE THAT?

10  **A.**   CORRECT.  IF YOU'RE LOOKING AT THE BOTTOM RIGHT SIDE OF MY

11  SCREEN -- IT'S HOPEFULLY THE SAME SCREEN WE ARE LOOKING AT --

12  SO IT WOULD BE THAT HEAVY MARKING, A THICKER COLOR, KIND OF

13  GREEN'ISH.  AND YOU SEE THE L SHAPE.

14          YOU LOOK AT 24TH STREET.  THAT WOULD BE LIKE A

15  QUARTER FROM THE BOTTOM UP OF THE SCREEN.  AND YOU SEE 24TH

16  STREET MISSION BART, THAT'S THE NORTENO TURF.  THAT'S THE 24TH

17  STREET CORRIDOR.  AND YOU HAVE THE LOWER IS GUERRERO STREET.

18  AND I TALKED ABOUT THE 24TH STREET CORRIDOR GOING FROM GUERRERO

19  ALL THE WAY DOWN TO POTRERO.  WHICH POTRERO AVENUE IS NEAR THE

20  HOSPITAL, SAN FRANCISCO GENERAL HOSPITAL.  SO YOU SEE ALL THE

21  MARKINGS.

22          AND THEN BRANCHING OUT NORTH WOULD BE THE LOWER PART.

23  AND THAT WILL BE ALABAMA -- ALABAMA STREET ALL THE WAY UP TO 20

24  STREET.  SO IT'S L SHAPE.  LOOKS LIKE AN L.  IT GOES DOWN

25  TOWARDS THE RIGHT SIDE OF THE SCREEN, AND THEN IT GOES OUT

 1   TOWARDS THE UPPER PART OF THE SCREEN IN THE NORTHERN DIRECTION.

 2   AND THAT'S NORTEÑO TURF.

 3   **Q.**   DURING WHAT TIME FRAME?

 4   **A.**   LIKE WE STATED, 2000 TO 2008.

 5   **Q.**   AND WHAT'S THE BASIS FOR YOUR STATEMENT AS TO THIS IS WHAT

 6   NORTEÑO TURF IS AND WHAT SUREÑO TURF IS?

 7   **A.**   MY WORK IN THE MISSION DISTRICT AS A POLICE OFFICER.  MY

 8   OBSERVATIONS.  MY ENCOUNTERS WITH GANG MEMBERS.  MY

 9   INVESTIGATIONS OF GANG ACTIVITY IN THESE AREAS.  GRAFFITI IN

10   THESE AREAS.  SPECIFIC AREAS THAT GANG MEMBERS WILL CLAIM, OR

11   CLAIM AS A TURF.

12   **Q.**   HAVE YOU EVER HEARD THE EXPRESSION OF TAGGING TERRITORY OR

13   TURF?

14   **A.**   YES.

15   **Q.**   WHAT DOES THAT MEAN?

16   **A.**   I USE "MARKING."  MARKING A TERRITORY.

17           AND IN THE GANG CULTURE, SPECIFICALLY LATINO GANGS,

18   THEY ARE VERY TERRITORIAL.  THEY ARE TURF ORIENTED.  USUALLY

19   THEY SETTLE IN AN ALREADY ESTABLISHED LATIN COMMUNITY, AND THEY

20   TEND TO MARK THE TERRITORY WHICH THEY CLAIM.  AND THEY DO SO BY

21   DOING WRITINGS ON THE WALL.

22           THEY WILL TAG THE NAME OF THE GANG.  THEY WILL TAG

23   NUMBERS AFFILIATED WITH THE GANG.  THEY WILL DO WHAT'S ROLL

24   CALL, WHERE THEY PUT THE NAMES OF THE GANG MEMBERS AND A

25   STRAIGHT LINE TO THE BOTTOM, AND SO FORTH.

1          THEY PUT SLOGANS ABOUT THE GANG.  THEY WILL USE PENAL

2     CODE SECTIONS TO DESCRIBE THE ACTIVITIES OF THE GANG, AND SO

3     FORTH.

4     **Q.**   HAVE YOU LOOKED AT, HAVE YOU SEEN GANG GRAFFITI THROUGHOUT

5     THE COURSE OF YOUR, WHAT, 20 YEARS AS AN OFFICER?

6     **A.**   UHM, YEAH.  ABOUT 17, I THINK.  YES, I HAVE SEEN GANG

7     GRAFFITI.

8     **Q.**   START WITH -- IS THERE CERTAIN TYPES OF GRAFFITI THAT'S

9     SPECIFIC TO MS-13?

10    **A.**   THERE IS.

11    **Q.**   AND WHAT IS THAT?

12    **A.**   THE NAME OF THE GANG.  *LA MARA SALVATRUCHA.*  SOMETIMES

13    IT'S USED AS TAG SPREAD OUT ON THE WALL.

14          THEY USE THE LETTERS "MS" TOO.  THE LETTER "M" AND

15    THE "S" AND THE NUMBER 13 ATTACHED TO IT.  THEY ALSO USE THE

16    NUMBER "20TH" IN SAN FRANCISCO, BECAUSE THEY CLAIM THE AREA OF

17    20TH AND MISSION.

18          SO THEY WILL WRITE "MS-13," "20TH STREET" NEXT TO IT,

19    WHICH IS REFERENCE TO THE CLIQUE, THEIR CLIQUE IN THAT SPECIFIC

20    AREA.

21          THEY ALSO USE *LA GARRA*, L-A G-A-R-R-A, WHICH IS "THE

22    DEVIL'S CLAW" OR "THE CLAW."

23          AND IT'S BASICALLY HAVING YOUR INDEX AND/OR PINKIE

24    FINGER UP OR POSITION, AND HAVING YOUR RING FINGER AND MIDDLE

25    FINGER DOWNWARD AGAINST THE PALM OF YOUR HAND, BEING TUCKED IN

1  BY YOUR THUMB.  AND THAT'S IN REFERENCE TO -- IT'S THE

2  TRADEMARK FOR MS-13.  BECAUSE WHEN YOU INVERT IT, IT TURNS INTO

3  AN "M."

4  (INDICATING.)

5           SO IT HAS TWO WAYS OF REPRESENTING THE GANG.  IT

6  REPRESENTS *LA GARRA*, AND ALSO REPRESENTS THE "M" WHEN IT'S DONE

7  DOWNWARD.

8           **MS. GIBBONS:**  MAY I SHOW THIS TO COUNSEL?

9           **THE COURT:**  YES.

10           **MS. GIBBONS:**  WHAT'S BEEN MARKED GOVERNMENT'S 101 FOR

11  IDENTIFICATION.

12           (PHOTOGRAPH DISPLAYED FOR COUNSEL AND THE WITNESS.)

13  **BY MS. GIBBONS:**

14  **Q.**   DO YOU RECOGNIZE THIS EXHIBIT, THIS FIRST PAGE OF IT?

15  **A.**   I DO.

16  **Q.**   HOW DO YOU RECOGNIZE IT?

17  **A.**   I RECOGNIZE THE GRAFFITI ON THE WALL.  AS JUST STATED, IT

18  REPRESENTS *LA GARRA*, WHICH IS "THE CLAW," "THE DEVIL'S CLAW,"

19  WITH THE HAND'S UP, THE HORNS.  THEY CALL THEM THE HORNS.  AND

20  THE MIDDLE FINGERS CLOSED DOWN.

21  **Q.**   SERGEANT, DO YOU KNOW WHERE THIS WAS TAKEN?

22  **A.**   I DO.

23  **Q.**   WHERE?

24  **A.**   AS THE MISSION PLAYGROUND AT 850 VALENCIA.  AND THIS IS

25  THE SOUTH WALL, SOUTH WALL OF THE PLAYGROUND.

1  Q.   SORRY TO CUT YOU OFF.  THEY'RE NOT LOOKING AT IT YET.

2  A.   OH, I'M SORRY.

3  Q.   YOU RECOGNIZE THIS.  AND THIS IS A FAIR AND ACCURATE

4  DEPICTION OF WHAT YOU'VE SEEN ON MISSION PLAYGROUND, GRAFFITI?

5  A.   YES.  THIS IS THE TYPE OF GRAFFITI THAT I HAD SEEN IN THE

6  MISSION PLAYGROUND.

7  Q.   AND THE NUMBER -- SECOND PAGE --

8  A.   I WASN'T DONE WITH THAT.

9  Q.   OH.

10  A.   I WAS TALKING ABOUT *LA GARRA*.

11  Q.   LET ME PUBLISH THE FIRST PAGE OF EXHIBIT 101.

12          **THE COURT:**  THIS IS EXHIBIT WHAT?

13          **MS. GIBBONS:**  101.

14          **THE COURT:**  ANY OBJECTION TO 101?

15          **MS. GIBBONS:**  NO, YOUR HONOR.

16          **MR. MARTINEZ:**  NO, YOUR HONOR.

17          **THE COURT:**  RECEIVED IN EVIDENCE.  101 MAY BE SHOWN

18  TO THE JURY.

19          (PLAINTIFF'S EXHIBIT 101 RECEIVED IN EVIDENCE.)

20          (DOCUMENT DISPLAYED.)

21  **BY MS. GIBBONS:**

22  Q.   SGT. MOLINA, WHAT ARE WE LOOKING AT HERE?

23  A.   WE ARE LOOKING AT *LA GARRA*, I STATED BEFORE.  WE ARE ALSO

24  LOOKING AT THE NUMBER 13, THE 1 AND 3.  AND WE ARE ALSO LOOKING

25  AT THE NUMBER 20, THE 2 AND THE ZERO.  AND YOU HAVE THE "ST"

1 FOR STREET, IN THE MIDDLE OF THE ZERO FOR 20TH STREET.

2 **Q.** IF YOU TOUCH THE SCREEN, IT MAKES A MARK. CAN YOU TOUCH

3 IT?

4 **A.** YOU HAVE THE "S" AND "T" FOR STREET. AND YOU HAVE THE

5 NUMBER 2 AND THE ZERO FOR 20TH. AND YOU HAVE THE 1 AND THE 3

6 REPRESENTS THE NUMBER 13, WHICH IS IN LINE WITH SUREÑOS. ALSO,

7 YOU HAVE *LA GARRA*, WHICH IS THE TRADEMARK FOR MS-13.

8 **Q.** AND YOU SAID THIS IS ON MISSION PLAYGROUND?

9 **A.** THAT WAS THE SOUTH WALL OF THE MISSION PLAYGROUND, NEAR

10 THE GRASSY AREA.

11 **Q.** OKAY. LIKEWISE, DO NORTEÑOS, DO THEY HAVE CERTAIN TYPES

12 OF GRAFFITI?

13 **A.** THEY DO.

14 **Q.** AND WHAT IS THAT?

15 **A.** UHM, IN NORTEÑO GANG CULTURE, THEY USE -- ONCE AGAIN, THEY

16 USE THE NAME OF THE GANG. THEY WILL WRITE DOWN THE NAME OF THE

17 GANG. LIKE IN SAN FRANCISCO, IT WILL BE LOCO NORTH SIDE, SFM,

18 22ND AND BRYANT. THEY WILL ALSO USE THE NUMBER 14. AND THAT

19 STANDS FOR THE 14TH LETTER OF THE ALPHABET, THE N. SO THEY

20 WILL USE THAT.

21 THEY WILL -- THEY WILL ALSO DO THE ROLL CALL. THEY

22 WILL PUT THE NAME OF THE GANG PLUS THE NICKNAMES OF THE GANG

23 MEMBERS THAT GO WITH THAT SPECIFIC CLIQUE.

24 THEY WILL ALSO USE THE NUMBER 24TH STREET -- 24TH,

25 WHICH REPRESENTS 24TH STREET. AND THEY ALSO WILL USE THE ROMAN

1    NUMERAL 14.  "X" FOR 10, "I" FOR 1, AND "V" FOR 5.  SO 14 IN

2    ROMAN NUMERALS.

3            THEY WILL ALSO USE THE "X," THE "X," AND THE 4 IN

4    NUMERICS.  SO THEY WILL COMBINE BOTH.  SO WHENEVER THEY WRITE,

5    THEY WILL COMBINE THEIR NUMBERS WITH ROMAN NUMERALS.  THEY WILL

6    ALSO USE DOTS.  THEY WILL USE LINES TO REPRESENT THEIR SPECIFIC

7    CLIQUE.

8            **THE COURT:**  MS. GIBBONS, IT'S 1:00 O'CLOCK.  BUT WHY

9    DON'T YOU FINISH UP, TAKE A MINUTE TO FINISH UP THIS POINT, AND

10   THEN WE'LL BREAK FOR THE DAY.

11           **MS. GIBBONS:**  SURE.

12   **BY MS. GIBBONS:**

13   **Q.**   I WOULD LIKE TO SHOW YOU A COUPLE OF MORE PHOTOGRAPHS OF

14   GRAFFITI, STARTING WITH THE GOVERNMENT'S 111 FOR

15   IDENTIFICATION.

16           IS THIS A GANG GRAFFITI OF SOME SORT?

17           (PHOTOGRAPH DISPLAYED FOR COUNSEL AND THE WITNESS.)

18   **A.**   IT IS.  WE LOOKING AT A WALL AND A WINDOW.  AND YOU CAN

19   SEE THE XXIV FOR 24TH.  AND RIGHT BELOW THAT, I CAN MAKE OUT

20   THE WORD "SHOTWELL."

21           SHOTWELL IS THE STREET IN THE MISSION DISTRICT AND IS

22   CLAIMED BY A NORTEÑO CLIQUE.

23           **MS. GIBBONS:**  CAN WE PUBLISH THIS TO THE JURY FOR

24   DEMONSTRATIVE?

25           **THE COURT:**  ANY OBJECTION TO 111?

 1          **MR. PHILIPSBORN:**  NO.

 2          **THE COURT:**  RECEIVED.  PUBLISH IT TO THE JURY.

 3          (PLAINTIFF'S EXHIBIT 111 RECEIVED IN EVIDENCE.)

 4  **BY MS. GIBBONS:**

 5  **Q.**   CAN YOU EXPLAIN WHAT YOU WERE MENTIONING?

 6  **A.**   I WAS LOOKING AT THE BRICK AREA RIGHT UNDER THE WINDOW.

 7  AS PREVIOUSLY STATED, I TALKED ABOUT THE "X" AND "X" AND "I"

 8  AND "V."  ROMAN NUMERAL FOR 24TH, WHICH REPRESENTS THE NORTEÑOS

 9  IN THE MISSION DISTRICT.

10          RIGHT BELOW IT -- I DON'T KNOW IF YOU CAN READ IT,

11  BUT IT SAYS, "SHOTWELL."  IT'S GOT THE "S," THE "H," THE "O,"

12  THE "T," THE "W," THE "E," AND THE TWO LS AT THE END.  AND THE

13  LETTER "S" IS CROSSED OUT.  THIS ONE RIGHT HERE IS CROSSED OUT.

14  IT'S GOT THE XING.  IT'S BEING CROSSED OUT (INDICATING).

15          IN THE GANG CULTURE, WHEN THEY ARE WRITING GRAFFITI

16  AND THEY USE LETTERS ASSOCIATED WITH THEIR RIVALS GANG MEMBERS

17  WILL CROSS IT OUT AS A SIGN OF DISRESPECT FOR THE RIVALS.

18          IN THIS INSTANCE, NORTEÑOS WROTE "SHOTWELL" SO THEY

19  WILL TEND TO CROSS OUT THE "S," WHICH REPRESENTS SUREÑO.  SO

20  THEY WILL CROSS IT OUT.

21          AND WHEN SUREÑOS WRITE SOMETHING THAT HAS TO DO WITH

22  THE LETTER "N," THEY WILL CROSS THE "N" OUT TO DISRESPECT THAT

23  GANG.

24          SO THAT'S TYPICAL IN THE LATINO GANG GRAFFITI.  YOU

25  WILL SEE THAT.

1          **THE COURT:**  CAN WE BREAK RIGHT NOW?

2          **MS. GIBBONS:**  SURE.

3          **THE COURT:**  ALL RIGHT.  WE'RE GOING TO ADJOURN.

4          I NEED TO GIVE YOU A QUICK HEADS UP ON SOMETHING.

5    THIS IS FOR THE JURY.  YOU KNOW, WHEN I WAS DRIVING TO WORK

6    THIS MORNING THEY -- THE NEWS WAS ALL ABOUT THE GOVERNMENT

7    SHUTDOWN.  AND I HAVE MADE INQUIRY AND LEARNED THAT IF THERE IS

8    A GOVERNMENT SHUTDOWN, AT LEAST FOR A WEEK IT WILL NOT AFFECT

9    OUR JURY -- OUR ABILITY TO PAY YOU FOR JURY SERVICE.

10         SO EVEN IF THERE IS A SHUTDOWN ON FRIDAY, WE WILL BE

11   IN SESSION NEXT WEEK.  AND IT SEEMS LIKE MAYBE EVEN FURTHER

12   THAN THAT.  BUT I HAVE TO -- I ONLY HAVE A GUARANTEE, AT THIS

13   POINT, THROUGH NEXT WEEK.  BUT I'M PRETTY SURE THAT WE WILL BE

14   ABLE TO TELL YOU THERE'S NO PROBLEM.

15         I JUST WANTED TO PUT YOUR MIND AT EASE SO THAT YOU

16   WOULDN'T BE THINKING THAT THE FEDERAL COURTHOUSE IS ALL DARK

17   AND THE ELECTRICITY IS OFF, AND WE WON'T BE GOING FORWARD WITH

18   THE TRIAL.  WE WILL BE GOING FORWARD WITH THE TRIAL.

19         NOW, LOOKING AHEAD THIS WEEK, WE ARE IN SESSION ALL

20   FIVE DAYS.  NEXT WEEK WE WILL BE IN SESSION ALL FIVE DAYS.  THE

21   FOLLOWING WEEK I AM THINKING ABOUT TAKING OFF THAT FRIDAY,

22   APRIL 22ND, OR AT LEAST GIVING YOU OFF FRIDAY APRIL 22ND.  SO

23   THAT WOULD BE THE THIRD FRIDAY THAT WE WOULD BE IN SESSION.  I

24   CAN'T CONFIRM THAT FOR YOU YET, BUT THAT'S A POSSIBILITY.

25         BUT -- SO FIVE DAYS THIS WEEK, FIVE DAYS NEXT WEEK,

```
 1   AND AT LEAST FOUR DAYS THE FOLLOWING WEEK.  AND MAYBE FIVE.  SO

 2   THERE WE ARE.  THAT'S MY HEADS UP FOR YOU.

 3           HAVE A GOOD REST OF THE DAY.  REMEMBER THE

 4   ADMONITIONS.  WE'LL SEE YOU BACK HERE TOMORROW.

 5           THE CLERK:  ALL RISE.

 6           (JURY OUT AT 3:04 P.M.)

 7           (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

 8           OUTSIDE THE PRESENCE OF THE JURY.)

 9           THE COURT:  ALL RIGHT.  THANK YOU.  EVERYONE BE

10   SEATED.

11           MAY SGT. MOLINA BE EXCUSED FOR NOW?

12           HEARING NO OBJECTION, YOU CAN GO BACK TO WORK,

13   SERGEANT.  THANK YOU.  WE'LL SEE YOU HERE TOMORROW AT 7:30 A.M.

14   THANK YOU.

15           (WITNESS STEPS DOWN)

16           THE COURT:  ANYTHING THAT THE LAWYERS -- I KNOW,

17   MR. ROSENBUSH, YOU WANTED TO MAKE A -- BEFORE WE GET TO

18   MR. ROSENBUSH'S STATEMENT, IS THERE ANYTHING MORE THAT THE

19   LAWYERS WANT TO TAKE UP WITH THE COURT AT THIS TIME?

20           MR. SABELLI:  YES, YOUR HONOR.  I HAVE TWO MATTERS

21   THAT NEED TO BE BROUGHT UP.

22           THE COURT:  LET'S HEAR YOURS FIRST.

23           MR. SABELLI:  ONE OF THEM, YOUR HONOR, THE EVIDENCE

24   THAT I BELIEVE MAY BE PROFFERED BY THE GOVERNMENT THROUGH

25   MR. MARTINEZ, IF HE TESTIFIES TOMORROW.
```

Exhibit F

382

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ----------------------------------------x
   UNITED STATES OF AMERICA,

3
                              07 CR 725
4

5              versus          United States Courthouse
                               225 Cadman Plaza East
6  MICHAEL UVINO, ET AL,       Brooklyn, N.Y. 11201

7
                   DEFENDANTS.
8
   ----------------------------------------x
9
                               December 3rd, 2008
10                             9:30 a. m.
            TRANSCRIPT OF TRIAL
11 Before:  HON. JACK B. WEINSTEIN,
                   UNITED STATES DISTRICT COURT JUDGE
12
                       APPEARANCES
13
   BENTON J. CAMPBELL
14 United States Attorney - Eastern District of New York
   271 Cadman Plaza East
15 Brooklyn, New York  11201
        ELIZABETH A. GEDDES, ESQ.
16      JAMES D. GATTA, ESQ.
   Assistant United States Attorneys
17

18
   REPRESENTING MICHAEL UVINO: Law Offices of Michael S. Washor
19                             233 Broadway, Suite 1800
                               New York, New York 10279
20                             BY: MICHAEL S. WASHOR, ESQ.
                               BY: ROBERT LEIGHTON, ESQ.
21
   REPRESENTING JOHN TRIPI:    Law Office of Scott Yale Auster
22                             65 Highview Drive
                               Carmel, New York 10512
23                             BY:  SCOTT YALE AUSTER, ESQ.

24 REPRESENTING BRIAN DONO:    Charles S. Hochbaum, P. C.
                               16 Court Street, Suite 1800
25                             Brooklyn, New York 11241

                   LISA SCHMID, CCR, RMR
                   OFFICIAL COURT REPORTER

*Carillo, John*
3510-28

383

```
 1   REPRESENTING PHILIP COSTANZA:    Papa, DePaola & Brounstein
                                      42-40 Bell Blvd., Suite 500
 2                                    Bayside, New York 11361
                                      BY: STEVEN L. BROUNSTEIN, ESQ.
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   Reporter:        LISA SCHMID, CCR, RMR
                      225 Cadman Plaza East Rm 354E
24                    Brooklyn, New York  11201
                      Tel: (718) 613-2644  Fax: (718) 613-2379
25   Proceedings recorded by mechanical stenography, transcription
     by CAT.
```

1  in this case.  Thank you very much.

2          THE COURT:  Thank you.  Call your first witness

3  please.

4  (Pause in the proceedings.)

5          MS. GEDDES:  Your Honor, the government's first

6  witness is investigator John Carillo.

7          THE COURT:  Swear the witness please.

8  (Witness sworn by the clerk.)

9  J O H N    C A R I L L O, having been first duly

10 sworn was examined and testified as follows:

11         THE CLERK:  Please state your name and spell it for

12 the Court.

13         THE WITNESS:  John Carillo, C A R I L L O.

14 DIRECT EXAMINATION

15 BY MS. GEDDES:

16 Q    Good afternoon.

17 A    Good afternoon.

18 Q    Investigator Carillo, how long have you been in law

19 enforcement?

20 A    Approximately 25 years.

21 Q    What is your current position?

22 A    I'm an investigator for the U.S. Attorney's Office in the

23 Southern District of New York.

24 Q    Is the Southern District the district that we're in right

25 now?

Case 8:03-cr-00929-WFA Document 6799-2 Filed 09/07/11 Page 96 of 279

1   A   No, it is not.

2   Q   Where is the Southern District of New York?

3   A   It is located in lower Manhattan.

4   Q   And what district are we currently in?

5   A   The Eastern District.

6   Q   Are you familiar with the term "Cosa Nostra"?

7   A   Yes, I am.

8   Q   What does that term mean?

9   A   Cosa Nostra's translation in English is "this thing of

10  ours" or "our thing."

11  Q   Is it the mafia?

12  A   Yes, it is.

13  Q   Have you been investigating Cosa Nostra for a period of

14  years?

15  A   Yes.

16  Q   Approximately how long?

17  A   Since 1992, so it is almost 16 years or 17 years, I'm

18  sorry.

19  Q   Can you describe to the jury what positions you've had in

20  investigating Cosa Nostra?

21  A   Yes, in 1992 I had approximately eight years on the New

22  York City Police Department and in 1992 I had my first

23  investigative assignment at Queens Public Morals Division and

24  my responsibilities during that assignment was to investigate

25  members and associates of organized crime, their involvement in

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   gambling and loansharking operations, more particularly in the

2   County of Queens.

3   Q   And how long were you at that assignment?

4   A   From 1992 till the end of 1995.

5   Q   And what did you do starting in 1995?

6   A   In 1995 I was transferred to the Queens County District

7   Attorney's Squad.  There's a group of detectives, NYPD

8   detectives assigned to the District Attorney's Office.

9   Q   And how long were you in that capacity?

10  A   From 1995 till 1998.

11  Q   And beginning in 1998 how were you employed?

12  A   In 1998 I was transferred to the Organized Crime

13  Investigation Division, more particularly the Investigative and

14  Analysis Section of the NYPD.

15  Q   So, were you in the NYPD for the entire duration that you

16  just explained?

17  A   Yes, from 1992 until I retired in 2004 I had those three

18  assignments, I investigated organized crime members and

19  associates.

20  Q   And after you held those positions in the New York City

21  Police Department did you hold other positions that

22  investigated Cosa Nostra?

23  A   Yes.

24  Q   What were those positions?

25  A   Upon my retirement I was hired by the Nassau County

Case 2:02-cr-00079-WFN   Document 672   Filed 08/07/21   Page 99 of 179

CARILLO/DIRECT/GEDDES

1   District Attorney's Office to again investigate organized crime

2   members and associates and about two -- almost two and a half

3   years ago I was hired by the U.S. Attorney's Office to conduct

4   criminal investigations and to maintain information and

5   intelligence on organized crime members and associates in the

6   New York City area.

7   Q   And is that where you're currently employed?

8   A   That's correct.

9   Q   In your career investigating Cosa Nostra have you

10  participated in the arrest of members and associates of Cosa

11  Nostra?

12  A   Yes.

13  Q   Approximately how many arrests have you participated in?

14  A   Several hundred.

15  Q   Have you also participated in the searches of locations

16  associated with Cosa Nostra?

17  A   Yes.

18  Q   Approximately how many locations?

19  A   Again, well over 100.

20  Q   Have you participated in eavesdropping of locations or

21  telephones used by persons associated in Cosa Nostra?

22  A   Yes.

23  Q   Approximately how many devices?

24  A   Well over 100 devices.

25  Q   And have you conducted physical surveillance of people

Holly Driscoll, CSR

447

CARILLO/DIRECT/GEDDES

1  involved in Cosa Nostra?

2  A   Yes.

3  Q   Can you briefly describe to the jury what you mean by

4  eavesdropping?

5  A   Eavesdropping is court authorized permission, we make an

6  application to the court, they authorize permission for us to

7  intercept conversations whether on a hard line telephone,

8  sometimes on a cellular telephone, sometimes on a bug which is

9  a device that we place in a location and we're authorized to

10  listen to particular people discussing particular crimes.  If

11  those crimes are not being discussed we're also directed by the

12  court to minimize, to go off the machine and not listen.

13  Q   And can you describe to the jury what you meant by physical

14  surveillance?

15  A   Yes, physical surveillance is when we set up at a

16  location, it could be a social club, it can be a social event

17  held by organized crime.  An example of my physical

18  surveillance, I set up in a vehicle, usually I have camera

19  equipment, video equipment, binoculars and according to what

20  the environment allows, darkness, weather, that type of thing,

21  I would take photographs when I could, take video when I could

22  and take notes of the observations that I make and at a later

23  time formalize that in a report, an official report.

24  Q   And in your 25 years of law enforcement what are some of

25  the Cosa Nostra crimes that you've investigated?

Holly Driscoll, CSR

Case 3:12-cr-00731-MCA Document 2496 Filed 10/27/14 Page 101 of 179

1  A   I've been involved in investigations which include murder,

2  loansharking, extortion, various types of gambling enterprises,

3  money laundering, narcotics trafficking, auto crimes,

4  robberies, burglaries.

5  Q   In your years investigating Cosa Nostra have you learned

6  about some of the language and the code words that are used by

7  members and associates of Cosa Nostra?

8  A   Yes, I have.

9  Q   Have you become familiar with the organizational structure

10 of Cosa Nostra?

11 A   Yes.

12 Q   Have you become familiar with the different crimes that

13 they commit and how they go about committing those crimes?

14 A   Yes.

15 Q   Have you been become familiar with the history of Cosa

16 Nostra in the United States?

17 A   Yes.

18 Q   Have you previously testified in this capacity about Cosa

19 Nostra?

20 A   Yes.

21 Q   Approximately how many times?

22 A   Well, in federal court this would be the 17th time and then

23 I've done some state proceedings probably in excess of 20.

24 Q   Can you briefly explain what is Cosa Nostra?

25 A   Cosa Nostra is a criminal organization located throughout

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   the United States that's involved in illegal activities for the

2   profit of its members.

3   Q   And are there other names by which Cosa Nostra is commonly

4   referred to?

5   A   Yes.

6   Q   What are some of those?

7   A   As you had mentioned before, the mafia; sometimes you'll

8   hear the mob, the syndicate.  In Chicago they call it the

9   outfit.

10  Q   What is the purpose of Cosa Nostra, generally speaking?

11  A   Basically to generate money through illegal activities and

12  protect its hierarchy.

13  Q   How is Cosa Nostra currently structured in New York City?

14  A   In New York City there's five separate families.

15  Q   And what do you mean by family?

16  A   A family is a separate entity with its own hierarchy,

17  again, involved in their own illegal enterprises.

18  Q   To be clear, you're not talking about blood relatives, are

19  you?

20  A   No.

21  Q   What are the names of the five families in New York City?

22  A   You have the Gambino family, the Genovese family, the

23  Colombo family, the Bonanno family and the Lucchese crime

24  family.

25  Q   Who assigned the names to those families?

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1    A    Back in the early 1960's through sources that were

2    developed by the government they had the identities of the

3    leaders or the bosses of the five families.  We still use those

4    names today.  So, the families that I just named, those were

5    the bosses that were in fact their last names in approximately

6    1962 or 1963.

7    Q    Referring to the Colombo family, where does the name

8    Colombo from?

9    A    From its prior boss, Joseph Colombo.

10   Q    And have some of the families been known by other names

11   other than those you've previously testified about?

12   A    Yes, they have.

13   Q    The Gambino family, does that also guy by another name?

14   A    They would call that John's family.

15   Q    Referring to whom?

16   A    John Gotti.

17   Q    Are you familiar with the term "The West Side"?

18   A    Yes.

19   Q    What does that refer to?

20   A    That's another reference to the Genovese crime family.

21        MS. GEDDES:  May I approach the witness?

22        THE COURT:  Yes.  You needn't inquire.

23   Q    Investigator Carillo, I'm showing you what's been marked

24   for identification as Government Exhibit 2.

25   Do you recognize that?

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   A    Yes.

2   Q    What is that?

3   A    That's a chart of the hierarchy of an organized crime

4   family.

5   Q    Is it a fair and accurate depiction of the organizational

6   structure of the crime family?

7   A    Yes, it is.

8          MS. GEDDES:  The government now offers Government

9   Exhibit 2 into evidence.

10         THE COURT:  No objection.  In evidence.

11  Q    I'm now placing a larger version of Government Exhibit 2 on

12  the easel.

13  Investigator Carillo, could you please step down and describe,

14  starting from the top, the positions of a Cosa Nostra organized

15  crime family.

16  (Witness steps down.)

17  A    Yes, typically speaking, at the top of the chart is a boss.

18  Each family has its own boss.  Their power within their family

19  is absolute.  They mete out punishment when necessary and set

20  policy for their family.  The underboss is second in command,

21  usually named by the boss, and the consiglieri is somewhat of

22  an adviser, an intermediary between the families, the four

23  other families in New York, and also settles disputes between

24  what we call the administration and the rest of the family.

25  Q    You mentioned the administration; what is the

452

CARILLO/DIRECT/GEDDES

1   administration?

2   A   The administration of each family is made up of the top

3   three positions, the boss, the underboss and the consiglieri.

4   Q   Below the administration of the family what is the next

5   position?

6   A   On the chart it is referred to as a captain. Other names

7   for captain is capo, skipper, caporegime, capodecinas. They

8   are assigned by the boss of the family to run regimes or crews

9   within the family. Those regimes consist of numerous soldiers

10   that are assigned to their crew and close associates that are

11   on record in that captain's crew.

12   Q   And you referred to the term crew; what is a crew?

13   A   A crew is a regime led by a captain. It consists, again,

14   of soldiers and close associates.

15   Q   You mentioned the term "soldier," are there any other names

16   for a soldier?

17   A   Yes, on the street there would be words like good fellow,

18   wise guy, man of honor, button man. They're referred to

19   sometimes as a man of honor and within Cosa Nostra they'll also

20   refer to a soldier as somebody that is straightened out.

21   Q   Do soldiers sometimes have crews around them?

22   A   Well, officially the crew is the captain's but there are

23   certainly Cosa Nostra groups of associates that answer directly

24   to a soldier.

25   Q   You mentioned now the term "associate," what is an

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   associate?

2   A   An associate is somebody outside the family that can be

3   involved mostly in criminal activity but we have seen occasions

4   when they're front-men for legal enterprises for a member of

5   Cosa Nostra.

6   Q   Are you familiar with the term "inducted"?

7   A   Yes.

8   Q   What does that term mean?

9   A   Inducted means somebody that has formally been allowed

10  membership into one of these crime families.

11  Q   Is there a ceremony associated with an induction?

12  A   Yes.

13  Q   Can you please describe are there any oaths taken at the

14  that ceremony?

15  A   Yes.

16  Q   What oaths are taken?

17  A   The oath of omerta which means silence and you swear

18  loyalty to that family in a formal ritualistic ceremony.

19  Q   And what is the oath of omerta?

20  A   The oath of omerta, again, is to keep the business of your

21  Cosa Nostra family to yourself, to never cooperate with law

22  enforcement, to go on record if you're approached by law

23  enforcement in any way, shape or form.

24  Q   And are there any penlites for violating that oath of

25  omerta?

454

CARILLO/DIRECT/GEDDES

1    A    Yes.

2    Q    What are those?

3    A    It could be as high as death.

4              MR. WASHOR:  I'm sorry?

5              THE WITNESS:  Death.

6    Q    Is there an ethnic requirement to become a member or a

7    soldier of organized crime or Cosa Nostra?

8    A    Yes.

9    Q    What are those ethnic requirements?

10   A    You have to be of Italian descent at least on your father's

11   side and at different periods of time you have to be of

12   100 percent Italian descent, that fluctuates back and forth

13   through the years.

14   Q    Please describe to the jury again what's the distinction

15   between soldier and associate?

16   A    A soldier is formally inducted inside the family, an

17   associate is somebody involved with criminal activity from

18   outside the family.

19   Q    And is there an ethnic requirement to become an associate?

20   A    No, there's no gender or ethnic requirement to be an

21   associate.

22             THE COURT:  You may sit down.

23             THE WITNESS:  Thank you.

24   (Witness resumes the stand.)

25   Q    And are associates considered members of the crime family?

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1  A   Associates, no.  An associate on record could be part of a

2  crew but they're outside the family.

3  Q   Is a soldier allowed to talk publicly about his status as a

4  soldier?

5  A   They're not supposed to, no.

6  Q   Are there terms in Cosa Nostra known as "to be around" or

7  "with"?

8  A   Yes.

9  Q   What do those terms mean?

10  A   Again, an associate is somebody involved with criminal

11  activity outside the family and if they're with somebody or

12  around somebody, that means they're under the protection of

13  that soldier or captain in an organized crime family.

14  Q   Now, on the chart it has a captain and then a soldier and

15  then an associate; can an associate report directly or be

16  around a captain directly?

17  A   Yes.

18  Q   What is -- are you familiar with the term "to be on

19  record"?

20  A   Yes.

21  Q   What does that term mean?

22  A   To be on record, there's many people involved in illegal

23  activities out in the world of Cosa Nostra, all different types

24  of illegal activities; if you do that independently, you're

25  leaving yourself at risk to be extorted by members of organized

Case 2:08-cr-00079-MCA Document 692 Filed 06/17/11 Page 109 of 179

CARILLO/DIRECT/GEDDES

1    crime if you're not protected by another member.  So, to be on

2    record with somebody is sort of to be claimed by that

3    particular member of organized crime so that if you are

4    approached by somebody outside of that crew or family you can

5    say that you're on record with that person and the appropriate

6    measures will be taken to protect you and your illegal

7    activities.

8    Q    What happens to a crew when a soldier or a captain is

9    incarcerated?

10   A    A soldier or a captain --

11   Q    When a captain is incarcerated what happens?

12   A    A captain, they can temporarily name somebody in an acting

13   position either through incarceration or illness to temporarily

14   run that crew and the affairs of that crew.

15   Q    There would be a substitute for the captain?

16   A    Yes.

17   Q    Are you familiar with the term in Cosa Nostra known as   "a

18   beef"?

19   A    Excuse me?

20   Q    A beef?

21   A    A beef, yes.

22   Q    What is a beef?

23   A    A beef is a dispute within Cosa Nostra and there's protocol

24   to settling the disputes or the beefs.

25   Q    How are beefs settled in Cosa Nostra, what is the protocol?

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   A    Well, if two associates are having a dispute that involved

2   a particular illegal enterprise and they're both represented by

3   people in Cosa Nostra, only people of the same ranks can

4   represent them.  So, if someone, a particular associate is

5   represented by a soldier and the other someone is represented

6   by a captain, then that soldier has to get his captain to meet

7   in what they call a sit-down.  Associates can't be present when

8   they're actually discussing Cosa Nostra business but their

9   representatives have to be of the same rank.  So, only a

10  soldier meets with a soldier, a captain with a captain,

11  somebody in the administration would meet with somebody from

12  another family's administration.

13  Q    What types of disputes are resolved at a sit-down?

14  A    It could be monetarily, it could be a business dispute,

15  could be beefs over loansharking debts, gambling debts, the

16  whole gamut that could come up in Cosa Nostra life.

17  Q    What are some of the types of locations in which members

18  and associates meet?

19  A    Members and associates, well, historically met at social

20  clubs, they're usually storefronts set up by a member and

21  associate of organized crime, it becomes a meeting place for

22  that crew or that family.  Many times they meet in bars,

23  restaurants, a big meeting space, actually wakes and weddings,

24  affairs, social events, things like that.

25  Q    Do organized crime members on occasion use legitimate

CARILLO/DIRECT/GEDDES

1    businesses?

2    A    Yes, absolutely.

3    Q    For what purpose?

4    A    Do they use them to meet?

5    Q    And for other purposes?

6    A    Sure, many times the illegal monies from the enterprises

7    they're involved with, that fuels and funnels, allows them the

8    ability to establish themselves in legitimate businesses which

9    is quite common.

10   Q    Once you become a member or a soldier of Cosa Nostra can

11   you describe -- can you decide that you no longer want to

12   become a member?

13   A    No, when you go through the ritual, you're in it for life.

14   They tell you there's only one way in and one way out.  So, if

15   you go to jail, if you cooperate with law enforcement, you're

16   still a member of that family until the day you die.

17   Q    Is it common in Cosa Nostra to have a nickname?

18   A    Yes, very common.

19   Q    Are there terms in Cosa Nostra known as "a walk-talk"?

20   A    Yes.

21   Q    What is that?

22   A    That's usually when two members or associates of organized

23   crime leave a location, either speak in front or walk around

24   the corner to evade law enforcement detection.  They know from

25   years of experience now that we have a tendency to listen

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   inside so it makes it easier for them to discuss illegal

2   activities.

3   Q    Besides walk-talks are there other ways that people

4   involved in Cosa Nostra can try and avoid being intercepted by

5   law enforcement?

6   A    Sure.

7   Q    What are some of those?

8   A    If they're inside a location sometimes they'll raise the

9   TV, they'll whisper, they'll try to keep other noises inside a

10  location just in case there is a device in there that we can't

11  intercept a conversation.

12  Q    Are you familiar with the term "shakedown"?

13  A    Yes.

14  Q    What is a shakedown?

15  A    A shakedown is an extortion of sorts; again, if you have an

16  illegal enterprise or sometimes a legal establishment and

17  you're not under the protection of another Cosa Nostra member

18  or have a representative, it is very common for Cosa Nostra

19  members to pay a visit to either threaten you or to make you

20  feel that you need their protection to continue your business.

21  Q    And what types of techniques in your experience did the mob

22  use to shake down someone?

23  A    There's many different ways, sometimes there's direct

24  approaches where they just tell you right out that they want

25  you to be with them.  Sometimes they'll actually send people in

Case 2:04-cr-00079-VCA Document 7992 Filed 08/17/11 Page 26 of 29

CARILLO/DIRECT/GEDDES

1    to cause a disturbance in your business and then come in the

2    next day like the good guy saying, listen, I heard you had a

3    problem, if you don't want these problems anymore I could

4    intercede for you and then they work out a deal where you pay

5    me so much money, I'll afford you that protection.

6    Q    You testified previously that you had some experience

7    investigating illegal gambling?

8    A    Yes.

9    Q    What types of illegal gambling have you investigated?

10   A    Bookmaking operations, card games, policy operations which

11   another word for them is numbers, casino style gambling

12   operations.

13   Q    How many investigations have you been involved with that

14   pertained to bookmaking?

15   A    Several hundred.

16   Q    How about illegal card games?

17   A    A few dozen.

18   Q    In the course of your investigation of illegal gambling

19   have you listened to conversations of wiretaps about illegal

20   gambling?

21   A    Yes.

22   Q    Approximately how many?

23   A    Several thousand.

24   Q    Have you conducted search warrants related to illegal

25   gambling investigations?

CARILLO/DIRECT/GEDDES

1   A    Yes.

2   Q    Approximately how many?

3   A    Several hundred.

4   Q    Have you also reviewed gambling records seized pursuant to

5   a search warrant?

6   A    Yes.

7   Q    How many?

8   A    Thousands.

9   Q    Have you become familiar with the terms used in bookmaking?

10  A    Yes, I have.

11  Q    And have you previously testified about illegal gambling?

12  A    Yes.

13  Q    Approximately how many times?

14  A    Over 15 times in state proceedings and I think in federal

15  court several times.

16  Q    Is it typical for individuals involved in organized crime

17  to operate card games?

18  A    Yes.

19  Q    What types of card games?

20  A    Various types, it could be poker games, Texas Hold 'Em,

21  Rubino, any type of game with several players sitting at a

22  table and they can make a profit off of it.

23  Q    Where do they hold these games?

24  A    Sometimes in cafes, social clubs; sometimes they'll rent

25  locations to have the games according to how many patrons they

1   have.

2   Q    And what does the host provide?

3   A    Well, they usually provide some type of protection for the

4   game, they provide sometimes food and beverage, and other

5   players to play against.

6   Q    Do they also provide security?

7   A    Yes, sometimes, yes.

8   Q    How does someone in organized crime profit from a card

9   game?

10   A    Well, it is a no lose situation as opposed to other types

11   of gambling because they're not betting against you, so if you

12   have three tables going in a card place, three different games

13   and you take a cut of that game, it is not against you.  So,

14   each time there's a pot they would take a percentage of the pot

15   so it is a no lose situation.

16   Another way that they do it is they'll charge each player by

17   the hour X amount of money per hour to join in the games so

18   they can't lose.

19   Q    Is there any financial downsides to illegal gambling --

20   A    No.

21   Q    -- or card games?

22   A    Not the card games, no.

23   Q    Can you please explain how a typical bookmaking operation

24   works?

25   A    Well, a bookmaking operation is usually fueled by organized

CARILLO/DIRECT/GEDDES

463

1    crime or Cosa Nostra in my experiences.  You have a bookmaker,

2    it is their business, they're the person that wins and loses,

3    so it is their operation.  The bookmaker usually hires a

4    controller or a manager to oversee the day-to-day operations of

5    his business.  It is usually the bookmaker's responsibility,

6    more so years ago, they would get a location and hire clerks

7    where they could accept wagers over the telephone.  Today it is

8    more frequent to have offshore rooms where the bookmaker hires

9    an agency and the agent receives    X amount of money per week

10   from each bettor that calls in bets to that location.

11   Q    Is there a name for that location?

12   A    Usually it is called a wire room or an office.  Sometimes

13   you'll hear a bookmaker referred to as the office, meaning it

14   is his operation.

15   Q    How are the people who run the office compensated, the

16   clerks and the comptrollers?

17   A    Well, the clerks are usually -- if it is an office or a

18   wire room that's in the United States, it is not offshore,

19   they're compensated by a salary.  There's other people involved

20   in a bookmaking operation that are called runners and that's

21   like a prearranged agreement between the bookmaker and the

22   runner.

23   Q    Can you explain to the jury what a runner does?

24   A    Yeah, like I said, there is prearrangement, usually they're

25   on a quarter or a half sheet, they share in the profits of the

Holly Driscoll, CSR

Case 2:16-cr-00721-MCA Document 1002 Filed 03/17/21 Page 1 of 179

CARILLO/DIRECT/GEDDES

1   bettors' losses.  So, if they're on a quarter sheet, they get

2   25 percent of the bettor's loss, the bookmaker gets 75 percent.

3   If they have a prearranged agreement that they're on a half

4   sheet or 50 percent sheet, then when the bettors lose on a

5   particular week, they share the bettors' losses 50/50.

6   Q    And they being the --

7   A    The bookmaker and the runner.  The runner's responsibility

8   is to go out and recruit bettors.  I can only give you an

9   example, let's say in a particular bar there's a runner named

10  John and he has a code with the bookmaker of number eight.  So,

11  he supplies that code to everybody he could recruit in that bar

12  and also supplies the phone number of where to bet with all the

13  players on his sheet or what they call the runner's count.  So,

14  basically he supplies the number and his code.  So, if he has

15  three different bettors, John, Paul and Joe, when they call

16  into that phone number that he supplies them, they have to

17  place their wager Joe for number eight, Joe the runner's number

18  number eight, John for number eight, Frank for number eight,

19  and that gives the people that are accepting the wagers a way

20  of distinguishing the bets on that runner's account from other

21  runners.

22  Q    Just to clarify, what is the difference between a runner

23  and a bettor?

24  A    A runner is somebody involved in the illegal enterprise,

25  he's sharing in the profits with the bookmaker.  A bettor is

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1  the consumer in a bookmaking operation, so he's placing wagers.

2  In a bookmaking operation usually the week goes from Monday

3  through Sunday, so it starts on a Monday, ends on a Sunday.

4  So, the runners's account for each given week, they only square

5  up with their bettors once a week, goes from that Monday to

6  Sunday.  So, at the end of that week that runner calls up the

7  wire room and he gets the figure, accumulated figures for all

8  his bettors and then he knows whether he has to pay the bettors

9  or get money from the bettors and split that with the

10  bookmaker.

11      THE COURT:  We're going to break now.  The lunch is

12  here.  You'll have to come back, I'm sorry, sir.

13  Be back please at 1:20.  You can retire to the jury room,

14  ladies and gentlemen.

15  (Jury leaves courtroom.)

16      MR. WASHOR:  Your Honor --

17      THE COURT:  Sit down please.

18      MR. WASHOR:  I'm only standing here because I'm almost

19  to your side.  Not starting today, but I'm going to ask that if

20  it is possible and if it meets with the approval of the U.S.

21  Marshals, I haven't asked them yet, that we can bring in, the

22  lawyers, some lunch for these three defendants.  It is a little

23  difficult for them inside.  If you feel it is not

24  appropriate --

25      THE COURT:  Well, that will be up to the marshal.  The

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1    (Continued on next page.)

2    A F T E R N O O N   S E S S I O N

3    (Time noted:  1:30 p.m.)

4    (The following takes place out of the presence of the jury.)

5         THE COURT:  Court Exhibit 1, note from Juror Number

6    Six, was distributed to the parties.

7    Will the witness take the stand please.

8         MS. GEDDES:  Your Honor, can we address the note from

9    Juror Number Six?

10        THE COURT:  Not right now.  I'll see you at the end of

11   the day.

12   (Witness resumes the stand.)

13   (Jury enters courtroom.)

14        THE COURT:  Proceed please.

15   DIRECT EXAMINATION (CONTINUED)

16   BY MS. GEDDES:

17   Q   Investigator Carillo, before lunch you were testifying

18   about the difference between a runner and a bettor.  Could you

19   please remind the jury of the distinctions between those two

20   terms?

21   A   The bettor is the person, it is the consumer, they're

22   placing the wagers.  The runner is sharing with the profits of

23   the bettors' losses with the bookmaker.

24   Q   Who actually places the bet, the bettor or the runner?

25   A   I've seen it both ways but the vast majority of time it is

Holly Driscoll, CSR

CARILLO/DIRECT/GEDDES

1   the bettor that actually places the wagers.

2   Q   How does the bettor place the bet?

3   A   They call the telephone number supplied to them by the

4   runner with the code; as I explained earlier, they have a code

5   and the runner has a code and usually there's a limit set to

6   them in that wire room how much money they can bet up to and

7   they place their wagers on sporting events, horses, whichever

8   they choose.

9   Q   And what happens when the bettors for a runner have a

10  winning week?

11  A   When the bettors win, let's say the accumulation of a

12  runner's account, they win $5,000 for the week; the runner

13  never pays money out of his pocket, he gets the $5,000 to pay

14  the players or the bettors from the bookmaker but then he has

15  what they call a \read\red or a stuck figure of $5,000 and the

16  runner doesn't share in the profits of the bettors' losses

17  until that red or stuck figure is depleted.  So, on week one if

18  his bettors won 5,000, he has a $5,000 stuck figure.  On the

19  second week of let's say football season the accumulation of

20  the runner's bettors lose $10,000, the runner has to take the

21  first $5,000, gives that directly to the bookmaker to deplete

22  or to get rid of that red or stuck figure.

23  Q   That's to get rid of the stuck figure from the prior week?

24  A   That carried from the following week.  Now, the second

25  5,000 because he eliminated the \read\red or stuck figure, now

HOLLY DRISCOLL, CSR

1  he shares in that 50 percent, so 2,500 would go to the

2  bookmaker and the runner would put $2,500 in his own pocket.

3  Q    And what if the runner had a winning week the following

4  week?

5  A    Well, if there's no red or stuck figure then let's say the

6  bettors lose another $5,000, it is split according to the

7  prearrangement, if it is a half sheet 2,500 to the runner, 25

8  to the bookmaker.  There are runners that can stay with a

9  \read\red or stuck figure for weeks on end, they don't start

10 sharing in the profits until they get rid of that red or stuck

11 figure.

12 Q    And does the runner ever have to pay out of his own pocket

13 to pay for any losses?

14 A    Generally speaking, no.

15         MS. GEDDES:  Thank you.  I have no further questions.

16         MR. WASHOR:  Judge?

17         THE COURT:  Yes, please, cross.

18 CROSS-EXAMINATION

19 BY MR. WASHOR:

20 Q    Good afternoon, Mr. Sarillo (ph).  It is Mister?

21 A    It is Carillo.

22 Q    But it is Mister, it is not detective or investigator?

23 A    Well, you can call me Mister but I am an investigator.

24 Q    Thank you.  You've got a lot of experience in investigating

25 organized crime, making -- preparing affidavits for wiretaps,

Exhibit G

PRISCO TRIAL 4-14-09 SDNY.txt

94e1priv1

```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA,
 3
 4              v.                        08 CR 885 (NRB)
 4
 5   ANGELO PRISCO,
 5
 6                  Defendant.
 6
 7   ------------------------------x
 7
 8                                       New York, N.Y.
 8                                       April 14, 2009
 9                                       9:21 a.m.
 9
10
10   Before:
11
11                HON. NAOMI REICE BUCHWALD,
12
12                                       District Judge
13
13
14                     APPEARANCES
14
15   LEV L. DASSIN
15        Acting United States Attorney for the
16        Southern District of New York
16   ELIE HONIG
17   LISA R. ZORNBERG
17        Assistant United States Attorneys
18
18   GALLET, DREYER & BERKEY
19        Attorneys for Defendant
19   ROGER LEE STAVIS
20   MICHELLE QUINN
20
21   ALSO PRESENT:  JOHN LaRAIA, Special Agent, FBI
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94e1priv1                    Voir Dire

```
 1            (Trial resumed)
 2            (In the jury room)
 3            THE COURT:  First matter is, there's a juror from
 4   yesterday who requested to speak to me alone about some
 5   matters, I don't know what, that he was uncomfortable speaking
 6   in front of Mr. Prisco.  If I can find his number.  Juror 93.
 7            MR. STAVIS:  What does your Honor suggest?
 8            THE COURT:  Well, I was going to ask you.
 9            MR. HONIG:  I don't mind him meeting with your Honor.
10            MR. STAVIS:  Yes.  I think the parties are in
11   agreement that if the juror wants to meet with your Honor
12   alone, it would be an agreement that that could happen, so long
```

Page 1

*Carillo, John*
3510-29

PRISCO TRIAL 4-14-09 SDNY.txt

```
19   A.  Yes.
20   Q.  Can you tell us what your responsibilities included.
21   A.  Well, clean the window, all the garbage, you know, taking
22   out the garbage and clean the parking lot.
23   Q.  And what was your shift at that time, if you recall?
24   A.  6 to 5:00.
25   Q.  I want to direct your attention now to the date of
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    263

94e1pri5                        Perez - direct
```
 1   June 3rd, 1992.  Were you at work that day?
 2   A.  Repeat again?
 3   Q.  Yes.  On June 3rd, 1992, were you at work that day?
 4   A.  McDonald's?
 5   Q.  Yes.
 6   A.  Yes.
 7   Q.  And can you tell us what happened that day while you were
 8   at work.
 9   A.  Well, that day I remember I go outside, clean the parking
10   lot.  And I saw the van, a white van, and I was in behind the
11   white van, I see a couple of bullets in the van, so when I go
12   to the other side, I see a couple of -- a couple of bullets in
13   the -- in the window, so when I approached to the -- to the
14   van, I see a body in there.  So then I report to my supervisor,
15   my supervisor called the police, and...
16   Q.  How did the body in the white van appear to you?  How did
17   it look, that body?
18   A.  The only thing I see was the body and a lot of blood on the
19   top of the body.  That's all.
20            MS. ZORNBERG:  No further questions, your Honor.
21            MR. STAVIS:  No cross-examination, your Honor.
22            THE COURT:  Thank you very much, Mr. Perez, for coming
23   in.
24            THE WITNESS:  Thank you.
25            (Witness excused)
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    264

94e1pri5                       Carillo - direct
```
 1            MS. ZORNBERG:  Your Honor, may we call our next
 2   witness?
 3            THE COURT:  Certainly.
 4            MS. ZORNBERG:  The government calls John Carillo.
 5            THE CLERK:  Please remain standing and raise your
 6   right hand.
 7            (Witness sworn)
 8            THE CLERK:  Please state and spell your full name for
 9   the record.
10            THE WITNESS:  John Carillo, C-A-R-I-L-L-O.
11            THE CLERK:  Please be seated.
12   JOHN CARILLO,
13       called as a witness by the Government,
14       having been duly sworn, testified as follows:
15   DIRECT EXAMINATION
16   BY MS. ZORNBERG:
17   Q.  Where do you work, Mr. Carillo?
18   A.  I'm an investigator in the United States Attorney's Office
19   in the Southern District of New York.
20   Q.  What do you do as an investigator for the US Attorney's
21   Office?
22   A.  My responsibilities are twofold.  I assist the criminal
23   investigations on organized crime members and associates, and
```
                              Page 38

PRISCO TRIAL 4-14-09 SDNY.txt
24  it's also my responsibility to gather and maintain information
25  on those associates and members.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    265

94e1pri5                  Carillo - direct
1   Q.  For approximately how long have you worked for the US
2   Attorney's Office?
3   A.  This summer it will be three years.
4   Q.  And what did you do before that?
5   A.  Prior to that, from 1984 to 2004, I was -- I worked for the
6   New York City Police Department, and then I had various jobs
7   after that.
8   Q.  At the time you left the New York Police Department what
9   was your rank?
10  A.  Detective investigator.
11  Q.  And as an NYPD detective, did you have any particular
12  focus?
13  A.  Yes.  The first eight years I was on the police department,
14  I had patrol duties; I was in uniform.  For the last twelve
15  years I was assigned to investigative assignments.
16  Q.  And during your career with the NYPD what responsibilities,
17  if any, did you have for investigating organized crime matters?
18  A.  From 1992, the last 12 years I was on the department, I had
19  three assignments in particular, where I was -- my
20  responsibilities included investigating organized crime members
21  and associates.
22  Q.  During your law enforcement career, approximately how many
23  organized crime targets have you investigated?
24  A.  Several hundred.
25  Q.  And can you tell the jury what types of organized crime
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    266

94e1pri5                  Carillo - direct
1   investigations you've been involved in.
2   A.  Certainly.  I've been involved in investigations which
3   include murder, loan sharking, gambling operations, extortions,
4   narcotics trafficking, auto crimes, money laundering.
5   Q.  Okay.  What sorts of investigative techniques have you used
6   in your organized crime investigations?
7   A.  I've been involved in numerous surveillances; I've been
8   involved with the monitoring of literally thousands of
9   intercepted telephone calls or calls over bugged devices, with
10  electronic eavesdropping; I've partook in debriefing of
11  numerous confidential informants and cooperating witnesses; and
12  it was -- part of my responsibility was to be in constant
13  contact with other law enforcement agencies, whether they be
14  federal or state.
15  Q.  Have any of your investigations of organized crime matters
16  also involved undercover operations?
17  A.  Yes, they have.
18  Q.  So let me go through each of those things individually now.
19          Physical surveillance, what is physical surveillance?
20  A.  Physical surveillance is when you set up on a particular
21  location to make observations.  Sometimes, if possible, I'll
22  take photographs, I'll have camera equipment with me, I'll have
23  binoculars with me, and whatever observations I make, I'll make
24  notes of it, and at a later time I formalize them into reports.
25  Q.  Approximately how many physical surveillances have you done
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                    267

                          Page 39

PRISCO TRIAL 4-14-09 SDNY.txt
94e1pri5                        Carillo - direct
1   relating to organized crime?
2   A.  Well over a thousand.
3   Q.  And at what types of locations have you conducted physical
4   surveillances?
5   A.  All different types of locations, which include social
6   clubs, bars, restaurants, I've done numerous surveillances at
7   wakes and social affairs that organized crime members have.
8   Q.  And for what reason is surveillance useful in these types
9   of investigation?
10  A.  Sometimes it's to see associations, if you're involved in
11  an investigation, sometimes it's to corroborate an intercepted
12  eavesdropping call, where you'll hear that certain people are
13  going to meet at a certain location, and you go to verify that.
14  Q.  Okay.  You also mentioned the use of electronic
15  surveillance or eavesdropping.  Can you just first explain to
16  the jury, what is electronic surveillance?
17          MR. STAVIS:  Your Honor, I have an objection, if I
18  might be heard at the sidebar.
19          THE COURT:  Yes.
20          (Continued on next page)
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

268

☐       94e1pri5                        Carillo - direct
1           (At the sidebar)
2           MR. STAVIS:  Your Honor, if the witness is testifying
3   as to what he did and to who he surveiled, that's fine, but if
4   he's testifying as to what these methods are and how they're
5   utilized, then he would have to be qualified as an expert,
6   which he hasn't been.  He's giving his opinions on various
7   techniques.
8           MS. ZORNBERG:  Your Honor, I think it's form over
9   substance.  I'm going to be qualifying him as an expert in a
10  matter of minutes, but I'm just laying the foundation of what,
11  you know, what things are and his involvement in them at the
12  same time.  It's --
13          THE COURT:  Objection is overruled.
14          (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

269

☐       94e1pri5                        Carillo - direct
1           (In open court)
2   BY MS. ZORNBERG:
3   Q.  Investigator Carillo, can you tell us, please, what is
4   electronic surveillance?
                            Page 40

PRISCO TRIAL 4-14-09 SDNY.txt
```
 5  A.  As law enforcement officers, we make an application to the
 6  court, and with their permission, we intercept either
 7  conversations over cellular or hard phones or, with their
 8  permission, we install devices inside a location, to intercept
 9  conversations, but more particularly, to listen to those
10  conversations as they pertain to particular crimes that we make
11  the application to the court, with their permission.
12  Q.  And how often have you worked with electronic surveillance
13  in your organized crime investigations?
14  A.  Over -- well over a hundred investigations, which included
15  the monitoring of thousands of intercepted conversations.
16  Q.  All right.  Moving along, you also mentioned the use of
17  confidential informants in organized crime investigations.
18  What is a confidential informant?
19  A.  A confidential informant is somebody that comes into an
20  agreement with a law enforcement officer to supply us with
21  information regarding organized crime members or associates, in
22  return, sometimes for monetary compensation or sometimes for
23  court consideration.  But their identity is always kept secret.
24  Nobody's to know their true identity.
25  Q.  And you also mentioned cooperating witnesses.  What is the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

270

94e1pri5                    Carillo - direct
```
 1  difference between a confidential informant and a cooperating
 2  witness?
 3  A.  A cooperating witness is usually somebody that's in custody
 4  already with law enforcement.  They also come into an
 5  agreement, but usually that agreement entails testifying in
 6  open court.
 7  Q.  Approximately how many times have you spoken to cooperating
 8  witnesses about organized crime?
 9  A.  Well over 50, possibly over a hundred.
10  Q.  And have you previously testified in federal court about
11  organized crime in the New York City area?
12  A.  Yes, I have.
13  Q.  Approximately how many times?
14  A.  Approximately 18 times.
15       MS. ZORNBERG:  Your Honor, the government offers
16  Investigator Carillo as an expert witness on organized crime in
17  the New York City area.
18       MR. STAVIS:  Brief voir dire, your Honor.
19  VOIR DIRE EXAMINATION
20  BY MR. STAVIS:
21  Q.  Investigator Carillo, you're not an academic type expert,
22  is that correct?
23  A.  Excuse me?
24  Q.  You're not an academic type expert; you're coming from law
25  enforcement, is that correct?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

271

94e1pri5                    Carillo - direct
```
 1  A.  Yes, I'm testifying from my experience in law enforcement,
 2  yes.
 3  Q.  And you don't have a PhD or some sort of advanced degree,
 4  do you?
 5  A.  In organized crime?  I don't think it exists.
 6  Q.  Correct.  There's no such thing as "mafiology," so to
 7  speak.
 8  A.  Not that I know of.
 9  Q.  And there is a school here in New York that's part of the
```
Page 41

PRISCO TRIAL 4-14-09 SDNY.txt
```
10   City University which is John Jay School of Criminal Justice.
11   Are you familiar with that?
12   A.  Yes.
13   Q.  Do you hold any professorship or anything at that school?
14   A.  No, I don't.
15   Q.  And you haven't published in any kind of scholarly journals
16   or anything like that, have you?
17   A.  No.
18   Q.  Now you were, from 1998 to 2004, with the investigative and
19   analysis section, is that correct?
20   A.  Yes.
21   Q.  And one of the things you did there was you viewed reports
22   of other law enforcement agencies, correct?
23   A.  That's correct.
24   Q.  And some of the reports were from an individual by the name
25   of Ken McCabe, is that correct?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

272

94e1pri5                Carillo - direct
```
1    A.  That's correct.
2    Q.  And those went back for years and years, correct?
3    A.  Yes.
4    Q.  And those are reports that you viewed, correct?
5    A.  That's correct.
6    Q.  And you viewed reports of other agencies, correct?
7    A.  Yes.
8    Q.  And you've had direct contact with officials and you've
9    gained -- with law enforcement officials and you've gained
10   information from them, correct?
11   A.  Yes.
12   Q.  And then of course, as you told the prosecutor, you've
13   gotten information from cooperators and from informants,
14   correct?
15   A.  That's correct.
16   Q.  And you testified 18 times in the federal court, qualified
17   as an expert, according to your testimony?
18   A.  Not qualified; in this capacity.
19   Q.  You could explain that, I --
20   A.  Sometimes it's up to the judge in the courtroom, sometimes
21   I'm deemed in open court, sometimes I'm just allowed to testify
22   as an expert.
23   Q.  I see.
24   A.  But all 18 times I testified in the capacity of an expert.
25   Q.  And you're not -- you didn't testify those 18 times as a
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

273

94e1pri5                Carillo - direct
```
1    fact witness where you -- something that you saw or one of your
2    own surveillances.
3    A.  Several times I have, yes.
4    Q.  So there's a little overlap there?
5    A.  No.  On one occasion the defense asked me fact questions,
6    and I'd done an investigation myself in 1992, and the judge
7    allowed me to come back as a fact witness.  That's happened
8    several times.
9    Q.  I see.  And just to make clear, you have never testified
10   where you're called as a witness by the defense, is that
11   correct?
12   A.  That's correct.
13   Q.  And as an employee of the US Attorney's Office for the
14   Southern District of New York, you couldn't, if you wanted to,
```
Page 42

PRISCO TRIAL 4-14-09 SDNY.txt
15  testify for the defense, isn't that correct?
16  A.  It just hasn't occurred.  I guess if they called me, I
17  would be -- if I was subpoenaed by a defense attorney, I guess
18  I would --
19  Q.  No, as an expert, not as a fact witness.
20  A.  As an expert?
21  Q.  As an expert for the defense.
22  A.  I don't know what the rules are.  It's just never happened.
23  Q.  And you're testifying here only as an expert, is that
24  correct?
25  A.  That's correct.
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                        274
       94e1pri5              Carillo - direct
1            MR. STAVIS:  No objection, your Honor.
2            THE COURT:  Thank you.  You may continue,
3   Ms. Zornberg.
4            MS. ZORNBERG:  Thank you, your Honor.
5   BY MS. ZORNBERG:
6   Q.  Investigator Carillo, are you familiar with the term La
7   Cosa Nostra?
8   A.  Yes.
9   Q.  And what does it mean literally?
10  A.  Literally, it means "this thing of ours" or "our thing."
11  Q.  What is Cosa Nostra?
12  A.  Cosa Nostra is a criminal organization located throughout
13  the United States in different cities and Canada.
14  Q.  What are some of the other names by which Cosa Nostra is
15  commonly known?
16  A.  You hear terms like the Mob, the Syndicate, the Mafia; in
17  Chicago they call it the Outfit.
18  Q.  What is the purpose of Cosa Nostra, generally speaking?
19  A.  To create a hierarchy that protects its hierarchy and also
20  to generate money through illegal enterprises.
21  Q.  How is Cosa Nostra currently structured in the New York
22  City area?
23  A.  Well, historically and today, there's always been five
24  families based in the New York City area.
25  Q.  And what do you mean by family?
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                        275
       94e1pri5              Carillo - direct
1   A.  Family is a separate unit with a hierarchy involving
2   criminal enterprises.
3   Q.  So just to be clear, you're not talking about a blood
4   relative family, correct?
5   A.  No.
6   Q.  What are the five families in New York City?
7   A.  The Genovese crime family, the Gambino crime family, the
8   Lucchese crime family, the Colombo crime family, and the
9   Bonanno crime family.
10  Q.  Do any of those five families operate outside of New York
11  City as well?
12  A.  Yes.
13  Q.  Do any of those five families operate in New Jersey?
14  A.  Yes.
15  Q.  Do the different families interact with each other?
16  A.  On a con -- on a daily basis, yes.
17  Q.  Can you tell us how the five families got their names.
18  A.  The federal government developed sources of information in
19  the '60s.  From those sources of information, the bosses that
                          Page 43

PRISCO TRIAL 4-14-09 SDNY.txt

20 were in charge of these five families at that time are the
21 names we continue to use today in law enforcement.
22 Q.  And at the time in the 1960s, who were the bosses of the
23 five families?
24 A.  Well, you had Vito Genovese, Carlo Gambino, you had Joe
25 Colombo, for the Bonanno family you had Joe Bonanno, and for
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

276

94e1pri5                 Carillo - direct
1 the Lucchese family you had Tommy Lucchese.
2 Q.  Is there an organized crime family that has historically
3 operated in New England?
4 A.  Yes, with the permission of the five families from New --
5 oh, in New England, yes, the Patriarca family.
6 Q.  And historically is there any relationship between the
7 Patriarca family and the Genovese family?
8 A.  They've had interactions, yes.
9 Q.  Now focusing on the five families in New York --
10          MS. ZORNBERG:  Your Honor, may I approach the witness?
11          THE COURT:  Sure.
12 Q.  Investigator Carillo, I'm showing you what's been marked
13 for identification as Government Exhibit 40.  What is it?
14 A.  It's a diagram of the ranking within the Cosa Nostra or an
15 organized crime family.
16 Q.  And will the diagram assist in explaining the internal
17 structure of the five families for the jury?
18 A.  Yes.
19          MS. ZORNBERG:  The government offers Government
20 Exhibit 40.
21          MR. STAVIS:  No objection, your Honor.
22          THE COURT:  Received.
23          (Government's Exhibit 40 received in evidence)
24          MS. ZORNBERG:  All right.  Let's put that up on the
25 screen.  We'll have to enlarge as we go through it.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

277

94e1pri5                 Carillo - direct
1 Q.  First of all, how are the five families structured
2 internally?
3 A.  From top down, you want me to go through each rank?
4 Q.  Yeah, let's -- starting at the top.
5 A.  Okay.  Each family has a boss.  He's in charge of his
6 family.  His power is absolute.  He sets policy within his own
7 family and metes out punishment when he deems necessary.
8          He names his underboss; that's the second in command.
9          And the consigliere is an adviser to the boss, also
10 interacts with other families.
11          The three top ranks, the boss, the underboss and the
12 consigliere, make up the administration.
13 Q.  Okay.  Let's talk now about the family hierarchy below the
14 level of administration.  Looking at the next level, which, in
15 the diagram is indicated as capos.
16 A.  Yes.  Capos, also known as caporegimes or capodecinas,
17 they're also known as skippers.  They are assigned by the boss
18 of the family to run regimes or crews within the family, and
19 those crews consist of soldiers, which are inducted members of
20 the family and close associates.
21 Q.  So who does the capo supervise?
22 A.  Soldiers and close associates.
23 Q.  And what are the advantages to a capo of having a crew?
24 A.  Well, the crew, in an organized crime family, are the
Page 44

PRISCO TRIAL 4-14-09 SDNY.txt
25    soldiers and the close associates involved with illegal

94e1pri5                 Carillo - direct

1    activities. It's their responsibility to push money upward to
2    the captains, so if they're involved in the illegal activities,
3    a certain percentage of their profits have to go up to the
4    captain. So the bigger the crew, the more money the captain
5    generates.
6    Q. All right. Let's look at the next level in the diagram,
7    which is referred to here as soldiers. Are there other -- Why
8    don't you tell us what a soldier is and if there are other
9    names by which they're referred.
10    A. Right. A soldier is an inducted member. They're part of
11    the family. Other names that they go by are goodfellas,
12    wiseguys, bud men, men of honor. Within Cosa Nostra they refer
13    to somebody that's made as somebody that's straightened out.
14    They also refer to -- within Cosa Nostra themselves, they call
15    somebody that's inducted amiga nostra, or "a friend of ours."
16    Q. Okay. So is being straightened out and being made, are
17    those synonymous terms?
18    A. Yes, they are.
19    Q. And meaning that they're soldiers?
20    A. They've gone through a ceremony and they're inducted in
21    that family.
22    Q. Now can anyone become a made member of Cosa Nostra?
23    A. No. There is criteria.
24    Q. What are the criteria?
25    A. You have to be a male gender, you have to be of Italian

94e1pri5                 Carillo - direct

1    descent. In some families it's a hundred percent Italian on
2    your mother and father's side, but in all families it's at
3    least on your father's side. And you have to be sponsored or
4    proposed by a current member of that family. They have to
5    speak up for you to the boss of that family.
6    Q. Now what does somebody usually have to do before he can get
7    proposed for membership?
8    A. Well, when you're proposed, that person that's a member has
9    to think enough of you to try to put you up for membership.
10    It's considered the highest honor, for somebody that's involved
11    in that type of life. So it's usually a longstanding
12    relationship. It's common knowledge within Cosa Nostra that
13    usually you get inducted, or made, for two reasons. You either
14    have to be a good earner or you have to be what they call
15    capable; somebody that's capable of violence or has committed
16    murders for the family.
17    Q. Can you tell us what the process is for becoming a made
18    member.
19    A. Yes. If you're proposed by an active member of a
20    particular family and the boss of that family approves of that
21    person becoming made, in New York, a list is sent from that
22    family to the other four families for their approval. Upon
23    their approval of this person's induction and at the boss's
24    choosing or the personal representative of the boss, they open
25    the books. That's the Cosa Nostra term for inducting new

94e1pri5                 Carillo - direct
Page 45

PRISCO TRIAL 4-14-09 SDNY.txt

```
 1   members.
 2   Q.  Are there actual physical books, that you're aware of?
 3   A.  No.
 4   Q.  Historically, what happens at an induction?
 5   A.  Well, at the -- it's supposed to be the most secret of
 6   induction ceremonies.  They protect it with all their
 7   resources.  On the day of an induction, the person that's
 8   proposed is brought to a location where the hierarchy of that
 9   family's high -- if the boss is incarcerated or incapacitated,
10   representatives, high -- high-ranking officials from that
11   family are usually present, and sometimes the person that
12   proposes that person, whether it be a soldier or a captain, is
13   there also.
14        Usually they're brought into a room -- This is
15   historically.  They're brought into a room where there's a gun
16   and a knife on the table, and the person to be inducted is
17   asked if they are willing to kill for Cosa Nostra, if they are
18   willing to put Cosa Nostra before all other things in their
19   life.  If they agree, they usually take out a piece of paper or
20   a picture of a saint, they prick the new member's finger, a
21   couple of drops of blood placed on the paper or the saint,
22   they're lit on fire and placed in the new member -- in the palm
23   of their hand, and they have to recite that they should burn in
24   hell if they do anything against any members of Cosa Nostra; if
25   they disclose any information of any member of Cosa Nostra,
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              281

```
     94e1pri5                 Carillo - direct
 1   they should burn in hell.  Then usually a ranking member will
 2   explain the rules of Cosa Nostra to this new inductee.
 3   Q.  And --
 4   A.  Then -- Yes, I'm sorry.
 5   Q.  What are the cardinal rules of Cosa Nostra?
 6   A.  Well, when they're reciting -- when the saint or the paper
 7   is burning in their hands, they call that the oath of omertá,
 8   silence.  Then the rules are explained to them, several rules,
 9   that you have to put Cosa Nostra above all else in your life.
10   Sometimes they use an example, that if you're by the bedside of
11   an ailing mother and a ranking person in Cosa Nostra called you
12   in, there's no excuses, you have to come.
13        They also inform the new member that if somebody was
14   to inform on Cosa Nostra, whether it be a blood relative of the
15   new inductee, it could be a brother or an uncle, a son, and
16   Cosa Nostra asks them to kill them for the family, they would
17   have to do so.
18        They're also told that they have to put on record all
19   illegal and legal activities that they're involved with, so
20   that their captain is aware of all the money that that new
21   member is generating.
22   Q.  And what does it mean to put it on record?
23   A.  On record is a term that you'll hear in Cosa Nostra for
24   anything that's public between a member and his captain or the
25   hierarchy of the family.
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              282

```
     94e1pri5                 Carillo - direct
 1   Q.  Are there any other rules that are explained?
 2   A.  Yes.  If a Cosa Nostra member is involved with any females
 3   of another Cosa Nostra member's [sic], it has to be with good
 4   intentions.  It's high on their list to respect females.
 5   They're not supposed to deal with narcotics or government
```
                          Page 46

PRISCO TRIAL 4-14-09 SDNY.txt

```
 6  bonds.
 7  Q.  Are these rules broken?
 8  A.  All the time.
 9  Q.  If a made member breaks the rules, are there penalties that
10  are recognized within organized crime?
11  A.  Yes.
12  Q.  What are the range of penalties?
13  A.  A made member -- only a made member can be what they call
14  shelved.  It's a form of discipline in lieu of killing that
15  person.  What they do is they strip the powers of that made
16  member to make any money through illegal enterprises, and the
17  word is supposed to go out to all other members of Cosa Nostra
18  not to respect that person, not to have meetings or what they
19  call sit-downs with them, if that person calls on it.
20  Q.  And since you brought it up, you mentioned the term
21  sit-down, what is a sit-down?
22  A.  A sit-down is the way Cosa Nostra settles their disputes,
23  but there's a criteria for it.  If a soldier has a beef with
24  another soldier, they can meet.  If a soldier has a dispute
25  with a captain, then that other soldier has to get his captain
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

283

94e1pri5                    Carillo - direct
```
 1  to meet with the other captain.  So the ranks have to be the
 2  same.  If a boss or somebody on the administration is settling
 3  the dispute with another family, they have to meet with
 4  somebody on the administration of the other family.
 5  Q.  All right.  We were talking about the possible range of
 6  penalties if a made member breaks the rules of Cosa Nostra.
 7  Besides being shelved, what are the other penalties that a made
 8  member could face for breaking the rules?
 9  A.  Well, they could be verbally disciplined, they could have
10  certain illegal activities taken away from them, or they could
11  be killed.  The one thing that they -- Cosa Nostra is not
12  supposed to do to another member under any circumstances is to
13  raise their hand to one another, whether they did something
14  wrong or not.  So you won't often see a Cosa Nostra member
15  striking another Cosa Nostra member, no matter what the
16  infraction.  They would kill them, usually, before they would
17  do that.
18  Q.  Now are you familiar with something called the Commission?
19  A.  Yes.
20  Q.  What is that?
21  A.  Well, the Commission was formed many years ago where the
22  heads of the five families, the bosses of the five families,
23  would meet periodically to set policy in the New York area to
24  use their influence with one another rather than to be violent
25  with one another.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

284

94e1pri5                    Carillo - direct
```
 1  Q.  And what role historically has the Commission played in
 2  permitting or not permitting the making of new members?
 3  A.  Well, sometimes it's discussed on the Commission whether to
 4  open the books and induct new members or not to.
 5  Q.  Historically have there been periods of time where the
 6  books were closed?
 7  A.  One in particular, yes.
 8  Q.  And when was that?
 9  A.  In the late 1950s, somewhere around 1958, to 1978, the
10  books were closed in all five New York families.
```

Page 47

PRISCO TRIAL 4-14-09 SDNY.txt

```
11   Q.  Now going back to our diagram, we've talked about the
12   administration, the capos, soldiers.  Let's now talk about
13   associates.  What is an associate?
14   A.  An associate is somebody of any ethnic background or any
15   gender that's involved in criminal activity with a member of
16   organized crime or they could be involved in a legitimate
17   business as a front to launder money with them or just to be a
18   front person in a particular business.
19   Q.  What terms are used to describe the relationship between an
20   associate and a made organized crime member?
21   A.  When an associate is under the protection of being what
22   they call serviced by a made member, usually you'll hear, "I'm
23   with so-and-so" or "I'm around them."  So "with" and "around"
24   are the terms that a close associate would use to be on record,
25   what they call on record with a made member.
```

94e1pri5                         Carillo - direct
```
1    Q.  What are the advantages to the associate of being on record
2    with a made member?
3    A.  Well, in return for giving a certain percentage of the
4    profits from illegal activities to the members of the family or
5    to the family, they in turn receive protection and influence
6    from that family.  What that means is basically if you're
7    involved in an illegal enterprise and you're out there
8    independent, you're always at a risk to be extorted by members
9    of organized crime if they find out you're involved in
10   bookmaking or, for instance, a loan sharking operation.  When
11   you're with somebody or around somebody and on record, you're
12   under their protection, so if you are approached by another
13   member, you could just refer them to that member and the
14   problem will be resolved.
15   Q.  Now are there any advantages to being a made member over an
16   associate?
17   A.  Yes.
18   Q.  What are those?
19   A.  Well, becoming a made member in Cosa Nostra, it's also said
20   at your induction, you're in it for life.  You're also under
21   the protection in a way different from an associate.  In order
22   for you to be killed in Cosa Nostra by another member, once
23   you're an inducted member, they would have to get the
24   permission of your boss.  Only your boss can give the okay for
25   you to be killed.  That's one advantage.
```

94e1pri5                         Carillo - direct
```
1            And then you're actually part of something.  So in the
2    event that you're not able to generate money for yourself,
3    sometimes other members will give you activities so that you
4    would -- the way they refer it is to give you an earn, to allow
5    you to earn money.
6    Q.  Okay.  Now earlier we discussed penalties that a made
7    member could face for breaking Cosa Nostra rules.  Are there
8    penalties for associates who commit infractions in Cosa Nostra
9    rules?
10   A.  Yes.
11   Q.  And what could those penalties be?
12   A.  Well, as opposed to a made member, they could chase you.
13   That means they could just give you an ultimatum not to come
14   around anymore, to give up your end of the illegal enterprise
15   that they're involved with, they could physically hurt you by
```

PRISCO TRIAL 4-14-09 SDNY.txt
16    assaulting you, and they could kill you.
17    Q.  What are some of the reasons that result in associates
18    being disciplined?
19    A.  I mean, it could range from one gamut to the other.  The
20    biggest infraction is usually stealing from a member,
21    disrespecting a member, just not following the protocol that
22    that member desires from that associate.
23    Q.  Okay.  Now looking at the diagram, you explained earlier
24    that a capo supervises a crew.  To what extent can associates
25    be part of a capo's crew?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

287
94e1pri5                    Carillo - direct
1     A.  They are -- they are part of a crew if they're on record or
2     what they consider close associates.  So a captain's crew, it's
3     both made members that are assigned to the captain and close
4     associates.
5     Q.  Can close associates report directly to capos?
6     A.  Sure.
7     Q.  In terms of the eligibility requirements, do you have to be
8     Italian to be an associate of the Mafia?
9     A.  No.
10    Q.  And is there any induction ceremony for associates?
11    A.  No, there's not.
12    Q.  All right.  Investigator Carillo, you mentioned earlier
13    that you've conducted physical surveillance at social clubs.
14    What are social clubs?
15    A.  Social club's usually a storefront, it's a location that's
16    opened up by either a Cosa Nostra member or an associate and --
17    and it's a meeting place, historically it's been a meeting
18    place for members and associates, and historically it's always
19    been a place where they feel comfortable exchanging monies from
20    operations to pay up or to pay tribute to their peers.
21    Q.  Where in New York City have social clubs been located?
22    A.  In all five boroughs and the suburbs.
23    Q.  All right.  I'm going to ask you now about some additional
24    organized crime technol -- terminology.
25          First of all, are you familiar with the term "friend"
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

288
94e1pri5                    Carillo - direct
1     or "friend of mine" or "friend of ours"?
2     A.  Yes.
3     Q.  And what do those terms refer to in an organized crime
4     context?
5     A.  "A friend of mine" means exactly what it sounds.  Anybody
6     can say that.  When a Cosa Nostra says "friend of ours,"
7     there's a significance to it.  When you're inducted into the
8     family, it's usually explained to you that you can never
9     introduce yourself to another made member; you have to be
10    introduced by a third party that's a made member that knows
11    both parties.  And the way that introduction would take place,
12    if one person is made and he knows that the other two people
13    are made and they need to meet to conduct business, then the
14    third party would introduce the two people as, he's a friend of
15    ours, and he's a friend of ours, and then they know that
16    they're inducted members of Cosa Nostra.
17    Q.  Are you familiar with the terms "kicking up" or "tribute"?
18    A.  Yes.
19    Q.  Okay.  First of all, do those terms mean the same thing?
20    A.  Yes.
Page 49

PRISCO TRIAL 4-14-09 SDNY.txt

21   Q.  What do they mean?
22   A.  It's just whatever illegal activity you're involved with,
23   paying money up through the chain of command.  The money always
24   goes up through a Cosa Nostra family, up --
25   Q.  Who do the associates kick up to?

94e1pri5                    Carillo - direct

1    A.  Well, it's all according.  Sometimes the money could go
2    directly to a soldier or a captain or somebody on the
3    administration.  It's all according to those phrases that I
4    mentioned before, who they're around or with or who they're on
5    record with.
6    Q.  What are the range of consequences that a member or
7    associate could face for failing to kick up?
8    A.  Well, as I had mentioned before, you can be verbally
9    chastised.  For a member and an associate it's different.  You
10   could be chased, if you're an associate; you could be shelved,
11   if you're a made member; and either one could be killed if they
12   feel the infraction is severe enough.
13   Q.  Are you familiar with the term "walk and talk"?
14   A.  Yes.
15   Q.  What is a "walk and talk"?
16   A.  It's just two members or associates of organized crime
17   walking outside a location to discuss illegal activity to avoid
18   electronic eavesdropping, whether it be bugs or wiretaps, that
19   type of thing.
20   Q.  All right.  What terminology, Investigator Carillo, is used
21   in the Mafia to refer to murder?
22   A.  You'll hear phrases like clip or whack, they'll refer to it
23   amongst themselves as a piece of work; you'll hear one member
24   say to another member, that guy's done work for the family.  So
25   that's a main phrase that they use for murders within

94e1pri5                    Carillo - direct

1    themselves.
2    Q.  What is the protocol regarding the authorization of murder?
3    A.  Authorized murders come from the top, if they're, you know,
4    on record or authorized or sanctioned murders.  Whoever's the
5    boss or acting for him has to approve any member in that family
6    to partake in a murder.
7    Q.  Can you explain the difference between a sanctioned murder
8    and an unsanctioned murder within organized crime.
9    A.  Sure.  A sanctioned murder is what I said, with permission
10   from their superiors.  An unsanctioned murder, you also hear
11   terminology like a sneak murder, that's somebody taking it upon
12   themselves to kill somebody without permission of their
13   superiors.
14   Q.  Now earlier you referred to bookmaking and loan sharking.
15   So first, why don't you explain what bookmaking means.
16   A.  Well, a bookmaker is somebody -- well, in Cosa Nostra
17   terms, it's somebody who's associated with them or sometimes a
18   member that sets up a location where they accept illegal
19   wagers, usually over the telephone, sometimes over the
20   computer, on sporting events and sometimes horses.
21   Q.  And what is loan sharking?
22   A.  Loan sharking, you'll also hear terms what they call a
23   shylock.  That's, again, somebody that puts loans out on the
24   street.  It's not a financial institution.  They usually get
25   high rates of interest, and that interest has to be paid on a

Page 50

PRISCO TRIAL 4-14-09 SDNY.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

291

94e1pri5                    Carillo - direct
1   weekly basis.
2   Q.  Moving on to some other terms, are you familiar with the
3   term shakedown?
4   A.  Yes.
5   Q.  What is a shakedown?
6   A.  It's an extortion.
7   Q.  Historically in New York City, in what industries have
8   shakedowns been most prevalent?
9   A.  You had many extortions in the carting industry,
10  construction industry, restaurants, bars, catering halls,
11  funeral parlors, any place -- if the business is in an area
12  where Cosa Nostra is prevalent, the more risk of shakedowns or
13  extortions would occur.
14  Q.  Are you familiar with the term "score" or "a score"?
15  A.  Yes.
16  Q.  And what does a score refer to?
17  A.  A score is usually not an ongoing illegal enterprise, it's
18  usually a one-shot deal where a large amount of money is
19  brought in.  It's not an ongoing operation.
20  Q.  All right.  I'd like now to focus specifically on the
21  Genovese crime family.  You testified earlier that this family
22  was named for Vito Genovese.  When was he boss?
23  A.  From approximately 1957 until his death in 1969.
24  Q.  Have there been other bosses since then?
25  A.  Yes.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

292

94e1pri5                    Carillo - direct
1   Q.  Is the Genovese family still active?
2   A.  Yes.
3   Q.  How does it compare in size to the other organized crime
4   families?
5           MR. STAVIS:  Objection, your Honor.
6           THE COURT:  What's the relevance of that?
7           MS. ZORNBERG:  Just laying some groundwork about the
8   family, its existence and scope.
9           MR. STAVIS:  I have an objection.  If your Honor wants
10  to hear my objection at the sidebar, I'll state it or...
11          THE COURT:  You should just go on.  Go on, to your
12  next question.
13          MS. ZORNBERG:  Next question?  All right.
14  BY MS. ZORNBERG:
15  Q.  Approximately how many made members are in the Genovese
16  crime family?
17  A.  Over 200.
18  Q.  And how does that number break down within the various
19  ranks we've discussed?
20  A.  Well, there's approximately 20 captains or caporegimes with
21  crews, you have the administration, either acting or official
22  positions, and the remainder are soldiers or made men in the
23  family.
24  Q.  Now that number of 200 you said, approximately --
25  A.  200 to 250, somewhere in there.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

293

94e1pri5                    Carillo - direct
1   Q.  Okay.  Does that include associates?
Page 51

PRISCO TRIAL 4-14-09 SDNY.txt

```
2   A.  No.
3   Q.  How many associates are there approximately with or around
4   the various Genovese crews?
5   A.  At least a couple of thousand.
6           MS. ZORNBERG:  No further questions, your Honor.
7   CROSS-EXAMINATION
8   BY MR. STAVIS:
9   Q.  Investigator Carillo, drawing your attention to
10  Government's Exhibit 40, the position of capo, can you
11  please -- that's directly under the administration of the Mafia
12  family, is that correct?
13  A.  That's correct.
14  Q.  And that's a very powerful position; could we agree with
15  that?
16  A.  Yes.
17  Q.  And there aren't that many captains with regard to the
18  whole Mafia family -- Well, let me withdraw that.
19          You testified that there are, in the Genovese crime
20  family, there are 200 to 250 formal made members, correct?
21  A.  That's correct.
22  Q.  And you testified that there are only 20 capos, correct?
23  A.  Yes.
24  Q.  And you testified that there are a couple of thousand
25  associates, correct?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

294

94e1pri5                    Carillo - cross
```
1   A.  Yes.
2   Q.  So if you're a capo, then you have potentially thousands of
3   people who can do things for you, correct?
4   A.  Well, when I said 2,000 associates, they're not all on
5   record or considered close associates.  So the number -- it's
6   significant, but it would be less.
7   Q.  But a capo has a lot of people that he could call upon to
8   do things for him, is that fair to say?
9   A.  It's fair to say, but it's on a captain-by-captain basis.
10  Some captains have many people, some have less, so it's all
11  according to who you're talking about.
12  Q.  But it's a high up -- it's a high up position and there are
13  many lower positions, is that correct?
14  A.  Yes, yes.
15  Q.  And the capo is a high position where you have these
16  sit-downs that you spoke of, correct?
17  A.  Not just a captain.  Any made member could have a sit-down.
18  You could only have it with a person of the equivalent rank.
19  Q.  But a captain would have more important sit-downs than a
20  member, is that correct?
21  A.  Not necessarily, no.
22  Q.  And you testified that a capo is in charge of a crew?
23  A.  Yes.
24  Q.  And what are the sizes of crews?
25  A.  They vary.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

295

94e1pri5                    Carillo - cross
```
1   Q.  They vary from what to what?
2   A.  I've had as many as 15 to 20 members in a crew, I've had
3   captains with no crew, that they'll leave this, out of
4   respect -- Somebody that may have lost some of the soldiers
5   that were underneath them through the years, they'll leave them
6   at that rank just out of respect.
```

Page 52

Exhibit H

U.S. District Court, EDNY

Page 78

1  REYNALDO TARICHE,
2        called as a witness, having been first
3        duly sworn, was examined and testified
4        as follows:
5        THE COURT:  Please state your full name and
6  spell your name slowly for the record.
7        THE WITNESS:  My name is Reynaldo,
8  R-E-Y-N-A-L-D-O Tariche, T-A-R-I-C-H-E.
9        THE COURT:  You may proceed.
10       MR. DONOGHUE:  Thank you, your Honor.
11
12
13  DIRECT EXAMINATION
14  BY MR. DONOGHUE:
15  Q.  Good afternoon, Agent Tariche.
16  A.  Good afternoon.
17  Q.  Sir, you're currently employed by the FBI, correct?
18  A.  Yes.
19  Q.  And how are you employed by the FBI?
20  A.  I'm assigned to the Long Island gang task force.
21  Q.  How long have you been a Special Agent with the FBI?
22  A.  Over 19 years.
23  Q.  Prior to joining the FBI, how were you employed?
24  A.  I was employed in a brokerage firm in Manhattan, New
25  York.

Page 79

1  Q.  Could you please just briefly explain to us what your
2  formal education background is?
3  A.  Yes.  I have a BS, Bachelor of Science in finance
4  from Boston College.
5  Q.  Just generally what type of formal training have you
6  received over your 19 years as an FBI agent?
7  A.  As an FBI agent, myself and all agency attend 16 week
8  training academy at Quantico, Virginia, where we learn the
9  duties of an FBI agent.  In addition to that, we are also
10  do continuing education courses at Quantico and other
11  venues throughout the United States.
12  Q.  What type of continuing education courses have you
13  taken?
14  A.  I've taken the safe streets training course, as well
15  as numerous other special weapons in tactics courses.
16       THE COURT:  I didn't get the first one.
17  A.  Special weapons and tactics.
18  Q.  Have you taken any courses or training specifically
19  relating to street gang investigations?
20  A.  Yes.  That safe streets task force which I mentioned.
21  Q.  Can you briefly describe the different assignments
22  that you've had since joining the FBI?
23  A.  Yes, I joined the FBI in 1990.
24       At that time I was assigned to the Long Beach
25  resident agency or satellite office of the Los Angeles

Page 80

1  division of the FBI.
2  Q.  How long were you in Long Beach?
3  A.  I was in Long Beach for five years, again 1990 and
4  1995.
5  Q.  What was follow on assignment?
6  A.  In 1995, I was transferred to the Brooklyn-Queens
7  resident agency or satellite office of the New York
8  division of the FBI.
9  Q.  And where were you assigned there?
10  A.  I was assigned to a drug money laundering task force
11  from 1995 through 2004.
12  Q.  And where were you assigned in 2004?
13  A.  In 2004 I was assigned to the Long Island resident
14  agency or satellite office the New York division of the
15  FBI to the Long Island gang task force.
16  Q.  While you were assigned in the Long Beach, California
17  resident agency, were you a member of any task force?
18  A.  Yes.  I was a member of the violent crimes task
19  force.
20       (Court alarm sounds.)
21       THE COURT:  I will find out what that is all
22  about.  Sometimes it is a false alarm.
23       (Pause in proceedings.)
24       THE COURT:  Since I have been in this building
25  from the year 2000 when it opened, there were a million

Page 81

1  alarms, none of which were real.  So what we're going to
2  do is just so I can check, we're going to ask you to go
3  into the jury room and wait.
4       Now, my courtroom deputy is going down to get
5  your lunch just as this went off.  So now not only are we
6  inconvenienced, we're prevented from eating.  So I want
7  you to recess and go into the jury room and I will let you
8  know.  When you recess, we do it in the following manner,
9  the rear row goes out first, followed by the front row.
10  Please don't be concerned, I'm almost sure it doesn't
11  mean anything.  Please recess yourself.
12       (Whereupon, the jury retired from the
13  courtroom.)
14       THE COURT:  It takes a short while to learn
15  about why it's a false alarm.  Do you know anything about
16  it.
17       THE COURT SECURITY OFFICER:  They want everybody
18  out, Judge.
19       THE COURT:  They want everybody out?  Why?
20       THE COURT SECURITY OFFICER:  I don't know if
21  it's a drill.
22       THE COURT:  It's not a drill.  It's a false
23  alarm probably.
24       (Court security officer speaks to the Court at
25  this point.)

Mary Ann Steiger, OCR

U.S. District Court, EDNY

Page 82

1       THE COURT: They want all of you out. I'm sure
2  it's going to be a meaningless trip, but I follow
3  instructions. So you all have to go out. We are probably
4  recessed until 2:15.
5       MR. TOMAO: Thank you, your Honor.
6       (Luncheon recess taken at this point.)
7       (Continued on next page;)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1       A F T E R N O O N  S E S S I O N
2
3       THE CLERK: Jury entering.
4       (The jury is present.)
5       THE COURT: Please be seated, members of the
6  jury.
7       You may proceed.
8       MR. DURHAM: Your Honor, with the Court's
9  permission and the consent of the defendant, the
10  government would ask to call Vincent Destefano.
11       THE COURT: You're interrupting the testimony of
12  the previous witness, correct?
13       MR. DURHAM: Yes, your Honor
14       THE COURT: Members of the jury, we will take a
15  new witness. We will get back to the other witness.
16  Right now, we're taking a new witness.
17
18  VINCENT DESTEFANO,
19       called as a witness, having been first
20       duly sworn, was examined and testified
21       as follows:
22
23       THE CLERK: Please state your name and spell
24  your last name slowly for the record.
25       THE WITNESS: Vincent DeStefano,

Page 84

1  D-E-S-T-E-F-A-N-O.
2       THE COURT: Have a seat, Mr. Destefano.
3       Keep your voice up and speak into the microphone
4  loudly.
5       You may proceed.
6       MR. DURHAM: Thank you, your Honor.
7
8  DIRECT EXAMINATION
9  BY MR. DURHAM:
10  Q.  Good afternoon, sir?
11  A.  Good afternoon.
12  Q.  What do you do for a living?
13  A.  I deliver flowers.
14  Q.  What is the name of the business?
15  A.  Strictly Roses.
16       THE COURT: I'm sorry, I can't hear you.
17       THE WITNESS: Strictly Roses.
18  BY MR. DURHAM:
19  Q.  Do you just deliver roses or other types of flowers
20  as well?
21  A.  All different kinds of bouquets, flowers, roses.
22  Q.  How long have you been operating that business?
23  A.  10 years.
24  Q.  Where do you buy your flowers from?
25  A.  I buy them from the wholesaler in Suffolk, Deer Park.

Page 85

1  Q.  Where do you sell the flowers?
2  A.  Nassau County, Suffolk County.
3  Q.  The flowers that you sell, are they, if you know,
4  grown here in New York or elsewhere?
5  A.  Most of them are grown out of the country.
6  Q.  Do you know where?
7  A.  Mexico, South America.
8  Q.  When they're imported into the country, do you know
9  if they come straight to New York or do they go somewhere
10  else first?
11  A.  Most of them go to Miami.
12       MR. TOMAO: Objection, your Honor.
13       THE COURT: On what grounds?
14       MR. TOMAO: On the grounds of there's no
15  foundation for how he would know, your Honor. It could be
16  hearsay.
17       MR. DURHAM: I'll rephrase the question as if
18  you know.
19       MR. TOMAO: It still calls for hearsay, your
20  Honor.
21       Objection.
22       THE COURT: Well, other than people telling you,
23  is there any other way you know that the flowers come from
24  out of the country, Mexico and South America?
25       THE WITNESS: Yeah.

22 (Pages 82 to 85)

U.S. District Court, EDNY

Page 94

1 Q.  Do you know if the police had opened that panel?
2 A.  No, they didn't.
3 Q.  So you don't know how it got opened?
4 A.  No.
5 Q.  By the way, do you recall if you had 123,000 miles on
6 the van when it was stolen?
7 A.  I don't remember.
8       MR. TOMAO:  No further questions.
9       Thank you, your Honor.
10      THE COURT:  Anything else?
11      MR. DURHAM:  Just one question.
12
13 REDIRECT EXAMINATION
14 BY MR. DURHAM:
15 Q.  The loss of the van, the loss of your account book,
16 what impact did that have on your business?
17      MR. TOMAO:  Objection, your Honor.
18      THE COURT:  Sustained.
19 BY MR. DURHAM:
20 Q.  Did the loss of the van and your account book have
21 any impact on your business?
22      MR. TOMAO:  Objection.
23      THE COURT:  Sustained.
24      MR. DURHAM:  No further questions, your Honor.
25      Anything else?

Page 95

1       MR. TOMAO:  No, your Honor.
2       Thank you.
3       THE COURT:  You may step down.
4       (The witness steps down.)
5       THE COURT:  Are you recalling that witness?
6       MR. DONOGHUE:  Yes.
7       We recall Special Agent Tariche, your Honor.
8
9 REYNALDO TARICHE,
10      called as a witness, having been previously
11      duly sworn, was examined and testified further
12      as follows:
13
14      MR. DONOGHUE:  May I proceed, your Honor?
15      THE COURT:  Yes.
16
17 DIRECT EXAMINATION (CONT.)
18 BY MR. DONOGHUE:
19 Q.  Agent Tariche, I remind you that you're still under
20 oath.
21 A.  Yes.
22 Q.  Sir, when we left off, you indicated that your first
23 assignment was at the Long Beach satellite office out of
24 Los Angeles, correct?
25 A.  Yes.

Page 96

1 Q.  What years were you there?
2 A.  1990 to 1995.
3 Q.  Were you assigned to any task forces while you were
4 out there?
5 A.  Yes.
6      I was assigned to the Violent Crimes Task Force.
7 Q.  And what generally was the mission of the Violent
8 Crimes Task Force?
9 A.  The mission of our Task Force was to investigate
10 crimes, federal crimes, involving include to include
11 kidnappings, gang activities, bank robberies, drug
12 activities.
13 Q.  And approximately how long were you on that Task
14 Force?
15 A.  Five years.
16 Q.  What agencies provided personnel for that Task Force?
17 A.  It was led by the FBI.  We also had members of the
18 Los Angeles County Sheriff's Department.  And we also had
19 members of the Long Beach California Police Department, as
20 well as members from the Bureau of Narcotics Enforcement,
21 State of California.
22 Q.  Just roughly, approximately how many cases did you
23 work while you were on the Task Force?
24 A.  Over 100.
25 Q.  Just generally, what did you do in the course of

Page 97

1 those investigations?
2 A.  In the course of our investigation we conduct
3 arrests, search, surveillance, developing of informants,
4 assisting the U.S. Attorney's office in prosecuting cases
5 and witnesses, and the general duties of an FBI agent.
6 Q.  I think you also indicated that since 2004, you have
7 been assigned to a Task Force here on Long Island?
8 A.  Yes, that's correct.
9 Q.  What Task Force is that?
10 A.  That's the FBI Long Island Gang Task Force.
11 Q.  What agencies currently have personnel assigned to
12 that Task Force?
13 A.  Currently we have the FBI leading, New York State
14 Police, Nassau County Police Department, Nassau County
15 Sheriff's Department, Hempstead Police Department, as well
16 as the Suffolk County Police Department.
17 Q.  Generally, what is the mission of that Task Force?
18 A.  The mission of our Task Force is to combat and
19 investigate violent crimes perpetrated by gangs here on
20 Long Island.
21 Q.  From your work on the Task Force, do you know what
22 gangs we have here on Long Island?
23 A.  Yes.  Here on Long Island we have MS-13, SWP, which
24 is Salvadorians With Pride, Bloods, Crips and some
25 motorcycle gangs including the Hells Angels.

Mary Ann Steiger, OCR

U.S. District Court, EDNY

**Page 98**

1  Q.  From your work on the Task Force, do you know what
2  the largest gang on Long Island is?
3  A.  Yes.
4       MR. TOMAO:  Objection, your Honor.
5       THE COURT:  Overruled.
6  A.  The largest gang is the MS-13.
7  Q.  What does MS-13 stand for?
8  A.  It stands for Mara, M-A-R-A, Salvatrucha,
9  S-A-L-V-A-T-R-U-C-H-A.
10 Q.  Do you and other members of the Task Force work many
11 cases related to the MS-13?
12 A.  Yes.
13      I work exclusively MS-13 cases assisting other
14 agents from my squad in other matters, but we work MS-13,
15 yes.
16 Q.  And what types of activities have you undertaken to
17 gain an understanding of the MS-13 street gang?
18 A.  I investigated cases personally.
19      I have conducted both physical and audio
20 surveillance of the MS-13 meetings.
21      I have listened to many hours of tape recordings
22 of MS-13 members, both of their meetings and of telephone
23 recordings they have had.
24      I have conducted arrests of MS-13 members.
25      I have conducted searches of MS-13 locations in

**Page 99**

1  which paraphernalia has been found.
2       I have reviewed and translated letters and
3  correspondence between MS-13 members.
4       I have exchanged information and reporting with
5  other local, federal and state police departments as well
6  as international police departments.
7       And I have also conducted interviews of MS-13
8  members.
9  Q.  Approximately how many MS-13 members have you
10 arrested?
11 A.  I have arrested approximately 20.
12 Q.  And approximately how many MS-13 members or
13 associates have you interviewed?
14 A.  Approximately 40.
15 Q.  While you have been stationed in New York, have you
16 ever worked with law enforcement officers from other
17 jurisdictions on MS-13 matters?
18 A.  Yes, I have.
19 Q.  What jurisdictions?
20 A.  I have worked with jurisdictions in California,
21 Texas, Carolinas and Virginia.
22 Q.  Have you worked with any outside of the United
23 States?
24 A.  Yes, I have.
25 Q.  Where?

**Page 100**

1  A.  I have worked with law enforcement agencies from
2  Central America, from El Salvador specifically.
3  Q.  Aside from your case-based law enforcement
4  activities, have you done anything else to educate
5  yourself about the MS-13?
6  A.  Yes.
7       I have read numerous journals, articles and
8  reporting on the MS-13, as well as I have observed videos
9  of the MS-13 including documentaries as such.
10 Q.  Have you ever traveled to gain a great knowledge of
11 the MS-13?
12 A.  Yes.
13      I have been to El Salvador four times in
14 furtherance of investigations and conferences which I have
15 attended in El Salvador.
16 Q.  Generally, what did you do on those trips to El
17 Salvador?
18 A.  On three of the trips I attended international gang
19 conferences regarding MS-13, and exchanged reporting
20 information with law enforcement agencies from around the
21 United States and Central America and Mexico.
22      I have also gone to neighborhoods in El Salvador
23 and observed MS-13 members there as well as their
24 graffiti.
25      And I have additionally viewed videos of MS-13

**Page 101**

1  members committing extortions down in El Salvador and have
2  generally exchanged information with the law enforcement
3  agencies in Central America, specifically El Salvador.
4  Q.  Have you gone to any prisons in El Salvador in
5  furtherance of the MS-13 investigations?
6       MR. TOMAO:  Objection, your Honor.
7       THE COURT:  Overruled.
8  A.  Yes.
9       I have been to a prison in El Salvador that's
10 called Zacatecouloca, Z-A-C-A-T-E-C-O-U-L-O-C-A.
11      And I have been to the prisons, and that prison
12 specifically, in El Salvador which house many MS-13
13 members.
14 Q.  Aside from the conferences in El Salvador, have you
15 ever attended any seminars or conferences related to the
16 MS-13 here in the United States?
17 A.  Yes.
18      I have attended approximately five seminars here
19 in the United States related to MS-13.
20 Q.  Have you ever served as an instructor at such
21 seminars?
22 A.  Yes, I have.
23 Q.  Generally, what types of instructions have you
24 provided?
25 A.  I have provided case presentations on investigations

26 (Pages 98 to 101)

U.S. District Court, EDNY

**Page 102**

1  that I have conducted, as well as general MS-13
2  information.
3  Q.  You indicated earlier that you listened to many live
4  and recorded conversations between MS-13 members.
5       What language do they primarily use?
6  A.  They primarily use Spanish.
7  Q.  Can you speak, read and write Spanish?
8  A.  Yes, I can.
9  Q.  How did you first learn Spanish?
10 A.  I grew up in a bilingual home.
11      My parents are Cuban immigrants.
12 Q.  Have you ever testified as an expert witness before?
13 A.  Yes, I have.
14 Q.  Was that in state or federal court?
15 A.  Federal court.
16 Q.  What was the subject matter you testified about as an
17 expert?
18 A.  MS-13.
19      MR. DONOGHUE:  Your Honor, at this time, may we
20 tender the witness?
21      THE COURT:  Yes.
22      MR. DONOGHUE:  At this time, we tender the
23 witness as an expert in the history, structure and symbols
24 of the MS-13 street gang.
25      MR. TOMAO:  I object for the reasons stated

**Page 103**

1  before.
2       THE COURT:  Your objection is overruled for the
3  reasons I have stated on the record previously.
4       MR. DONOGHUE:  May I proceed?
5       THE COURT:  I find that he's qualified to be an
6  expert on MS-13.
7       You may proceed.
8       MR. DONOGHUE:  Thank you, sir.
9
10 BY MR. DONOGHUE:
11 Q.  Agent Tariche, through the work and experience you
12 described, have you been able to formulate certain
13 opinions regarding the MS-13 street gang?
14 A.  Yes, I have.
15 Q.  Have you been able to formulate an opinion regarding
16 where the gang originated?
17 A.  The gang originated in Los Angeles, California.
18 Q.  Have you been able to formulate an opinion regarding
19 where the gang currently has a presence?
20      MR. TOMAO:  Objection, your Honor.
21      THE COURT:  Overruled.
22 A.  The gang, after originating in Los Angeles,
23 California, spread throughout the United States to include
24 Texas, Virginia, the Carolinas, New York, as well as
25 throughout Mexico and Central America.

**Page 104**

1  Q.  Have you been able to formulate an opinion regarding
2  who the members of the gang generally are?
3       MR. TOMAO:  Objection, your Honor.
4       THE COURT:  Overruled.
5  A.  The members of the gang are generally from El
6  Salvador or Honduras.
7  Q.  Have you been able to formulate an opinion regarding
8  how the gangs are organized?
9       MR. TOMAO:  Objection.
10      THE COURT:  Overruled.
11 A.  The gang is organized into chapters or cliques,
12 C-L-I-Q-U-E-S.
13 Q.  Do the cliques use different titles to identify
14 themselves?
15 A.  Yes, they do.
16 Q.  Could you explain how they do that?
17      MR. TOMAO:  Objection.
18      THE COURT:  Overruled.
19 A.  Specifically here on Long Island, certain cliques or
20 chapters will take the name of their town.
21      For example, the Hempstead clique or chapter
22 would be known as the Hempstead Locos Salvatruchas, or
23 HSL.
24 Q.  Do other cliques use that same abbreviation?
25 A.  Yes, other cliques.

**Page 105**

1       For example, Islip would use the Islip Locos
2  Salvatruchas.
3       They also might use the name of a street in Los
4  Angeles to indicate their cliques as well.
5  Q.  Have you been able to formulate an opinion regarding
6  whether the gang holds meetings?
7  A.  Yes.
8  Q.  What's your opinion regarding that?
9       MR. TOMAO:  Objection.
10      THE COURT:  Overruled.
11 A.  My opinion is that the MS-13 conducts cliques,
12 meetings or chapter meetings amongst a particular chapter,
13 as well as they'll have a larger meeting called a
14 universal which would be comprised of several different
15 chapters meeting together.
16 Q.  Have you been able to formulate an opinion regarding
17 whether the MS-13 uses any symbols to demonstrate
18 membership?
19 A.  Yes.
20      The MS-13 --
21      MR. TOMAO:  Objection, your Honor.
22      THE COURT:  Overruled.
23 A.  The MS-13 uses hand signs to demonstrate their gang
24 affiliation to fellow members and to rivals.
25 Q.  Could you please demonstrate for us what that hand

27 (Pages 102 to 105)

U.S. District Court, EDNY

| Page 110 |
|---|
| 1    THE COURT:  Okay. |
| 2    What about the next one? |
| 3    MR. DONOGHUE:  It's similar, your Honor. |
| 4    MR. TOMAO:  Same objection. |
| 5    THE COURT:  Okay. |
| 6    (Continued on next page.) |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 111 |
|---|
| 1    (The following takes place in open court.) |
| 2    THE COURT:  You may proceed further in laying a |
| 3    foundation for Government's Exhibits 3 and 4. |
| 4    MR. DONOGHUE:  Thank you, your Honor. |
| 5    May we have 1 and 2 admitted at this time. |
| 6    THE COURT:  Yes. |
| 7    Government's Exhibit 1 and 2 are admitted. |
| 8    (Government's Exhibits 1 and 2 in evidence.) |
| 9 |
| 10  BY MR. DONOGHUE: |
| 11  Q.  Agent Tariche, I would like to draw your attention to |
| 12  exhibits 3 and 4. |
| 13    Without going into details as to what you see |
| 14  there, just generally, what do those two photographs show? |
| 15  A.  They show MS-13 graffiti on a jail cell wall in |
| 16  Zacatecoluca. |
| 17  Q.  Did you take those photographs or were you present |
| 18  when they were taken? |
| 19  A.  Yes. |
| 20    MR. TOMAO:  Objection, your Honor. |
| 21    I don't know what he answered yes to.  It was |
| 22  complex. |
| 23    MR. DONOGHUE:  I'll break it down. |
| 24  BY MR. DONOGHUE: |
| 25  Q.  Did you personally take those photographs? |

| Page 112 |
|---|
| 1    A.  No. |
| 2    I was present while they were taken. |
| 3    Q.  Do you recall approximately what year they were |
| 4    taken? |
| 5    A.  They were taken beginning of 2008, approximately a |
| 6    year and a half ago. |
| 7    Q.  From your training and experience in El Salvador and |
| 8    elsewhere, do you know if it was common to have that type |
| 9    of graffiti in prison cells in El Salvador back in 2003? |
| 10   A.  Yes. |
| 11     MR. DONOGHUE:  Your Honor, at this time, we move |
| 12   to admit government's exhibits 3 and 4. |
| 13     THE COURT:  Any objection? |
| 14     MR. TOMAO:  Same objection I stated at sidebar. |
| 15     THE COURT:  Those objections are overruled. |
| 16     Government's Exhibits 1, 2, 3 and 4 in evidence. |
| 17     (Government's Exhibits 1, 2, 3 and 4 in |
| 18   evidence.) |
| 19     MR. DONOGHUE:  Thank you, your Honor. |
| 20     May I bring them up on the screen, your Honor? |
| 21     THE COURT:  Surely. |
| 22   BY MR. DONOGHUE: |
| 23   Q.  Agent Tariche, the screen in front of you as well as |
| 24   behind you, on Government's Exhibit 1, sir, where was that |
| 25   photograph taken? |

| Page 113 |
|---|
| 1    A.  It was taken in Hempstead, Long Island. |
| 2    Q.  That's in Nassau County, correct? |
| 3    A.  Yes. |
| 4    Q.  Could you just explain for us what we see in that |
| 5    photograph? |
| 6    A.  Yes. |
| 7      May I use the pointer to explain? |
| 8      MR. DONOGHUE:  I have a laser that might help |
| 9    you point out some of the features. |
| 10     Your Honor, may he step out from the stand to |
| 11   point that out? |
| 12     THE COURT:  Yes. |
| 13     (The witness steps down.) |
| 14   A.  This is graffiti, MS-13 graffiti here in Hempstead |
| 15   where you could see that the letters SWP, WP have been |
| 16   crossed out, and the M was added to the S.  13 above. |
| 17   HLS, indicating Hempstead Locos Salvatruchas and then |
| 18   spelled out La Mara Salvatrucha on top. |
| 19   Q.  Do we see anything else above the writing there?  Do |
| 20   you see any initials? |
| 21   A.  The letters one, three, and initials HLS and the word |
| 22   La Mara Salvatrucha 13 with three dots next to it. |
| 23   Q.  Moving to government's exhibit 2, could you explain |
| 24   what we see in that exhibit? |
| 25   A.  Yes. |

29 (Pages 110 to 113)

**Page 114**

1    In this exhibit we see in block lettering a
2  large M and a large S.
3    We also see above the S Mafioso, which is a
4  nickname for an MS-13 member.
5    And lettering depicting other chapters or
6  cliques.
7    E is for El Salvador in between and then along
8  the side other lettering BGLS.
9    Above on the ceiling tombstones with RIP with
10  members' names and lettering below the members' names.
11  Q.  Between the two large letters M and S, what do you
12  see there?
13  A.  We see the El Salvadorian flag and symbols of the El
14  Salvadorian flag.
15  Q.  And just below that?
16  A.  We see a hand sign of the MS-13 that surrounds the
17  flag.
18  Q.  Is that the hand sign that you demonstrated earlier?
19  A.  Yes.
20  Q.  And what are the colors used to color in the M and S?
21  A.  Blue and then white on the flag in the center.
22  Q.  Where was that photograph taken?
23  A.  That was photograph was taken in the Zacatecoluca
24  prison in El Salvador.
25    MR. TOMAO:  Excuse me, your Honor.

**Page 116**

1  BY MR. DONOGHUE:
2  Q.  Okay.  Moving on to Government Exhibit number 4,
3  again just briefly can you tell us what you see there?
4  A.  Here we can see depictions of tombstones, for
5  example, rest in peace, joker from ELS, and then the names
6  of other members, Blackie, name of a cliques, Parka Vista
7  V-I-S-T-A Locos, and more lettering on the side wall
8  indicating members names and cliques.  The name silent.
9  Q.  Okay.  Thank you.  If you can return to the witness
10  stand.
11    I'll going to put before you what's marked for
12  identification Government Exhibits 5 through 17, ask that
13  you take a look at those.  (Handing.)
14    Sir, do you recognize those exhibits?
15  A.  Yes, I do.
16  Q.  So what do you recognize them to be?
17  A.  Tattoos, MS-13 members.
18  Q.  They're all photographs, correct?
19  A.  Photographs of members and their tattoos, yes.
20  Q.  And have you seen those actual tattoos on those
21  members?
22  A.  Yes, some of them I have, yes.
23  Q.  Do those photographs fairly and accurately depict the
24  tattoos that you saw on those individuals?
25  A.  Yes.

**Page 115**

1    I was under the impression that was taken in
2  Hempstead.
3    Is he now saying it's taken in El Salvador?
4    MR. DONOGHUE:  Government's exhibit 2 is; yes,
5  your Honor.
6    MR. TOMAO:  I would ask my objection to three
7  and four also apply to two.
8    THE COURT:  Yes, and overruled.
9  BY MR. DONOGHUE:
10  Q.  I'm going to move to Government's Exhibit 3 on the
11  screen.
12    Could you briefly explain what we see there?
13  A.  We see again in block lettering the M and S with a
14  13, clique abbreviation VMLS below, 503, which is the area
15  code of El Salvador, or the country code, and then to the
16  left more block lettering NLCS and then MS on the ceiling.
17    (Continued on next page.)
18
19
20
21
22
23
24
25

**Page 117**

1    MR. DONOGHUE:  Your Honor, at this time I move
2  to admit Government's Exhibit 5 to 17.
3    MR. TOMAO:  Your Honor, may I have a brief voir
4  dire on this.
5    THE COURT:  Yes.
6    Members of the jury, voir dire in this context
7  means that the lawyer is entitled to ask questions not on
8  cross-examination, because it's not his turn yet, but on
9  the foundation for the admissibility of the photographs.
10  That's what voir dire means.  Go ahead.
11
12  VOIR DIRE EXAMINATION
13  BY MR. TOMAO:
14  Q.  Good afternoon, Agent Tariche.
15  A.  Good afternoon.
16  Q.  You and I have met each other before?
17  A.  Yes.
18  Q.  As always if I ask you a question and you need to
19  have the question repeated just ask and I'll did that?
20  A.  Yes, sir.
21  Q.  Agent Tariche, you indicated that Government Exhibits
22  5 through 17 are photographs of what you call MS-13
23  members; is that correct?
24  A.  Yes.
25  Q.  Were these all individuals who were arrested in

U.S. District Court, EDNY

| Page 118 | Page 120 |
|---|---|

**Page 118**

1  connection with the FBI Long Island task force?
2  A.  Yes.
3  Q.  And I believe in response to a question by
4  Mr. Donoghue, you indicated that you were present when
5  some of these pictures were taken?
6  A.  Yes.
7  Q.  Would it be more than half or less than half?
8  A.  More than half.
9  Q.  Can you tell us which ones you weren't present when
10  they were taken?
11  A.  I was not present for number one.
12  Q.  I'm sorry?
13  A.  I'm sorry, number five I was not present for, I was
14  not present for number six, I was not present for number
15  seven.  I was present for the rest.
16  Q.  So you were present, not present for five, six and
17  seven; is that correct?
18  A.  Yes.
19  Q.  So you can't testify from your own knowledge that
20  these accurately depict the individual who was
21  photographed at the time the photograph was taken?
22  A.  Yes, because I have seen them since the photographs
23  were taken with the tattoos.
24  Q.  You've seen these individuals since that time and
25  these accurately reflect what you've seen?

**Page 120**

1  MR. DONOGHUE:  Thank you, your Honor, may I
2  proceed.
3  THE COURT:  Yes.
4  Let me see if I can get that a little better.
5  That's very good.  No one can see anything.  We'll have to
6  go ahead that way, unless I turn the lights down and then
7  put them back up again.
8  MR. DONOGHUE:  Honestly, your Honor, for us it's
9  fine.  I know the jurors can probably see the side panels
10  very good.  I hate to inconvenience the Court because I
11  know you don't have a monitor.
12  THE COURT:  Let's proceed.
13
14  DIRECT EXAMINATION (Continued.)
15  BY MR. DONOGHUE:
16  Q.  Agent Tariche, can you just tell us briefly what we
17  see in that photograph?
18  A.  Yes, we see a MS-13 member with a tattoo of a 1 and a
19  3 on his chin.
20  Q.  Moving to Government Exhibit number 6, what do we see
21  there?
22  A.  We see on the chest of a MS-13 member the hand sign
23  which I have previously shown and we saw also in the
24  graffiti in El Salvador.
25  Q.  Moving to Government Exhibit number 7, what do we see

| Page 119 | Page 121 |
|---|---|

**Page 119**

1  A.  Yes.
2  Q.  When you did you see the individual in exhibit five
3  for the first time?
4  A.  Number five I saw for the first time several years
5  ago.
6  Q.  All the pictures you would have seen for the first
7  time after 2004; is that correct?
8  A.  Yes.
9  Q.  And you weren't part of the investigation of
10  Mr. Castro at the time that investigation started?
11  A.  No.  It precedes my assignment to the task force.
12  Q.  And regard to exhibit six, when did you first see
13  that individual?
14  A.  Several years ago.
15  Q.  If I asked you the same question, would you give the
16  same answer for number seven?
17  A.  Yes.
18  Q.  So several years ago?
19  A.  Yes.
20  MR. TOMAO:  Your Honor, I object to the whole
21  group for the reasons we have stated before in our
22  pretrial motions.
23  THE COURT:  That motion -- your objection is
24  overruled.  Government Exhibits 5 through 17 in evidence.
25  (Government Exhibits 5-17 in evidence.)

**Page 121**

1  there?
2  A.  Three dots.
3  Q.  Is that common among MS-13 members?
4  A.  Yes, common among MS-13 members.
5  Q.  Moving on to number 8, what do we see there?
6  A.  We see the gothic lettering M S across the chest and
7  then El Salvador across the belly.
8  Q.  Moving to Government Exhibit number 8, what do we see
9  there?
10  A.  We see again the same number --
11  THE COURT:  Is that number 8?
12  MR. DONOGHUE:  This is I'm sorry, number nine.
13  THE COURT:  What.
14  MR. DONOGHUE:  Number nine, your Honor.
15  A.  Number nine we see spider webs on his elbows and
16  again the M S on his chest in gothic lettering.
17  Q.  It's hard to see on the date screen here, but if you
18  look at the photograph itself, can you see within the
19  spider webs on the elbows if there's anything there?
20  A.  Yes, you can see the numeral or the number 1 and the
21  number 3 on his elbows.
22  Q.  Moving to Government Exhibit number 10, what do you
23  see there?
24  A.  We see the block lettering M S on the chest of a
25  MS-13 member.

31 (Pages 118 to 121)

Mary Ann Steiger, OCR

U.S. District Court, EDNY

| Page 122 |
|---|
| 1   Q.   Moving on to Government Exhibit number 11, what do we |
| 2   see there? |
| 3   A.   We see the block lettering M S and then block numbers |
| 4   1 3 across the inside part of his arms, MS-13's member's |
| 5   arms. |
| 6   Q.   Moving on to Government Exhibit number 12, what do we |
| 7   see there? |
| 8   A.   Number 12 we see the MS-13 hand sign, we see the |
| 9   cross, written inside the cross we see the name Maklo, |
| 10   M-A-K-L-O nickname, and then the letters PVLS which is the |
| 11   Parka Vista Locos Salvatruchos. We see some tombstones on |
| 12   either side of the cross, and then alongside there's more |
| 13   tombstones, on both sides. |
| 14   Q.   Moving on to number 13, what do we see in that |
| 15   exhibit? |
| 16   A.   13, across the belly of a MS-13 member block |
| 17   lettering M S, outside the numbers 1 and 3. |
| 18   Q.   Moving on to Government Exhibit 14, what do we see |
| 19   there? |
| 20   A.   In this exhibit we see again the MS-13 hand sign, the |
| 21   three dots, gothic lettering M S and then written inside |
| 22   in the M S there is a cross, and a 13 in the center of the |
| 23   M. |
| 24   Q.   Moving on to number 15, what to we see there? |
| 25   A.   This is on the belly of a MS-13 member, gothic |

| Page 123 |
|---|
| 1   lettering M S, with a 1 3 in the center of the M. |
| 2   Q.   Moving on to Government Exhibit 16, what do we see |
| 3   there? |
| 4   A.   This is the back of a MS-13 member, depicting the |
| 5   hand sign in the center, on the hand sign are the three |
| 6   dots, and the numbers 1 and 3 on his back. |
| 7   Q.   Finally moving to exhibit number 17, can you tell us |
| 8   what we see there? |
| 9   A.   This is on the side of the belly of a MS-13 member, |
| 10   depicted is the face of a MS-13 member, Mara Salvatrucha |
| 11   along the top of the face, PVLS across the bridge of the |
| 12   nose, M S written in gothic lettering several times along |
| 13   the face, and in the throat area of the face tattoo. |
| 14   Q.   Is it fair to say that all of these exhibits were |
| 15   just typical examples of MS-13 tattoo? |
| 16   A.   Yes. |
| 17   Q.   And were all of those photographs taken here on Long |
| 18   Island? |
| 19   A.   Yes, they were. |
| 20   Q.   All right, sir. |
| 21         I'm going to approach and put in front of you |
| 22   what's marked for identification as Government Exhibit |
| 23   number 18, ask that you take a look at that. (Handing.) |
| 24         Sir, do you recognize what's in that exhibit? |
| 25   A.   Yes. |

| Page 124 |
|---|
| 1   Q.   Just generally, what is it? |
| 2   A.   These are letters or notes between MS-13 members. |
| 3   Q.   And the actual substance, the text has been removed. |
| 4   Correct? |
| 5   A.   Yes. |
| 6   Q.   What's left behind is essentially doodling or |
| 7   graffiti on the tape, correct? |
| 8   A.   Yes. |
| 9   Q.   Is that correspondence that you reviewed? |
| 10   A.   This is an example of some of the correspondence |
| 11   response that I have reviewed, yes. |
| 12   Q.   And those are photographs, correct? |
| 13   A.   These are photographs, correct. |
| 14   Q.   Aside from the redactions, are those copies, fair and |
| 15   accurate copies of the original letters that you reviewed? |
| 16   A.   Yes, they are. |
| 17         MR. DONOGHUE: Your Honor, at this time we move |
| 18   to admit Government Exhibit number 18. |
| 19         THE COURT: Any objection? |
| 20         MR. TOMAO: Yes, your Honor. |
| 21         I object, and I would ask that we be allowed to |
| 22   approach if I can explain. |
| 23         THE COURT: Yes. One minute. |
| 24         (Continued on next page.) |
| 25   |

| Page 125 |
|---|
| 1         (Whereupon, the following occurred at sidebar.) |
| 2         MR. TOMAO: Your Honor, one of those pages we're |
| 3   getting past just background, historical information. |
| 4   That's this page here which I've shown the prosecutor. |
| 5   This one already -- it begins to put Freeport, which is |
| 6   the issue here as to whether or not his group was part of |
| 7   this broader conspiracy. |
| 8         The other matters are all, all don't have |
| 9   reference to Freeport the prosecutor has given me a |
| 10   proffer indicating he's not going to be eliciting anything |
| 11   on the other pages. |
| 12         So my objection would be to the page that has |
| 13   the reference to Freeport in the lower right-hand corner |
| 14   as being really beyond expert testimony now. What we |
| 15   would need to find out where this came from and develop |
| 16   whether or not this should be properly before the jury to |
| 17   find the issues here in this case as to whether this |
| 18   fellow is a member of this particular organization. |
| 19         MR. DONOGHUE: Your Honor, if it makes it |
| 20   easier, we'll just remove the last page. |
| 21         MR. TOMAO: On that basis, then my objection is |
| 22   the only one that I made before, the motion, which I |
| 23   repeat. |
| 24         THE COURT: Overruled. |
| 25         MR. TOMAO: Thank you. |

32 (Pages 122 to 125)

U.S. District Court, EDNY

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  (Whereupon, the following occurred in open
2  court.)
3  THE COURT:  Government Exhibit 18 as, with one
4  page redacted, correct.
5  MR. DONOGHUE:  I have just removed one page from
6  the exhibit that's before the witness, you are, the very
7  last page.
8  THE COURT:  Very well.
9  MR. DONOGHUE:  Otherwise in evidence,
10  your Honor?
11  THE COURT:  Yes.
12  MR. DONOGHUE:  Thank you.
13  (Government Exhibit 18 in evidence.)
14  BY MR. DONOGHUE:
15  Q.  Agent Tariche, I'm going to put up the first page of
16  Government Exhibit number 18 on the screen.  Could you
17  just explain to us what we see there?
18  A.  Yes, we see written across the top in gothic
19  lettering Mara Salvatrucha, in the top right-hand corner
20  we see Shortie, PLS with the three dots.  In the center of
21  the page we seat MS-13 hand sign with the 1 and a 3 on the
22  fingers.  And then we see Por, the letters Por, P-O-R
23  Vida, V-I-D-A.  And then below that Mara Salvatrucha,
24  Westbury Locotes above Mara Salvatrucha.
25  Q.  Moving down to the second page, can you tell us what

**Page 128**

1  and ask that you look at that.  (Handing.)
2  It's a photograph, correct?
3  A.  Yes.
4  Q.  Do you recognize what's depicted in that photograph?
5  A.  Yes, I do.
6  Q.  What is depicted there?
7  A.  This is a handkerchief with MS-13 writing on it.
8  Q.  Does the photograph fairly than an accurately depict
9  the handkerchief itself?
10  A.  Yes.
11  Q.  You've seen the handkerchief itself?
12  A.  Yes.
13  Q.  So the photograph accurately depicts it?
14  A.  Yes.
15  MR. DONOGHUE:  Your Honor, the government moves
16  to admit Government Exhibit 19.
17  THE COURT:  Any objection?
18  MR. TOMAO:  For the reasons stated previously on
19  the motions.
20  THE COURT:  That motion is denied.  In evidence.
21  (Government Exhibit 19 in evidence.)
22  Q.  I'll put it up on the screen so that you can see
23  it.  Could you just explain to us what we see depicted in
24  the color handkerchief?
25  A.  Yes.  Along the top on the outside you have the M S

**Page 127**

1  we see there?
2  A.  We see in the top left corner HLS and we see the hand
3  sign, one of the hand signs of the MS-13 on the left-hand
4  side of the page, we see LA gangster in the middle, and
5  then another MS-13 hand sign depicting the S on the
6  right-hand side of the page, with the letters RLS above
7  it.
8  Then a number 1 and the number 3 is partially
9  blocked out in the bottom right corner.
10  Q.  Moving down to the next page, can you tell us what we
11  see there?
12  A.  Next page along the top you can see the MS-13 hand
13  sign, with a 1 and a 3 in the two center fingers.  Another
14  MS-13 hand signs for the S next to it, then HLS with the
15  three dots in the center, MS-13 hand signs, indicating 1
16  and 3 with PLS in between it and then the three dots.
17  Q.  Turning to the next page, what do we see there?
18  A.  In gothic lettering La Mara Salvatrucha.
19  Q.  Turning to the next page, what do we see there?
20  A.  We see in the block lettering M S with the numbers
21  1 3 above it, and then in the end we see RIP, rest in
22  peace, El Matito, and RIP, rest in peace, El Tiro Loco,
23  T-I-R-O L-O-C-O.
24  Q.  And I'm going to approach and put before you what's
25  marked as Government Exhibit number 19 for identification

**Page 129**

1  in gothic lettering.  In between it states La Mara
2  Salvatrucha, the letters or the numbers one three, then
3  going down the handkerchief Somos, S-O-M-O-S Pelones,
4  P-E-L-O-N-E-S Locotes L-O-C-O-T-E-S, Por P-O-R Vida
5  V-I-D-A.
6  Q.  What does that mean?
7  A.  That means we are crazy Pelones for life La Mara
8  Salvatrucha.
9  Q.  Pelones is one of the cliques or chapters?
10  A.  One of the cliques or chapters, yes.
11  Q.  And what color is used in that handkerchief?
12  A.  Colors of the numbers and letters bluish the
13  handkerchief is white.
14  Q.  Is that a somewhat common piece of MS-13
15  paraphernalia?
16  A.  Yes.
17  Q.  Like the color handkerchief?
18  A.  Yes.
19  Q.  I'm going to put before you a disk which is marked
20  for identification as Government Exhibit number 20.  Sir,
21  do you recognize that disk?  (Handing.)
22  A.  Yes, I do.
23  Q.  And there's a video clip on that disk; is that
24  correct?
25  A.  Yes.

Mary Ann Steiger, OCR

U.S. District Court, EDNY

Page 130

1  Q.  It's an edited version of a longer recording.
2  Correct?
3  A.  Yes.
4  Q.  Have you reviewed both the longer recording and the
5  edited version?
6  A.  Yes, I have.
7  Q.  And does the file accurately reflect the recording
8  that you reviewed?
9  A.  Yes.
10          MR. DONOGHUE:  Your Honor, at this time we move
11  to admit Government Exhibit number 20.
12          MR. TOMAO:  I object, your Honor.  May we
13  approach?
14          THE COURT:  Very well.
15          (Continued on next page.)
16
17
18
19
20
21
22
23
24
25

Page 131

1          (Whereupon, the following occurred at sidebar.)
2          MR. TOMAO:  Your Honor, I'm going to object to
3  this.  There's been no foundation laid to this.  This is
4  the video of the wake.
5          I understand they have a witness coming in later
6  would may be able to testify regarding, this is coming in
7  for substantive evidence not just for this witness'
8  expertise and I would object to it on that basis.
9          MR. DONOGHUE:  Your Honor, we are offering it
10  subject to connection.  We will have a witness later on
11  who can testify that they were present when the recording
12  was made.
13          We did call Agent Tariche somewhat out of order
14  in part to address the defense concerns about his
15  sequestration.  So I would ask that we be permitted to
16  play it now.
17          THE COURT:  I'm going to take it subject to
18  connection.  I'll tell that to the jury.
19          MR. TOMAO:  Your Honor, I also have advised the
20  government that I would request that the entire recording
21  be played, we request that it be done at this time, so
22  that the jury can see it, the excerpt in context.
23          Having reviewed it all since the hearing I now
24  feel that it's important to have the entire --
25          THE COURT:  How long is it?

Page 132

1          MR. TOMAO:  It takes about an hour.
2          MR. DONOGHUE:  It's over an hour.
3          THE COURT:  You can object and in your case you
4  can put it in, but I'm going to let the government put in
5  the part they want to.  If you want to play the whole
6  thing, you can.
7          MR. DONOGHUE:  We have a disk with the entire
8  recording, your Honor, if the defense wants it.
9          THE COURT:  Why don't you offer the disk with
10  the entire thing and play just this part.
11          MR. TOMAO:  Can we do both, your Honor.
12          MR. TOMAO:  I have no objection -- let him play
13  this portion, I'll mark the entire disk as a defense
14  exhibit and play it during cross-examination.
15          THE COURT:  Good.
16          MR. DONOGHUE:  Thank you.
17          (Continued on next page.)
18
19
20
21
22
23
24
25

Page 133

1          (Whereupon, the following occurred in open
2  court.)
3          MR. DONOGHUE:  Your Honor, pursuant to the
4  discussion we just had at sidebar, the government moves to
5  admit what's been marked for identification as
6  Government's Exhibit 20 in evidence.
7          MR. TOMAO:  Your Honor, I object pursuant to the
8  reasons stated at sidebar.
9          THE COURT:  Overruled.  As I told you, you can
10  in your case offer the entire video clip in evidence.
11          MR. TOMAO:  Thank you, your Honor.
12          THE COURT:  We're just going to see the part of
13  it that the government offered now.  Government Exhibit 20
14  in evidence.
15          (Government Exhibit 20 in evidence.)
16          MR. DONOGHUE:  Your Honor, I'm going to play the
17  video.  It runs approximately eight minutes.
18          May we have the witness step down from the
19  witness stand so he can narrate a little bit better what
20  we're seeing.
21          THE COURT:  Yes.
22  Q.  Agent Tariche, this video is going to come up on the
23  monitor as well as the large screen.  I would just ask
24  that as we go through, you describe to us what we see
25  here?

34 (Pages 130 to 133)

Mary Ann Steiger, OCR

Page 134

1	(Videotape played.)
2	A.  This is a wake of a MS-13 member in a Hempstead
3	funeral home, and you can see individuals placing blue
4	bandanas onto his -- into the coffin, and groups --
5	chapters or cliques, coming up together showing their hand
6	signs, the MS-13 hand sign to the corpse; kneeling down,
7	many of them with their hands up in the MS-13 hand sign.
8	You can see that some have just one hand up but
9	several have both of their hands up, again that MS-13 hand
10	sign.
11	In the coffin you can see the blue bandanas on
12	top of the corpse.
13	Also, in the crowd you can see members wearing
14	the blue bandanas and their hand signs up.
15	Q.  If you know, was this taken prior to 2003?
16	A.  Yes.  This was taken in 2001.
17	In this particular chapter or clique are members
18	of the Hempstead clique of the MS-13.  Camera's panning
19	around the funeral home.  Again you can see some wearing
20	the blue bandanas and some with their hand signs up,
21	kneeling at the coffin.
22	Now we pass forward through the video to another
23	clique or chapter coming up.
24	This particular group is --
25	MR. TOMAO:  Objection, your Honor, to

Page 135

1	describing, identifying these groups.
2	THE COURT:  Pardon?
3	MR. TOMAO:  I object to his identifying which
4	groups these are.
5	That's outside his expertise.
6	THE COURT:  How do you know which groups they
7	are?
8	THE WITNESS:  I recognize this member being from
9	the BLS, the Brentwood Locos Salvatruchos, and I recognize
10	several members from the Hempstead group in the first
11	group, that group has moved away and a new group has come
12	up, some depicting the hand signs.
13	THE COURT:  It's the same wake?
14	THE WITNESS:  It's the same wake, yes.  We just
15	fast forwarded the video to another group approaching the
16	coffin.
17	THE COURT:  I see.  I'll overrule that
18	objection.
19	(Continued on next page.)
20
21
22
23
24
25

Page 136

1	THE COURT:  I'll overrule that objection.
2	(Video played.)
3	BY MR. DONOGHUE (Cont'd):
4	Q.  The gentleman in the center there with the white
5	cut-off T-shirt, can you see what's around his neck?
6	A.  Yes.
7	Around his neck are blue and white beads, which
8	is also a sign, or paraphernalia used by MS-13 members.
9	Q.  I know it's very quick, but at the end of this clip,
10	are we able to see what he does with them?
11	A.  Yes.
12	Quickly he will place them into the coffin with
13	the blue bandanas.
14	That group leaves and another group comes up
15	kneeling at the coffin, and certain members showing the
16	MS-13 hand sign to the coffin, both directly in front of
17	the coffin and in the second row you can see members
18	showing the hand sign of the MS-13.
19	Others placing, I believe, bandanas into the
20	coffin as they walk by the coffin.
21	Q.  Are the bandanas blue?
22	A.  The bandanas are blue, yes.
23	MS-13 members throwing the hand sign and the
24	sign of the cross to the corpse as they go by.  More
25	members doing the sign of the cross, as well as the MS-13

Page 137

1	gang signs.
2	More members throwing hand signs at the corpse
3	and placing bandanas into the casket.
4	Q.  What do we see at this point?
5	A.  This is now outside of the funeral home in Hempstead.
6	Members of the MS-13 throwing signs to the
7	person taking the video.  MS-13 signs to the video camera
8	outside of the funeral home.
9	Q.  What are they doing with their hands?
10	A.  They are spelling out different letters, the cliques,
11	HLS.
12	Q.  And that ends the video.
13	Correct?
14	A.  Yes.
15	(Video stopped.)
16	Q.  And, Agent Tariche, if you would return to the
17	witness stand.
18	(Witness resumes the stand.)
19	MR. DONOGHUE:  Your Honor, I have no further
20	questions.
21	THE COURT:  Cross-examination?
22	MR. TOMAO:  Thank you, your Honor.
23	THE COURT:  I think we'll take a recess before
24	cross.
25	Members of the jury, we are going to take a

35 (Pages 134 to 137)

Exhibit I

### E. Valentin-Direct/Donoghue

325

1  to make it darker.
2  A  **Well, I see the deli there.**
3  Q  Sir, would you please look at the large screen behind
4  you, and I will use this laser to indicate.
5     These buildings right here on the right edge of
6  the photograph, could you tell me what that is?
7  A  **I see it, I see where you are.**
8  Q  Is that the deli?
9  A  **Yes.**
10 Q  And this street here that runs diagonally across the
11 photograph, what street is that?
12 A  **That's Lowell Avenue.**
13 Q  Okay.
14    And I think earlier you indicated that this area
15 up here, the top left, is --
16 A  **That's the train.**
17 Q  The train station?
18 A  **Yes.**
19 Q  Okay.
20    Thank you, sir.
21    MR. DONOGHUE:  That's the last photograph we
22 will have with this witness, your Honor.
23 Q  Sir, after your son Jesus left for the deli on
24 June 30th, 2003, did you ever see him again?
25 A  No.

### E. Valentin-Cross/LaPinta

326

1  Q  When he didn't come home, what did you do?
2  A  **I got very concerned.  And I went to the police the**
3  **next day and I brought a picture with me.**
4  Q  Why did you go to the police the next day?
5  A  **Because my son was missing.**
6     MR. DONOGHUE:  Thank you.
7     Your Honor, I have no further questions.
8     THE COURT:  Cross-examination.
9     MR. LA PINTA:  Yes.
10
11 CROSS-EXAMINATION
12 BY MR. LA PINTA:
13 Q  Good morning, Mr. Valentin.
14 A  **Good day.**
15 Q  Let me show you what has been marked as
16 Defendant's Exhibit A, and ask that you take a look.
17    MR. LA PINTA:  May I approach?
18    THE COURT:  Sure.
19    For identification?
20    MR. LA PINTA:  Yes, sir.
      (Handed to the witness.)
22 Q  You recognize that photograph, don't you?
23 A  **It looks like Jesus.**
24 Q  Is that a fair and accurate depiction of your son
25 Jesus from June of 2003?

### E. Valentin-Cross/LaPinta

327

1  A  **No.**
2  Q  No?
3     Is that a fair and accurate depiction of Jesus
4  from 2003 in general?
5  A  **No.**
6  Q  No?
7     Is that not a photograph of your son Jesus
8  Valentin?
9  A  **This is Jesus.**
10 Q  Is it fair to say that this is how Jesus generally
11 looked in 2003?
12 A  **Well, he always looked the same.**
13 Q  Okay.
14    So you would agree that that is how he looked in
15 2003, yes?
16 A  **Yes, yes.**
17    MR. LA PINTA:  Thank you.
18    I offer that in evidence at this time.
19    MR. DONOGHUE:  I have seen it, your Honor.  We
20 have no objection.
21    THE COURT:  Defendant's Exhibit A, for Abel, in
22 evidence.
23    (Whereupon, Defendant's Exhibit A was received
24 in evidence.)
25    MR. LA PINTA:  I would like to publish it,

### E. Valentin-Cross/LaPinta

328

1  please, Judge?
2     THE COURT:  Yes.
3     (At this time a document was exhibited on
4  courtroom screen.)
5     MR. LA PINTA:  I have nothing further.  Thank
6  you.
7     THE COURT:  Anything else?
8     MR. DONOGHUE:  No.
9     (Whereupon, the witness leaves the witness
10 stand.)
11    THE COURT:  Please call your next witness.
12    MR. DONOGHUE:  Your Honor, the government calls
13 Special Agent Reynaldo Tariche.
14    THE COURT:  Raise your right hand.
15
16 R E Y N A L D O   T A R I C H E,
17    called as a witness, having been first
18    duly sworn, was examined and testified
19    as follows:
20    THE COURT:  Please be seated.
21    Please state your full name and spell your name
22 slowly for the record.
23    THE WITNESS:  My name is Reynaldo Tariche.  It
24 is R-E-Y-N-A-L-D-O, Tariche, T-A-R-I-C-H-E.
25    THE COURT:  You may proceed.

Tariche-Direct/Donoghue

329

1    I am going to give a limiting instruction, but
2  you can start your questioning.
3    MR. DONOGHUE:  Yes, sir.

5  DIRECT EXAMINATION
6  BY MR. DONOGHUE:
7  Q    Sir, can you tell us how you are currently employed?
8  A    I am a Special Agent of the Federal Bureau of
9  Investigation.
10  Q    And approximately how long have you been an FBI
11  Special Agent?
12  A    Approximately 19 years.
13  Q    Prior to joining the FBI, how were you employed?
14  A    I had a job at a brokerage firm in downtown
15  Manhattan.
16  Q    Would you just briefly tell us what your formal
17  education is?
18  A    I have a finance degree from Boston College.
19  Q    Would you just generally describe what kind of
20  training you received over your 19 years as an FBI agent?
21  A    Yes.  I attended the 16-week training academy of the
22  FBI in Quantico, Virginia.
23    In addition to that, I have gone to many
24  continuing education courses at Quantico and other
25  training facilities to include sophisticated

Tariche-Direct/Donoghue

330

1  investigations, seminars, and special weapons and tactics
2  training.
3  Q    Have you attended any courses specifically related to
4  street gang investigation?
5  A    Yes.  I have attended the FBI state street task force
6  training at Quantico, Virginia.
7  Q    Would you briefly describe the different assignments
8  you had as an FBI special agent?
9  A    Yes.
10    As a new agent I was assigned in 1990 to Long
11  Beach, California, resident agency, which is a satellite
12  office of the Los Angeles division of the FBI.  I was
13  there from 1990 to 1995 as part of the violent crimes task
14  force.
15  Q    What was your following assignment?
16  A    My following assignment was from 1995 to 2004, I was
17  assigned to the Brooklyn Queens resident agency or
18  satellite office of the New York office of the FBI,
19  working drug and money laundering investigations.
20  Q    And where were you assigned in 2004?
21  A    In 2004 I was assigned to the Long Island resident
22  agency on the Long Island gang task force from 2004 to the
23  present.
24  Q    While you were stationed in Long Beach, California,
25  were you assigned to a task force?

Tariche-Direct/Donoghue

331

1  A    Yes, I was.
2  Q    And what force, task force was that?
3  A    The violent crime task force.
4  Q    Approximately how long did you serve on that task
5  force?
6  A    I served there for five years, between 1990 and 1995.
7  Q    And what agencies provided personnel for that task
8  force?
9  A    It was comprised of the FBI, Los Angeles County
10  Sheriff's Office, the Long Beach, California Police
11  Department, as well as the Bureau of Narcotics
12  Enforcement, State of California investigators.
13  Q    And what was the mission of that task force?
14  A    The mission of the task force was to combat and
15  investigate violent crimes in violation of the federal
16  law.
17  Q    What type of cases did you work with?
18  A    We worked gang investigations, bank robberies,
19  kidnappings, extortions, as well as other violent crimes.
20  Q    And approximately, how many cases did you work
21  while you were out in California?
22  A    In the hundreds.
23  Q    Generally what did you do in the course of those
24  investigations?
25  A    In the course of my investigations, I conducted

Tariche-Direct/Donoghue

332

1  surveillances, I developed informants, conducted arrests,
2  search warrants, and assisted the United States Attorney's
3  Office in prosecuting the cases.
4  Q    You said you are currently assigned to the Long
5  Island gang task force?
6  A    Yes, that's correct.
7  Q    And what law enforcement agencies have personnel now
8  assigned to that task force?
9  A    The Long Island gang task force comprised of the FBI,
10  the New York State Police, Nassau County Police
11  Department, Nassau County Sheriff's Department, Hempstead
12  Police Department and most recently the Suffolk County
13  Police Department.
14  Q    Had you been assigned to that since 2004?
15  A    Yes, I have.
16  Q    And just generally what is the mission of the Long
17  Island gang task force?
18  A    The mission of the Long Island gang task force --
19    THE COURT:  You have to slow down a little,
20  agent, slow it down.
21    THE WITNESS:  Yes, your Honor.
22    THE COURT:  Okay.
23  A    It is to combat violent gangs here on Long Island and
24  to assist the United States Attorney's Office in
25  prosecuting the gangs.

Tariche-Direct/Donoghue

333

1  Q   From your work in the task force, do you know what
2  gangs we have here on Long Island?
3  A   Yes.  We have here on Long Island the MS-13, we have
4  the Latin Kings.  We have Netas, spelled N-E-T-A-S.  We
5  have 18th Street.  We have motorcycle gangs as well as
6  others.
7        THE COURT:  I think at this point I want to
8  instruct the jury about this witness.
9        Members of the jury, I am going to permit this
10 witness to testify as what we call an expert witness.
11       An expert is a witness allowed to express
12 opinion on matters about which he has special knowledge
13 and training, and in this particular case with regard to
14 gangs.
15       Expert testimony is presented to you on the
16 theory that someone who is experienced in a particular
17 field may assist you in understanding the evidence and
18 reaching an independent decision on the facts.
19       In weighing this witness' testimony, you may
20 consider his qualifications, the opinions given and his
21 reason for testifying, as well as all of the other
22 considerations that you ordinarily apply when deciding
23 whether or not to believe a witness' testimony.
24       You may give the opinions given by this witness
25 whatever weight, if any, you find it deserves in light of

Tariche-Direct/Donoghue

334

1  all the evidence in the case.  You should not, however,
2  accept such an expert witness' testimony merely because he
3  is an expert in the field.  Nor should you substitute it
4  for your own reason, judgment and common sense.
5        So the determination of the facts in this case
6  rests solely with you, including this expert witness'
7  testimony.
8        You may proceed.
9        MR. DONOGHUE:  Thank you, your Honor.
10 Q   Agent Tariche, from your work on the task force, do
11 you know what the largest street gang is on Long Island?
12 A   Yes.  The largest street gang is the MS-13.
13 Q   And what does MS-13 stand for?
14 A   It stands for Mara Salvatrucha, spelled M-A-R-A,
15 S-A-L-V-A-T-R-U-C-H-A.
16 Q   And those are Spanish slang words?
17 A   Yes.
18 Q   And just generally, what would the translation of
19 Mara Salvatrucha be?
20 A   The general translation of Mara indicates gangs,
21 Salvatrucha is from El Salvador, gang from El Salvador,
22 generally.
23 Q   Do you and other members of the task force work many
24 cases related to the MS-13?
25 A   Yes.

Tariche-Direct/Donoghue

335

1  Q   Approximately how many cases you work are related to
2  the MS-13?
3  A   Almost all the cases I work are MS-13 related.
4  Q   What types of activities have you undertaken to gain
5  an understanding of the MS-13 street gang?
6  A   I have worked specific MS-13 investigations myself.
7  I have conducted physical and audio surveillance of MS-13
8  members at their meetings.  I have also listened to hours
9  of audio recordings of MS-13 members and their meetings.
10 Also viewed video surveillance of their meetings.  And I
11 have conducted arrests of MS-13 members and their
12 associates; search warrants of MS-13 locations and their
13 associates.  I have translated and read many letters and
14 correspondence between MS-13 members and their associates.
15 I have coordinated investigations with other law
16 enforcement entities, both nationally and internationally,
17 with regard to MS-13.  And I have conducted interviews of
18 MS-13 members, current members and former members, as well
19 as their associates.
20 Q   Approximately how many MS-13 members have you
21 arrested?
22 A   Approximately 20.
23 Q   And approximately how many members or associates have
24 you interviewed?
25 A   Approximately 40.

Tariche-Direct/Donoghue

336

1  Q   While you were stationed here in New York, have you
2  ever worked with law enforcement officers from other
3  jurisdictions on MS-13 members?
4  A   Yes, I have.
5        I worked with law enforcement officers from
6  other jurisdictions to include California, Virginia, the
7  Carolinas, Texas and internationally, El Salvador.
8  Q   And aside from your case-based law enforcement
9  activities, have you done anything else to educate
10 yourself about the MS-13?
11 A   Yes.
12       I have attended conferences, both in the United
13 States and internationally.
14 Q   Where have you attended conferences outside the
15 United States?
16 A   Outside the United States, I traveled to El Salvador
17 on four occasions.  Three times to attend trans-national
18 gang conferences.
19 Q   And just generally, what did you do on those four
20 trips to El Salvador?
21 A   Generally on the trips, the first three times -- the
22 first two times, I guess, were these trans-national gang
23 conferences, bringing in officers, government officials
24 and others from all over Central America and the United
25 States, that's on three occasions.  Once I went down there

| Tariche-Direct/Donoghue | Tariche-Direct/Donoghue |
|---|---|

**337**

1  to actively work with the PNC, which stands for the
2  Policia National Civil, or the national police force of El
3  Salvador.
4      Q    And while you were down there with the PNC, what did
5  you do in relation to the MS-13?
6      A    While I was with PNC, we went to the neighborhoods
7  where the MS-13 gang operates.  I observed graffiti.  I
8  observed MS-13 members there.  I also went to a maximum
9  security prison that is called Zacataculoca, spelled
10  Z-A-C-A-T-A-C-U-L-O-C-A, where MS-13 members and other
11  gang members are housed, and I conducted -- helped to
12  conduct some interviews of MS-13 members there.
13          I also exchanged intelligence and case
14  information with the PNC.
15          THE COURT:  We are going to take a break at this
16  time.
17          MR. DONOGHUE:  Yes.
18          THE COURT:  Members of the jury, we will take a
19  recess for lunch.
20          I tell you again not to discuss this case either
21  among yourselves or with anyone else.
22          Keep an open mind.  Come to no conclusion until
23  the very end of the case.  You will hear me say that a
24  number of times every day because it is that important.
25          Keep an open mind.

**338**

1          We will recess until 1:40 p.m.
2          Have a nice lunch.
3          Please recess yourselves.
4          (Whereupon, at this time the jury leaves the
5  courtroom.)
6          THE COURT:  1:40.
7          (Luncheon Recess.)

**339**

1          A F T E R N O O N   S E S S I O N
2
3
4          (Whereupon, the jury at this time entered the
5  courtroom.)
6  R E Y N A L D O   T A R I C H E,
7          called as a witness, having been previously
8          duly sworn, was examined and testified as
9          follows:
10
11          THE COURT:  Please be seated, members of the
12  jury.
13          You may proceed, Mr. Donoghue.
14          MR. DONOGHUE:  Thank you, your Honor.
15
16  DIRECT EXAMINATION (cont'd)
17  BY MR. DONOGHUE:
18      Q    Agent Tariche, when we left off this morning, you
19  were talking about some of the things you had done down in
20  El Salvador with the national police there, and you talked
21  about conferences.
22          Aside from conferences in El Salvador, have you
23  attended any conferences here in the United States
24  relating to gang investigations?
25      A    Yes, I have.

**340**

1      Q    Approximately how many?
2      A    Approximately five times.
3      Q    And have you ever served as an a instructor at such
4  conferences?
5      A    Yes, I have.
6      Q    And just generally, what types of instruction have
7  you provided?
8      A    I have provided case instruction on active
9  investigations I have done in previous investigations.
10      Q    Aside from your work and experience on the two task
11  forces that you were on, and the additional training
12  seminars you attended, what else have you done to educate
13  yourself about the MS-13?
14      A    I read journal articles, books, and viewed
15  documentaries.
16      Q    You indicated earlier that you listened to many live
17  and recorded conversations between MS-13 members; is that
18  correct?
19      A    Yes.
20      Q    And what language do they usually use?
21      A    They usually use Spanish.
22      Q    Can you speak Spanish?
23      A    Yes, I can.
24      Q    Can you read it and write it as well?
25      A    Yes.

## Tariche-Direct/Donoghue

341

1 Q   And how did you first learn Spanish?
2 A   I grew up in a bilingual home.
3 Q   What is your ethnic background, sir?
   A   My parents are immigrants from Cuba.
5 Q   Due to the work and experience you described, have
6 you been able to formulate any opinions regarding the
7 MS-13 street gang?
8 A   Yes, I have.
9 Q   And have you been able to formulate an opinion
10 regarding where the gang originated?
11 A   Yes.  In my opinion the gang originated in Los
12 Angeles, California.
13 Q   And have you been able to formulate an opinion
14 regarding where the gang currently has a presence?
15 A   Yes.
16 Q   And what is your opinion?
17 A   My opinion is the gang spread from Los Angeles
18 through the United States to different regions, including
19 Texas, the Virginias, the Carolinas, New York, as well as
20 throughout Central America, and Mexico as well.
21 Q   And have you been able to formulate an opinion
22 regarding who the members of MS-13 generally are?
23 A   Yes, I have.
24 Q   What is your opinion on that?
25 A   My opinion is they are predominantly from El Salvador

## Tariche-Direct/Donoghue

342

1 and Honduras.
2 Q   Have you been able to formulate an opinion regarding
3 how the gang is organized?
4 A   Yes, I have.
5 Q   And what is your opinion on that?
6 A   My opinion is the gang is organized into groups, also
7 known as cliques, throughout the United States and
8 internationally.
9 Q   That's C-L-I-Q-U-E-S?
10 A   Yes.
11 Q   And is that how the members identify themselves?
12 A   Yes, by their cliques.
13 Q   And do the cliques use different names and titles to
14 differentiate themselves?
15 A   Yes, they do, yes.
16 Q   And how do they do that?
17 A   They can do it a couple of different ways.
18      For example, here on Long Island they will be
19 from a particular area, for example, Hempstead would be
20 known as the Hempstead clique.  Locos Salvatruchas,
21 L-O-C-O-S, S-A-L-V-A-T-R-U-C-H-A-S.  That would be an
22 example of a local clique on Long Island, for example.
23 The other one would be the Brentwood Locos Salvatruchas,
24 or BLS.
25      In addition, they sometimes have taken the names

## Tariche-Direct/Donoghue

343

1 of streets in Los Angeles.
2      For example, the Normandys would be an example,
3 using a Los Angeles name to cover their clique.
4 Q   You used some abbreviations there.  Is it common for
5 different cliques to have abbreviated their names the way
6 you described, HLS being Hempstead, and BLS being
7 Brentwood?
8 A   Yes, it is common to use that practice.
9 Q   Have you been able to formulate an opinion regarding
10 whether the gang holds any type of meetings?
11 A   Yes, I have.
12 Q   What is your opinion?
13 A   The gang holds meetings both within their cliques,
14 which is a small meeting, or they would hold also a
15 universal meeting in which various clique leaders would
16 come together to discuss gang business.
17      Another term they use is Misa, which is M-I-S-A,
18 which is Spanish for mass.
19      THE COURT:  Spanish for what?
20      THE WITNESS:  Mass, M-A-S-S.  Like a church
21 mass.
22 Q   Have you been able to formulate an opinion regarding
23 whether MS-13 members use any symbols to demonstrate their
24 membership?
25 A   Yes, I have.

## Tariche-Direct/Donoghue

344

1 Q   And what symbols do they use?
2 A   The MS-13 members use hand signs to signify their
3 membership, is one way.  They also use specific colors,
4 which are blue and white.  Additionally they use
5 tattooing, MS-13, the letters, and other symbols and
6 Gothic lettering sometimes.  And they also use graffiti to
7 mark their particular neighborhoods.
8 Q   I will approach and hand you what is marked as
9 Government's Exhibit 3, 3-A, 3-B, and 3-C for
10 identification, and ask you to take a look at those.
11      (Handed to the witness.)
12 Q   Do you recognize the photographs?
13 A   Yes.
14 Q   What is depicted in the photographs?
15 A   Various different MS-13 — an example of MS-13
16 graffiti.
17 Q   Do you know who took those photographs?
18 A   Yes, I took them or I was present when they were
19 taken in all four occasions.
20 Q   Okay.
21      Generally where were those photographs taken?
22 A   Exhibit 3 was taken in Hempstead.
23      Exhibit 3-A, 3-B and 3-C were taken at a maximum
24 security prison in El Salvador.
25 Q   And just generally what is depicted in those four

| Tariche-Direct/Donoghue | Tariche-Direct/Donoghue |
|---|---|

<table>
<tr><td colspan="2" align="center">345</td></tr>
</table>

**345**

1 photographs?

2 A   Generally you can see the MS-13 -- some of their

3 symbols, you have the S and the 13 obviously and --

4 Q   Are they just graffiti?

5 A   Yes.

6 Q   And do the photographs fairly and accurately reflect

7 the graffiti that you saw at those locations when the

8 pictures were taken?

9 A   Yes.

10         MR. DONOGHUE:  At this time, your Honor, the

11 government moves to admit Government's Exhibit 3, 3-A, 3-B

12 and 3-C.

13         THE COURT:  Any objection?

14         MR. LA PINTA:  No.

15         THE COURT:  Government's Exhibit 3, 3-A, 3-B,

16 3-C, in evidence.

17         (Whereupon, Government's Exhibits 3, 3-A, 3-B

18 and 3-C were received in evidence.)

19         MR. DONOGHUE:  Thank you.

20         THE COURT:  Now, I just wonder, instead of me

21 having to dim those lights, are these side-views, do they

22 show well?  Let me take a look.

23         MR. DONOGHUE:  They look much better actually

24 than the overhead, your Honor.

25         THE COURT:  All right.

**346**

1         What did you just put up?

2         MR. DONOGHUE:  Government's Exhibit 3, your

3 Honor.

4         (At this time a document was exhibited on

5 courtroom screen.)

6 Q   Turning your attention first to

7 Government's Exhibit 3.

8         Where was that photograph taken?

9 A   In Hempstead.

10 Q   I would like to hand you a laser pointer, and I ask

11 you to walk through that exhibit and tell us what you see

12 in that exhibit in Hempstead.

13         THE WITNESS:  Okay to step down?

14         THE COURT:  Yes.

15         I think I will dim it anyway to see it better.

16 Hold on a minute now.

17         THE WITNESS:  You can see the Gothic lettering,

18 M-S, the 13 above it, the HMS indicating Hempstead Locos

19 Salvatruchas.  Next to that you can see the spelling out

20 of La Mara Salvatrucha.

21 Q   Is there anything at the end of La Mara Salvatrucha

22 that you can make out?

23 A   There is also a 13 and three dots.

24 Q   Turn to 3-A.

25         Would you explain what you see depicted in that

**347**

1 photograph?

2 A   In this photograph we can see the large MS.  This

3 time it is in block lettering.

4         In the middle is the crest from the El Salvador

5 flag.  We have various persons' names.  Again, the LS,

6 with the initials for the different cliques, CMS, BGLS,

7 TLS.

8         In the upper left-hand corner here you can see

9 rest in peace, which are tombstones with gang members'

10 names within the tombstones.

11 Q   Where was this photograph taken?

12 A   This was taken in the maximum security prison in

13 El Salvador.

14         Also, I want to point out in the middle below

15 the crest is a hand sign, which is two fingers, the pinky

16 and pointer finger sticking up, crossed over with the

17 other two fingers in the middle.

18 Q   And that's the pinky and the index finger extended?

19 A   Yes.

20 Q   And what is that?

21 A   That is a hand sign used by the MS-13.

22 Q   And the letters M and S are in blue; is that correct?

23 A   Yes, that's correct.

24 Q   And looking at Government's Exhibit 3-B, would you

25 tell us where this picture was taken?

**348**

1 A   In a maximum security prison in El Salvador.

2 Q   What do you see depicted here?

3 A   Again, lettering, MS, the numbers 13, some initials

4 from cliques below.  MS on top as well.

5 Q   Moving to Government's Exhibit 3-C, would you tell us

6 again where that was taken?

7 A   It was taken at a maximum security prison in

8 El Salvador.  And depicted in this picture are various

9 names, some tombstones again, RIP, with gang members'

10 names.

11 Q   To the left, exactly where you are pointing, would

12 you tell us what that is?

13 A   It is written out Mara Salvatrucha.

14 Q   And that's in blue as well?

15 A   In blue.  Yes.

16 Q   Please return to the witness stand.

17         I will approach and put before you

18 Government's Exhibit 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,

19 15, 16, 17 and 18.

20         (Handed to the witness.)

21 Q   I would ask that you look at those photographs.

22         (Whereupon, at this time there was a pause in

23 the proceedings.)

24 Q   Sir, have you looked at each of those photographs?

25 A   Yes, I have.

| Tariche-Direct/Donoghue | Tariche-Direct/Donoghue |
|---|---|
| 349 | 351 |

**349**

1 Q   Do you recognize what is depicted in those

2 photographs?

3 A   Yes.  These are examples of the tattooing that MS-13

gang members commonly do.

5 Q   Have you seen those tattoos on each of the

6 individuals actually depicted in the photographs?

7 A   Yes, I have.

8 Q   And do the photographs fairly and accurately depict

9 the tattoo that you saw on those individuals?

10 A   Yes, they do.

11       MR. DONOGHUE:  Your Honor, at this time we move

12 to admit Government's Exhibit 4 through 18.

13       THE COURT:  Any objection?

14       MR. LA PINTA:  No.

15       THE COURT:  Government's Exhibit 4 through 18 in

16 evidence.

17       (Whereupon, Government's Exhibits 4 through 18

18 were received in evidence.)

19 Q   Agent Tariche, I would like to just walk through

20 those exhibits, and I will pull up number 4 first.

21       Would you again explain to us what it is we see

22 depicted in that photograph.

23       THE WITNESS:  Is it okay if I stand again with

24 the pointer?

25       THE COURT:  Surely.

**350**

1       THE WITNESS:  Depicted in this photo is the 13

2 tattooed on the chin of an MS-13 gang member.

3 Q   Moving to Exhibit 5.  What do you see there?

4 A   Depicted in this tattoo on the back of an MS-13

5 member, the two letters, MS, New York, FLS, which is his

6 clique, and then the numbers 1 and 3 on the outside of the

7 MS.

8 Q   What clique is FLS?

9 A   Freeport Locos Salvatruchas.

10 Q   And moving on to Exhibit number 6, what do you see

11 there?

12 A   Again, this is from the back of an FLS MS-13 member,

13 and his gang name above that.

14 Q   Okay.

15       Would you just spell that for the record.

16 A   Freeport Locos Salvatruchas.

17 Q   And the name above it?

18 A   The name above it is Huesito, H-U-E-S-I-T-O.

19 Q   Government's Exhibit 7, what is depicted there?

20 A   Depicted is a tattoo of the three dots, which we also

saw the three dots in the previous photo from Hempstead.

22 Q   Moving to Government's Exhibit 8.  What do you see

23 in that exhibit?

24 A   In this exhibit we can see the Gothic lettering MS,

25 which stands for Mara Salvatrucha.  And then spelled out,

**351**

1 El Salvador on the belly.

2 Q   And would you look at Government's Exhibit 9 and tell

3 what is depicted in that exhibit.

4 A   Depicted in this exhibit is the MS-13 hand sign again

5 that we saw from the previous graffiti in the prison cell

6 in El Salvador.

7       We also have numerous tombstones with RIP, the

8 clique initials, and names.

9 Q   Moving on to Government's Exhibit 10, can you tell us

10 what that is?

11 A   This exhibit is a tattoo of a chest of an MS-13 gang

12 member in the block style lettering, MS.

13 Q   Moving on to Government's Exhibit 11, can you tell us

14 what is depicted in that exhibit?

15 A   Depicted in this exhibit are block style lettering on

16 the arms, inner arms, MS, and then 1 and 3.

17 Q   Moving on to Government's Exhibit 12, can you tell us

18 what is depicted there?

19 A   Depicted in this exhibit is a tattoo of the belly

20 area of an MS-13 member, MS in block style lettering in

21 the center.  And outside, 1, 3, MS-13.

22 Q   Moving on to Government's Exhibit 13.

23       Can you tell us what you see in that exhibit?

24 A   This is the tattooing of the back of an MS-13 gang

25 member in Gothic style lettering, the M and the S.  The

**352**

1 hand sign which was on the other tattoo and the prison

2 wall in El Salvador.

3       Also the three dots, and looking inside are

4 other various -- the 13 is right in the center of the M.

5 Q   There are two figures standing on the shoulder blade

6 of that individual, tattooed on the shoulder blade.

7       Can you see what the figures are doing in that

8 portion of the tattoo?

9 A   On the upper shoulder of the tattoo of the MS-13 gang

10 member are figures doing hand signs, M and S.

11       There is another 13 over here in the top of

12 the S.

13 Q   Moving on to Government's Exhibit 14, can you tell us

14 what you see in that exhibit?

15 A   In this exhibit we see again another belly tattoo.

16 The M and S in Gothic lettering, standing for Mara

17 Salvatrucha, with a 13 in the center of the M.

18 Q   Moving on to Government's Exhibit 15, can you tell us

19 what you see there.

20 A   This is the back of an MS-13 gang member, again with

21 the hand sign which we have seen in other tattooing and

22 the graffiti, and the large 1 and 3.

23 Q   Moving on to Government's Exhibit 16, what do you see

24 in that exhibit?

25 A   In this exhibit we see in block style lettering, the

Tariche-Direct/Donoghue

353

1  ^ end pm1 M and S on one wrist. We also see the 13 on the
2  other wrist, and the three dots.
   Q   Moving on to Government's Exhibit 17, would you
   explain what you see depicted on that exhibit?
5  A   Depicted on that exhibit is the face of an MS-13 gang
6  member on the belly of an MS-13 gang member.
7      Written across the forehead is Mara Salvatrucha.
8  On the face, that is. Below it is the clique initials
9  PVLS. And then numerous times on the skull and face are
10 the Gothic lettering, MS.
11 Q   Moving on to Government's Exhibit 18, can you tell us
12 what you see in that exhibit?
13 A   This is a belly tattoo in the Gothic lettering, MS,
14 Roman numeral 10 and 3.
15 Q   Thank you.
16     Please return to the witness stand.
17     Agent Tariche, I will put before you a five-page
18 exhibit, which is marked for identification as
19 Government's Exhibit 18-A.
20     Please take a look at that.
21     (Handed to the witness.)
22 Q   Sir, do you recognize those pages?
23 A   Yes.
24 Q   And what are those pages?
25 A   These pages are examples of correspondence or letters

Tariche-Direct/Donoghue

354

1  between MS-13 members.
2  Q   Okay.
3      And the actual writing, the script has been
4  redacted; is that correct?
5  A   Yes.
6  Q   The only thing that remains are some doodlings in the
7  pages; is that right?
8  A   Yes.
9  Q   And does that photocopy fairly and accurately reflect
10 those portions of the correspondence that had not been
11 redacted?
12 A   Yes, they do.
13     MR. DONOGHUE: Your Honor, at this time I move
14 the admission of Government's Exhibit 18-A.
15     THE COURT: Any objection?
16     MR. LA PINTA: No.
17     THE COURT: Government's Exhibit 18-A, for Abel,
18 in evidence.
19     (Whereupon, Government's Exhibit 18-A was
20 received in evidence.)
   Q   Agent Tariche, I will put on the large screen
   Government's Exhibit 18-A.
23     (At this time a document was exhibited on
24 courtroom screen.)
25     MR. DONOGHUE: Your Honor, can he step down

Tariche-Direct/Donoghue

355

1  again?
2      THE COURT: Yes.
3  Q   This is the first page of 18-A.
4      Would you tell us what you see on that page?
5  A   In this exhibit we see the hand sign, which again we
6  saw on the tattooing and in the cell in the prison in El
7  Salvador, with a 1 and the 3 on the tip of the fingers.
8      You see above that Mara Salvatrucha in Gothic
9  lettering.
10     Upper right-hand corner we see Shorty from PLS.
11 The name of a gang member and the clique.
12     Below that we see the three dots.
13     Moving downward we see letters indicating POR,
14 Vida, V-I-D-A, which is Spanish for life.
15     Then we see Westbury Locotes, L-O-C-O-T-E-S,
16 which indicates the clique for Westbury, and below that
17 Mara Salvatrucha.
18 Q   Moving to page 2 of that exhibit, would you explain
19 what we see there.
20 A   Here we see again the symbol, the hand sign, a
21 picture of the hand sign, and another MS-13 hand sign.
22 This is an S, the hand sign for an S. This upside down
23 would -- is the M. And above it HLS. To the right of it,
24 RLS. And again, the name in the middle, gangster.
25     At the very bottom there is a 1, and the 3 is

Tariche-Direct/Donoghue

356

1  blocked out by the photocopying.
2  Q   Moving to page 3, what do you see there?
3  A   Here in this letter we also see again the hand sign,
4  which we have seen in the other exhibits. We see another
5  hand sign here. And this would be the M. The S hand
6  sign, the hand sign for 1, and the hand sign for 3.
7      So it is MS-13. And we see the three dots
8  within the one. And then the clique above, HLS. And to
9  the right, FLS.
10     Within the letters of the clique you can again
11 see the three dots, one, two, three, and with HLS, and
12 one, two, three, with the FLS.
13 Q   Moving to the next page, what do you see on that
14 page?
15 A   We see in Gothic lettering, Mara Salvatrucha.
16 Q   The next page, what do you see there?
17 A   In the block style lettering, we see the M and the S,
18 with the 13 above it. And then RIP, with the names of
19 gang members below the RIP, and within the M and within
20 the S.
21 Q   Would you please return to the witness stand.
22     Agent Tariche, I will put before you Exhibits
23 19, 20, 20-A, 21, and 21-A for identification.
24     (Handed to the witness.)
25 A   Okay.

| | Tariche-Direct/Donoghue |
|---|---|
| | 357 |

1  Q  You have had a chance to review it?
2  A  Yes.
3  Q  Referring you first to Exhibit 19, 20 and 21.
         Those are photographs; is that correct?
5  A  Yes.
6  Q  And generally what is depicted in those photographs?
7  A  **Generally depicted is MS-13 paraphernalia.**
8  Q  And do you recognize the items that are depicted in
9  those photographs?
10  A  Yes.
11  Q  And do those photographs fairly and accurately
12  represent the items reflected in the photographs?
13  A  Yes.
14         MR. DONOGHUE: Your Honor, at this time I move
15  to admit Government's Exhibit 19, 20 and 21.
16         THE COURT: Does that include 21-A and 20-A?
17         MR. DONOGHUE: I was going to do those next,
18  your Honor.
19         THE COURT: Okay.
20         Any objection?
21         MR. LA PINTA: No, sir.
22         THE COURT: Government's Exhibits 19, 20 and 21,
23  in evidence.
24         (Whereupon, Government's Exhibits 19, 20 and 21
25  were received in evidence.)

| | Tariche-Direct/Donoghue |
|---|---|
| | 358 |

1  Q  And Exhibit number 20 is a photograph of a
2  handkerchief; is that correct?
3  A  Yes.
4  Q  And referring you to Exhibit 20-A, is that the actual
5  handkerchief that is in the photograph?
6  A  Yes, it is.
7  Q  Okay.
8         Government's Exhibit 21 is similarly a picture
9  of a handkerchief; is that correct?
10  A  Yes.
11  Q  And is Government's Exhibit 21-A the actual
12  handkerchief that is depicted?
13  A  Yes, it is.
14         MR. DONOGHUE: Your Honor, at this time I move
15  Government's Exhibit 20-A and 21-A.
16         THE COURT: Any objection?
17         MR. LA PINTA: No.
18         THE COURT: Government's Exhibit 20-A and 21-A
19  in evidence.
20         (Whereupon, Government's Exhibits 20-A and 21-A
21  were received in evidence.)
22         MR. LA PINTA: Judge, may we approach, please?
23         THE COURT: Yes. Come on up.
24
25

| | Tariche-Direct/Donoghue |
|---|---|
| | 359 |

1         (Whereupon, at this time the following took
2  place at the sidebar.)
3         MR. LA PINTA: I'm sorry to interrupt, I need to
4  take a bathroom break.
5         THE COURT: We will take a recess now.
6         MR. LA PINTA: Please.
7         THE COURT: Surely.
8
9         (Whereupon, at this time the following takes
10  place in open court.)
11         THE COURT: We are going to have to take a
12  recess. Something has come up and I have to take care of
13  it.
14         In the meantime, please don't discuss the case
15  and keep an open mind.
16         This is not bad because you have an opportunity
17  to walk around and get a little exercise.
18         Please recess yourselves.
19         It will be only a five or ten-minute break.
20         (Whereupon, at this time the jury leaves the
21  courtroom.)
22
23         (Whereupon, a recess was taken.)
24
25

| | Tariche-Direct/Donoghue |
|---|---|
| | 360 |

1         THE CLERK: Jury entering.
2         (Whereupon, the jury at this time entered the
3  courtroom.)
4         THE COURT: Please be seated, members of the
5  jury.
6         You may proceed, Mr. Donoghue.
7         MR. DONOGHUE: Thank you, your Honor.
8  BY MR. DONOGHUE:
9  Q  Agent Tariche, you left off with Exhibit 18-A.
10         I would like to move now to Exhibit 19, and ask
11  you, can you tell us what is depicted in that photograph?
12  A  **Depicted in this photograph is a belt buckle of an**
13  **MS-13 gang member.**
14  Q  And you see the numbers 1 and 3 on the buckle; is
15  that correct?
16  A  Yes.
17  Q  And moving on to Exhibit 20, that is one of the
18  handkerchiefs; is that correct?
19  A  Yes, that's correct.
20  Q  And what is it we see depicted in
21  Government's Exhibit 20?
22  A  **We see along the top the letters FLS. The S has**
23  **three dots within it.**
24         **Moving down the handkerchief you see the Gothic**
25  **lettering M, S in the middle.**

Tariche-Direct/Donoghue

361

1    At the bottom there is a 1 and 3 with the
2  El Salvador flag.
3  Q    Between the 1 and 3?
4  A    Yes.
5  Q    Are those the correct colors of the El Salvador flag,
6  blue and white?
7  A    Yes.
8  Q    And do you know if that is why MS-13 uses blue and
9  white?
10  A    Yes, that's correct.
11  Q    And moving to Exhibit 21, again a photograph of a
12  handkerchief.
13       Can you tell us what is depicted there, sir?
14  A    Yes.
15       In this handkerchief you can see at the very top
16  Gothic lettering, M and S.  In-between it is La Mara in
17  block lettering.  Moving down the handkerchief on the
18  outside, you can see the numbers 1 and 3.  In-between the
19  1 and 3 is Salvatrucha, MS-13 La Mara Salvatrucha along
20  the top.  Moving down is the Spanish word, Somos, meaning
21  we are.
22  Q    Is that S-O-M-O-S?
23  A    Yes, S-O-M-O-S.
24       The next word is Pelones, and that's
25  P-E-L-O-N-E-S.  And that's the name of the clique.

Tariche-Direct/Donoghue

362

1       Below that it says Locotes, which is spelled
2  L-O-C-O-T-E-S, which means the crazy one.
3       The Spanish word Por, which is P-O-R, below
4  that.  And next to it another word, Vida, which is
5  V-I-D-A.
6       So altogether it says we are the crazy Pelones,
7  Somos Pelones Locotes Por Vida.
8  Q    Showing you now what is marked as
9  Government's Exhibit 22 for identification.
10       That is a computer disk; is that correct?
11  A    Yes, that's correct.
12  Q    Do you recognize the disk?
13  A    I do recognize the disk.
14  Q    How do you recognize it?
15  A    Because I have used it many times.
16  Q    Do you recognize the writing on the disk?
17  A    Yes.
18  Q    Do you know what is contained on the disk?
19  A    Yes, contained on the disk is a video of an MS-13
20  member's wake in Hempstead.
21       MR. DONOGHUE:  We move Government's Exhibit 22
22  for Identification into evidence.
23       THE COURT:  Any objection?
24       MR. LA PINTA:  No, your Honor.
25       THE COURT:  Government's Exhibit 22 in evidence.

Tariche-Direct/Donoghue

363

1       (Whereupon, Government's Exhibit 22 was received
2  in evidence.)
3       MR. DONOGHUE:  Give me one minute to load this,
4  your Honor.
5       THE WITNESS:  Is it all right if I step out,
6  your Honor, to explain the video?
7       THE COURT:  Surely.
8  Q    Agent Tariche, what I will do is begin to play this
9  recording and just ask that you explain to us what we see
10  in the recording as it rolls.
11       (Videotape is played.)
12  A    A wake of an MS-13 member at a funeral home in
13  Hempstead.
14       We see groups or cliques coming up together and
15  placing paraphernalia into the coffin, and paraphernalia
16  being handkerchiefs.  And this particular clique or group
17  is down and they are exhibiting hand signs that we saw, we
18  saw in the graffiti and the tattooing and the
19  correspondence.
20       Several members here are using the hand signs,
21  and several bandanas have been placed on the body of the
22  MS-13 member.
23       We see the members wearing the blue bandanas
24  here, and more of the MS-13 hand signs in front of the
25  coffin.

Tariche-Direct/Donoghue

364

1       The 1 and the 3.
2       More members in the back using the hand signs.
3       Here you have more members with blue bandanas.
4       Now, we fast forward it.  It is a seven minute
5  CD of a much longer tape.  And another group or clique has
6  approached together the coffin of the MS-13 gang member.
7  And, again, some using the hand signs of the new clique or
8  group that has come to the coffin.
9       That was a quick flash of a hand sign, an MS-13
10  hand sign in front of the camera.
11  Q    The individual standing closest to the coffin, can
12  you see what is on his neck?
13  A    Yes.
14       This individual is wearing blue and white beads,
15  which is another paraphernalia used by the MS-13 to
16  indicate their membership into the gang.
17  Q    At the end of this clip, can you see what he does
18  with the beads?
19  A    The video is going to depict him removing his beads
20  and quickly placing it into the coffin.
21       Now, this is a third group or clique approaching
22  together in front of the casket and you will see their
23  hand signs as well.
24       Here are more members using hand signs.
25       Again, the placing of the bandanas and

| Tariche-Direct/Donoghue | Tariche-Redirect/Donoghue |
|---|---|
| 365 | 367 |

Tariche-Direct/Donoghue — 365

1 paraphernalia into the coffin.
2 Q   As the members walk by the coffin single file, do you
3 see any hand signs?
   A   Yes, they are doing hand signs to the coffin as they
5 walk by, one by one.
6        Some are wearing, again, the blue bandanas.
7        More hand signs as they walk past the coffin.
8        Another member placing a bandana into the
9 coffin.
10 Q   What do you see at this point?
11 A   This is outside the funeral home, and members
12 throwing signs, MS-13 signs at the person taking the
13 video.
14        The same hand signs you saw in the tattooing and
15 the graffiti, and it is throughout the video.
16        Here more hand signs.
17 Q   Do you see them spelling out hand signs?
18 A   I believe they are spelling out HLS, their clique,
19 the Hempstead Locos Salvatruchas.
20        (Videotape is stopped.)
21 Q   The video has ended.  You can take the witness stand,
22 Agent Tariche.
23        MR. DONOGHUE:  Your Honor, thank you.
24        I have no further questions.
25        THE COURT:  Cross-examination.

Tariche-Redirect/Donoghue — 367

1 Q   And I believe there were four altogether; is that
2 correct?
3 A   Yes.
4 Q   And how much time would you say totally you spent in
5 El Salvador?
6 A   Roughly a week each.  So approximately a month.
7 Q   Would you agree with me that it is a very depressed
8 economy there, sir?
9 A   Yes.
10 Q   And that poverty is very widespread?
11 A   Yes.
12        MR. LA PINTA:  I have nothing further.
13        Thank you.
14        THE COURT:  Anything else?
15        MR. DONOGHUE:  Very briefly, your Honor, if I
16 may.
17
18 REDIRECT EXAMINATION
19 BY MR. DONOGHUE:
20 Q   Mr. LaPinta asked you about whether you were on the
21 task force in 2003.
22        These opinions that you have formed that you
23 presented in your direct regarding the MS-13, do you
24 believe that those were all in place, or that those facts
25 were established prior to 2004?

| Tariche-Cross/LaPinta | Tariche-Redirect/Donoghue |
|---|---|
| 366 | 368 |

Tariche-Cross/LaPinta — 366

1
2 CROSS-EXAMINATION
3 BY MR. LA PINTA:
4 Q   Agent Tariche, the video that we just saw does not
5 involve this case; is that right?
6 A   That's correct.
7 Q   It has nothing at all to do with this case in terms
8 of the deceased; is that correct?
9 A   Correct.
10 Q   Sir, in 2003 you were not part of the Long Island
11 bureau; is that correct?
12 A   I was part -- not part of the task force, no.
13 Q   And you were not involved in the investigation into
14 the death of Jesus Valentin?
15 A   Right.
16 Q   And you were not involved in the arrest of
17 Mr. Rubi-Gonzalez?
18 A   That's correct.
19 Q   And you came onto the task force at a later date; is
20 that correct?
21 A   That's correct.
22 Q   During your direct testimony, sir, you explained that
23 you have had an occasion -- I should say numerous
24 occasions -- to go go El Salvador?
25 A   Yes.

Tariche-Redirect/Donoghue — 368

1 A   Yes.
2 Q   Why?
3 A   Because of the nature of the MS-13, the MS-13
4 beginning in Los Angeles going back to the middle 90's, at
5 which time I was in Los Angeles.
6 Q   And some of these things that you reviewed in terms
7 of recordings, like the video or audio recordings that you
8 reviewed, were some of them prior to 2003?
9 A   Yes.
10        MR. DONOGHUE:  Thank you.
11        No further questions.
12        THE COURT:  Anything else?
13        MR. LA PINTA:  Nothing.
14        THE COURT:  You may step down, Agent.
15        (Whereupon, the witness leaves the witness
16 stand.)
17        THE COURT:  Please call your next witness.
18        MR. DURHAM:  Your Honor, the government calls
19 Roberto Romero.
20        Your Honor, may counsel approach very briefly?
21        THE COURT:  Yes.  Come up.
22
23
24
25

Exhibit J

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,         :      CR 03 851

     v.                            :      U.S. Courthouse
                                  Central Islip, N.Y.
LEDWIN CASTRO,                     :
                              :      TRANSCRIPT OF PROCEEDINGS
          Defendant.
                              :      September 15, 2009
------------------------------X      1:40 P.M.

BEFORE:

     HONORABLE ARTHUR D. SPATT, U.S.D.J.


APPEARANCES:

For the Government:   BENTON J. CAMPBELL
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722.
                     By:  RICHARD P. DONOGHUE, ESQ.
                          JOHN J. DURHAM, ESQ.
                          Assistants, U.S. Attorney


For the Defendants:   PETER J. TOMAO, ESQ.
                     226 Seventh Street
                     Garden City, New York 11530
                     For Defendant Castro


Court Reporter:       HARRY RAPAPORT, C.S.R.
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105


Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

21

THE COURT:  I will deny that motion.

After he testifies he can sit in the courtroom, and he can sit at your counsel table.  There is nothing wrong with that.

That leaves us with the Daubert situation.

Now, that is an interesting one because of the fact that we had a sociologist testify.  That was very innovative, Mr. Tomao.  It might not be successful, but very innovative.

Let's lay the foundation to that by saying Federal Rule of Evidence 702 permits an expert to offer testimony in the form of an opinion if his or her, quote, scientific, technical or other specialized knowledge will assist the trier of the fact to understand the evidence or to determine a fact in issue, end quote, provided that the testimony is based on sufficient facts or data; second, that the testimony is the product of reliable principles and methods; and, third, that the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 the Court must determine whether an expert's opinion on the subject will assist the trier of fact, or, in other words, be helpful to the jury.

In addition, the Supreme Court has instructed district courts to serve as, quote, gatekeepers, end quote, and ensure that expert testimony -- and here is the

key -- quote, rests on a reliable foundation, end quote.
And that's the Daubert and the Kumho cases.

So, the Court must determine whether the
expert's testimony is grounded on sufficient fact or data,
the product of reliable methods, and that the witness
applied these methods reliably.

And they have all kinds of other tests as to
whether the evidence is reliable.

Of course, this rule, Daubert, has been applied
to all expert testimony; and not only scientific testimony
which Daubert really centered on -- not only testimony of
a technical nature, such as in a products liability case,
or a case involving ballistics. But in all other cases
where experts testified.

So that Daubert really eliminated what used to
be known as the general acceptance standard. And now we
have other tests, including the main one, reliability --
relevancy and reliability.

And we know prior to the Second Circuit case in
this case that law enforcement officers have been
permitted to give expert testimony with respect to the
organization of criminal enterprises, such as organized
crime and gangs.

In United States against Williams, which is 2007
US appellate LEXIS 24726, decided October 31st, 2007, the

23

Court went through an excellent discussion about, for example, in that case it was a firearm expert, and that Daubert makes plain that Rule 702 embodies a more liberal standard of admissibility for expert opinions than the previous case called Frye against United States, which is still the law, I believe, in the state court, and emphasizes that Rule 702 requires a District Court to fulfill the gatekeeping function of ensuring that the testimony is reliable. That's the key word.

In the case involving this case in the Second Circuit, United States against Mejia, M-E-J-I-A, 545 F.3d 179, Second Circuit 2008, they talked about the emergence of the officer/expert. Starting in the 1980's a new type of expert witness emerged, namely, the law enforcement officer. And the government began calling law enforcement officers to testify as experts in what is referred to as, quote, the nature and structure of organized crime families, end quote, which started as far back as 1988, approved by the Second Circuit.

In 1986 when the Court first reviewed the challenge for the use of such an expert in United States against Ardito, 782 F.2d 358, Second Circuit 1986, when the government called an FBI agent to testify as an expert about terms such as, captain, capo, regime and crew. The Second Circuit upheld the admission of that testimony

24

about the organization and the terms used in the
organization because it aided the jury in its
understanding of recorded conversations in the case. And
they were talking about such things as captain and capo
and so forth, and crew, and as long as the District Court
reminded the jury that this was for the purpose of what it
was.

One year after that case in 1987, the Court
upheld the admission of expert testimony by a law
enforcement officer on the related matter on the meaning
or message -- of messages written in code. In other
words, these two men were talking, using words that we
normal people never heard of. And that was upheld,
explaining what the code names were. So, it is
organization, the people within the organization, the
positions within the organization and the code names used
by organization members.

There is testimony by agents identifying the
five organized crime families that operate in the New York
area; the requirements for membership; the rules of
conduct; the code of silence; and the meaning of the
jargon.

And yet, there is a thin line between the
explanation of the terms of the organization and the
membership, the types of members, captains, etcetera,

25

associates, and the jargon. And there is a thin line between that and factual evidence about what the organization does or did, which information was received from witnesses. And that, of course, runs into the Crawford problem where testimonial evidence of that kind, without an opportunity to be heard by the defense is not admissible.

So, we have to be very careful about that.

One of the important cases, United States against Dukagjini, D-U-K-A-G-J-I-N-I, 326 F.3d 45, Second Circuit 2003, they went too far.

While the agent testified to the word of the trade jargon in general practices of drug dealers, and interpreted various terms such as, quote, dry, end quote, and, quote, cooked, end quote, the agent also addressed specific exchanges in recorded conversations and explain their meaning to the jury. And the Second Circuit said that in that respect, explaining these conversations about what they were doing strayed from the proper expert's function.

And the fact that the government's decision to call the case agent as the expert in that case increased the likelihood that inadmissible and prejudicial testimony would be offered.

So, the Second Circuit identified two ways that

this testimony could not come in, and that, one, about the meaning of conversations in general beyond the interpretation of code words, and relying on hearsay statements that went outside the scope of expertise.

And, so, in this case that went up before the Second Circuit, the convictions were reversed because of the agent's reliance on inadmissible evidence and explaining such evidence to the jury in violation of Crawford.

There was another case tried, and I tried the retrial, as a matter of fact, United States against Rubi-Gonzalez, where the original trial was reversed because of the expert testimony. Currently the same expert had testified, who had testified in this original trial had testified in that original trial. And he testified about matters that the average juror could understand, which violates the rule. As a de facto case agent repeating hearsay evidence and stating out of court testimonial statements made by certain individuals during the course of custodial interrogations, which violated Crawford.

In that case the agent testified that MS-13 dealt in marijuana and cocaine, stole cars and murdered rival gang members in the case of turf wars, and went far beyond interpreting jargon or coded messages, describing

membership rules, or explaining organizational hierarchy.
That's the main thing, organizational hierarchy. The
agent transmitted hearsay evidence directly to the jury.
The evidence included books, newspaper articles, websites,
audio recordings and conversations with other law
enforcement officers. He communicated out-of-court
testimonial statements of cooperating witnesses and
informants directly to the jury in the guise of expert
opinion. He in fact was summarizing investigations made
by other agents.

The Second Circuit held that not with standing
what could be called overwhelming evidence, his
erroneously admitted testimony was not harmless and they
reversed the conviction.

Well, in this case we have the testimony of
Reynaldo Tariche -- is that right, Tariche, Agent?

S/A TARICHE: Yes, sir.

THE COURT: Reynaldo Tariche has been a
Special Agent of the FBI for nineteen years. He has a
bachelor of science degree in finance. He had the usual
sixteen-week FBI Academy training, and special street
force training. He was assigned to Long Beach, California
in 1990, in the violent crime task force, where he
conducted surveillances, arrests and search warrants.

His investigation included gangs like MS-13 in

28

California, and then he came to Long Island where he investigated the Bloods, the Crypts, the Latin Kings, the Hells Angels, the SWP and the MS-13. He testified that the largest gang on Long Island was the MS-13.

And this is how he knows about MS-13:

Personal investigation audio and physical surveillance of the meetings of MS-13, audio recordings and telephonic recordings of members of MS-13.

He reviewed correspondence and letters involving MS-13 members. He participated in arrests and searches. He coordinated with other law enforcement officers. He interviewed members and associates. He interviewed some 40 members, and 20 were in custody. He arrested 25 members of MS-13.

He also interpreted -- he found out, learned about and knows about the tattoos of MS-13, the one on the chin, the one and the three on the belly, MS-13; on the back, MS-13 with the hand sign.

I don't know how to do the hand sign too well, but something like that (indicating).

The three dots that he explained meant the three places that MS-13 members end up, prison, hospital and cemetery, the three dots.

And he showed us photographs of all of these hand signs, MS-13, three dots. They were on the back, the

chest, the hands, the forearms, the stomachs and the hand

signs, and the graffiti; the handkerchiefs with the blue

and white color of El Salvador.

He reviewed videos of MS-13, made by MS-13

members at wakes. He was familiar with investigations

made by other agents in the FBI, both in New York,

California, Texas, Virginia. He went to El Salvador

several times to investigate MS-13 gangs. He attended

five seminars on gangs, including when he was the

instructor, and reviewed books and articles. And he gave

certain opinions which are what the government intends to

put in evidence, if I find that he is a reliable expert

witness.

His opinions are that the gang, the MS-13,

originated in Los Angeles, and thereafter spread to

throughout the United States, Texas, Virginia, New York.

Also gangs were in Central America and Mexico, El

Salvador, Honduras.

His opinion included that these MS-13 -- that

the MS-13 hold meetings. They have two types of meetings,

a clique meeting, the small group, and a universal meeting

comprised of several cliques.

He did not use any information, he said, from

interviews with witnesses. He obtained all this

information over the years by investigation and working on

this subject. In fact, he said he can set aside in-custody interviews. He can set aside any information he obtained from the defendants in this case. He was not the case agent on this June 18th, 2003 shooting. And although he knows the previous agent who testified as an expert, he never relied on any information from him.

He was vigorously cross-examined by Mr. Tomao. And it was brought out during cross-examination that he started giving lectures on this subject after 2004, and attended conferences after 2004; that he looks at reliability of the sources.

I think that's about what I got from the expert's testimony. Very innovatively the defense put a case on. The defense in this Daubert hearing put on Dr. Louis Kontos, an adjunct associate professor at John Jay College, and another college which I didn't get the name of.

MR. TOMAO: It was Hunter, your Honor.

THE COURT: Pardon?

MR. TOMAO: Hunter.

THE COURT: Hunter College. Thank you.

He has a Ph.D. in sociology. So, he is a sociologist. He previously was an associate professor at LIU and Northeastern University. He taught courses in deviance in social control, published two books on street

gangs.

He sat in the court and heard the testimony of Special Agent Tariche, and he reviewed the testimony that was elicited during the Rubi-Gonzalez case.

He said that there are different methodologies in determining these matters as a sociologist and as a Special Agent of the FBI.

He says -- he testified that he was familiar with the methodology of law enforcement techniques. He taught Massachusetts State Troopers and he taught at John Jay College.

He gave his opinion about this type of testimony. He said he was concerned with contradictory views.

It's not good to say, quote, I studied 20 gang members, end quote, and, therefore, I know what I'm talking about. He says a lot of other things have to be done.

He says that overgeneralization and overstatement is a problem.

As to the methodology of Special Agent Tariche, he objects to certain words, such as research, operation and gang. That he himself worked with gangs since 1986, and that a gang is a complex, loosely knit and disorganized.

And MS-13, he said, is most disorganized, and doesn't support the conclusion that it was a large formal structure.

He doesn't believe that MS-13 13 gangs operate, but that there are certain rituals.

He mentioned the word "synthesize." Which I frankly had trouble understanding.

He said that is not what Special Agent Tariche did. He didn't synthesize.

He testified that he treats the report used by Special Agent Tariche as heuristic, which means shed some light.

And he testified that he doubts that gangs are criminal organizations.

He testifies about harmless little neighborhood cliques, end quote, and apparently it is not MS-13.

And he went on in detail.

He said that many gangs engage in nitpicking and exaggerate their strength, and exaggerate their antisocial nature. It is just acting out, according to him.

I know he stated no authority for this statement, that most gangs exaggerate their strength and antisocial nature and act out these things..

He did testify that Salvadorian police told him, told Dr. Kontos that 40 to 60 percent of the murders are

as a result of gang killings.

And the hospital stated in El Salvador, I
believe, that twelve percent of the murders were
gang-related; and that adult organized criminals were
capable of using the gangs as a method of operation.

He testified that the Special Agent, Tariche,
was not a, quote, social scientist, end quote.

Well, I don't know if he has to be a social
scientist in order to testify about the MS-13 gang.

Also, on cross-examination he admitted that he
is not an expert on the MS-13, never worked in law
enforcement, never arrested anyone, never conducted a
surveillance, nor has he listened to any wiretap of MS-13
members.

He did interview MS members on Long Island and
in Los Angeles. Quote, they are the big problem, end
quote, he said.

He was never to El Salvador.

He published a book on gangs. He edited a book.
He discussed MS-13 gangs, and stated, it's a violent
street ring, R-I-N-G.

And he testified on cross-examination, that he
believed that the MS-13 engages in violence.

He himself conducted interviews, reviewed
literature, and relied on them.

He talked about rituals and symbols, including tattoos, and hand signs.

So, the Court finds the following:

One, Special Agent Tariche does not have to be a sociologist, or a social scientist in order to testify as an expert witness on the MS-13 gang.

Two, Dr. Kontos does not set the only standard for reliable expert testimony on the MS-13 gang..

Three, sociologists don't set the standard for expert testimony by a Special Agent of the FBI expert on the MS-13 gang.

In conclusion, I find that the testimony of Special Agent Reynaldo Tariche, based on his experience, based on his investigation, based on his examination of the video, arrest, searches, over a long period of time, has put him in position to be an expert on the MS-13 gang. The matters on which he testified at this hearing are admissible at the trial.

Namely:  One, the organization of the MS-13 gang; the hierarchy of the MS-13 gang; the membership of the MS-13 gang; the clique; the universal meeting; and the explanation of any code name; and the explanation of any code words can be testified to by Special Agent Tariche. And that's it.

Is there anything else at this time?  I know I